IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| THE CORYN GROUP II, LLC,<br><br>        Plaintiff/<br>        Counterclaim-Defendant,<br>   v.<br><br>O.C. SEACRETS, INC.,<br><br>        Defendant/<br>        Counterclaim-Plaintiff. | Civil Action No. 08-cv-02764-WDQ<br><br>Judge William D. Quarles, Jr.<br><br>Magistrate Judge Susan K. Gauvey |
| O.C. SEACRETS, INC.,<br><br>        Third-Party Plaintiff,<br>   v.<br>THE CORYN GROUP, INC.,<br><br>        Third-Party Defendant,<br>   and<br>AMRESORTS, LLC,<br><br>        Third-Party Defendant. | |

**DEFENDANT/COUNTERCLAIM-PLAINTIFF O.C. SEACRETS, INC.'S MEMORANDUM IN
OPPOSITION TO THE CORYN GROUP II, LLC
AND AMRESORTS, LLC'S MOTION FOR SUMMARY JUDGMENT**

REDACTED VERSION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ................................................................................. 1

II.  STATEMENT OF MATERIAL FACTS............................................... 3

    A.   O.C. Seacrets, Inc............................................................................. 3

        1.   O.C. Seacrets, Inc. is the prior user and federal registrant......................... 4

        2.   Seacrets' customers and advertising. ........................................................ 5

    B.   The Coryn parties......................................................................... 7

        1.   Coryn Group, Inc., Coryn Group II, LLC and AMResorts, LLC. .............. 7

        2.   Coryn's customers and advertising. ........................................................ 9

        3.   Adoption of the SECRETS Mark by Coryn ............................................ 15

III. GENUINE ISSUES OF MATERIAL FACT PRECLUDE CORYN'S PARTIAL
MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES
AND DISGORGEMENT OF PROFITS UNDER 15 U.S.C. § 1117............................. 16

    A.   There is ample evidence of willful infringement by Coryn together with a
reckless and wanton disregard of Seacrets' rights in and to the SEACRETS
mark. ................................................................................................. 18

        1.   Coryn improperly conflates "bad faith" with "willfulness." ................... 18

        2.   The evidence of record supports a finding of willfulness and of a
reckless and wanton disregard of Seacrets' rights. ................................. 20

    B.   Whether sales have been diverted......................................................... 22

        1.   Coryn narrowly interprets this factor with mechanical precision
rather than with equitable consideration................................................. 22

        2.   The actual injury and harm to Seacrets is overwhelming. ........................ 23

    C.   Adequacy of other remedies. .............................................................. 27

          1.    Injunctive relief alone will not compensate Seacrets for the willful and reckless infringement by Coryn. ....................................................... 27

          2.    Disgorgement of Coryn's Profits is the only remedy to compensate Seacrets for the willful and reckless infringement.................................... 28

    D.    There has been no unreasonable or inexcusable delay by Seacrets in charging Coryn with infringement, nor has there been any prejudice by Coryn................................................................................................................ 30

          1.    Coryn misinterprets this factor.................................................................. 30

          2.    Seacrets' filing a petition to cancel tolls any delay or *laches*. .................. 31

          3.    Coryn fails to allege any prejudice. .......................................................... 35

    E.    The public interest............................................................................................... 35

          1.    The public interest is served by a disgorgement of Coryn's profits. ......... 35

          2.    Coryn's willfulness and reckless behavior should be made unprofitable. ............................................................................................... 36

          3.    There is a stronger public interest in a disgorgement of profits when "reverse confusion" is involved. ...................................................... 36

    F.    Palming off........................................................................................................... 38

IV.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE CORYN'S PARTIAL MOTION FOR SUMMARY JUDGMENT ON THE ISSUES OF DAMAGES AND PUNITIVE DAMAGES UNDER MARYLAND COMMON LAW .................... 38

    A.    Actual Damages ................................................................................................... 38

    B.    Punitive damages ................................................................................................ 39

    C.    The evidence of record supports a finding of Coryn's "wanton" infringement in total disregard of Seacrets' rights meriting an award of punitive damages. ............................................................................................... 40

V.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF ATTORNEY FEES. ................................................. 41

VI.    CONCLUSION............................................................................................................ 42

## TABLE OF AUTHORITIES

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 228, 57 U.S.P.Q.2d 1097 (3rd Cir. 2000) ............................................................................................... 36

*A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc.,* 61 F. Supp. 2d 426, 433 (D. Md. 1999) ......................................................................................................................... 27

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) .................... 16

*Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F. Supp. 1341 (E.D. P.A. 1972) ................................................................................................... 2, 33, 35

*American Farm Bureau Federation v. Alabama Farmers Federation*, 935 F. Supp. 1533, 1549 (M.D. Ala. 1996) ...................................................................................................... 2

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ...... 16, 17

*Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F. Supp. 2d 571 (M.D. N.C. 2009) ................................................................................... 2, 19, 20, 21, 22, 27, 36, 37, 41

*Cuisinarts, Inc. v. Robot-Coupe International Corporation*, 580 F. Supp. 634 (S.D. N.Y. 1984) ......................................................................................................................... 21

*Driving Force, Inc. v. Manpower, Inc.*, 498 F. Supp. 21, 28 (E.D. P.A. 1980) ................ 24, 33, 34

*Finance of America v. BankAmerica Corp.,* 502 F. Supp. 593 (D. Md. 1980) ............ 2, 30, 32, 35

*First Dakota National Bank v. Saint Paul Fire and Marine Ins. Co.,* 2 F.3d 801, 811 (8th Cir. 1993) .................................................................................................................... 22

*Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 475 (3rd Cir. 1994) ................. 36

*Five Platters, Inc. v. Purdie,* 419 F. Supp. 372 (D. Md. 1976) ........................................ 39, 40, 41

*Gardner v. Panama Railroad Co.,* 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) ........... 30

*Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F. Supp. 2d 571 (M.D. N.C. 2009) ........ 2, 19

*Microsoft Corporation v. Grey Computer, et al.*, 910 F. Supp. 1077, 1091 (D. Md. 1995) ......... 19

*Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F. Supp. 2d 460, 488 (D. Md. 1999) ....... 18

*People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370, 60 U.S.P.Q.2d 1109 (4th Cir. 2001) ............................................................................................................ 41

*Rothman v. Greyhound Corp.*, 175 F.2d. 893, 895 (4th Cir. 1949) ............................................. 30

*Roulo v. Russ Berrie Co.*, 866 F.2d. 931, 941 (7th Cir. 1989) .................................................. 27

*Safeco Ins. Co. of America et al. v. Charles Burr et al.*, 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed. 2d 1045 (2007) ........................................................................................................... 18

*Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F. 3d. 455, 467 (4th Cir. 1996) .................................. 25

*Schneider Saddlery Co., Inc. v. Best Shot Pet Products International, LLC*, 2009 WL 864072 fn. 31 (N.D. Ohio 2009) ................................................................................... 3, 23, 31

*Schneider v. Bestshot Pet Products International, LLC*, 2009 WL 864072 (N.D. Ohio 2009) ............................................................................................................. 3, 20, 23, 31

*Seidelman Yachts, Inc. v. Pace Yacht Corp.*, 1989 WL 214497 (D. Md. 1989) ........................... 39

*Shabazz v. Bob Evans Farms, Inc.* 163 Md. App 602, 881 A.2d 1212 (Md. App 2005) ............. 39

*Sterling Acceptance Corporation v. Tommark, Inc. d/b/a Sterling Associates*, 227 F. Supp. 2d 454 (D. Md. 2002) ............................................................................... 17, 18, 38

*Synergistic International LLC v. Korman*, 470 F.3d 162, 81 U.S.P.Q. 2d 1054 (4th Cir. 2006). ............................................................................... 1, 17, 18, 22, 27, 38, 39

*The Christian Science Board of Directors of the First Church of Christ v. Robinson*, 2000 WL 33422737 at *8 (W.D. N.C. 2000 March 29, 2000) ............................................. 16

*Therma-Scan, Inc. v. Thermoscan, Inc*, 295 F.3d 623, 638-639 (6th Cir. 2002) ........................ 20

*Tobacco Workers International Union Local 317 v. Lorillard Corp.*, 448 F.2d 949, 958 (4th Cir 1971) .......................................................................................................... 30

*Ty Inc. v. Softbelly's Inc.*, 517 F.3d 494 (7th Cir. 2008) ......................................................... 19

*United States Olympic Committee v. Union Sport Apparel, et al.*, 1983 WL 51932, 220 U.S.P.Q. 526 (E.D. V.A. 1983) .............................................................................. 27

*Venture Out Properties LLC v. Wynn Resorts Holdings, LLC*, 2007 WL 39112, 81 USPQ2d 1887 (TTAB 2007) .............................................................................................. 29

## Statutes

15 U.S.C. § 1051(b)(1) ................................................................................. 31

15 U.S.C. § 1063 ........................................................................................... 30

15 U.S.C. § 1064 .............................................................................. 30, 31, 33

15 U.S.C. § 1071(b) ...................................................................................... 34

15 U.S.C. § 1072 .................................................................................... 16, 20

15 U.S.C. § 1115 ............................................................................................. 4

15 U.S.C. § 1117 ................................................................... 1, 16, 17, 41

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 107 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ......................................................................... 17

*McCarthy on Trademarks and Unfair Competition*, § 30:58 (4th Ed. 2009) .............................. 28

*Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 60 USLW 2636, 22 U.S.P.Q.2d 1050 (4th Cir. 1992) ........................................................ 41

## Other Authorities

*McCarthy on Trademarks and Unfair Competition*, § 23:6, pp. 23-30 (June 2009) .............. 25, 26

*McCarthy on Trademarks and Unfair Competition*, § 25.1 (March 2009) ................................. 38

## EXHIBITS

**A.     Declaration of Barth X. deRosa, Counsel for O.C. Seacrets, Inc.**

Exhibit 1:      True and correct copy of excerpts from a portion of the TTAB record and contains the October 2, 2006 testimonial transcript of Leighton Moore, President and Owner of O.C. Seacrets, Inc.

Exhibit 2:      True and correct copy of the Declaration of Gary Lee Figgs, Vice President and Chief Financial Officer of O. C. Seacrets, Inc. dated August 28, 2009.

Exhibit 3:      True and correct copy of excerpts from a portion of the TTAB record that contains the certified copy of federal trademark Registration No. 2,102,604 covering the mark SEACRETS as registered by O.C. Seacrets, Inc.

Exhibit 4:      True and correct copy of excerpts from a portion of the TTAB record that contains the certified copy of Application Serial No. 76/593,861 as filed with the United States Patent and Trademark Office on May 25, 2005 to register the mark SEACRETS for "motel services."

Exhibit 5:      True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Eugene Trapkin, President and Owner of Sheridan Sign Company, Inc., a third party witness, dated November 2, 2006.

Exhibit 6:      True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Joseph Giannotta, a former employee of O.C. Seacrets, Inc. and third party witness, dated November 2, 2006.

Exhibit 7:      True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Leighton Moore dated November 21, 2006.

Exhibit 8:      True and correct copy of excerpts from the discovery deposition of Gary Lee Figgs dated September 8, 2009.

Exhibit 9:      True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Gary Lee Figgs dated October 2, 2006.

Exhibit 10:     True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Leighton Moore dated October 4, 2006.

Exhibit 11:     True and correct copy of excerpts from a portion of the TTAB records that contains the testimonial transcript of Michael Noah, Director of Tourism for the Department of Tourism for Ocean City, Maryland, a third party witness, dated October 5, 2006.

Exhibit 12:   True and correct copy of excerpts from a portion of the TTAB record that contains the discovery deposition of Robert Thaler, Director of Finance of Atkinson and Mullen Travel, Inc. d/b/a Apple Vacations, dated March 1, 2005.

Exhibit 13:   True and correct copy of the discovery deposition of Kevin Wojciechowski, Executive Vice President of Sales and Marketing for AMResorts, LLC, dated September 30, 2009.

Exhibit 14:   True and correct copy of excerpts from the Expert Damages Report of Joseph Epps dated July 31, 2009.

Exhibit 15:   True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Alejandro Zozaya, President of AMResorts, LLC, dated September 29, 2006.

Exhibit 16:   True and correct copy of Doc. Nos. AMR00029397-00029418 produced by AMResorts LLC during the course of this proceeding.

Exhibit 17:   True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Colleen Caponi, Senior Marketing Executive of AVW, Inc. d/b/a Apple Vacations, dated March 2, 2007.

Exhibit 18:   True and correct copy of excerpts from a portion of the TTAB record that contains the discovery deposition of Jan LaPointe, Director of Marketing and Distribution for AMResorts, LLC, dated March 1, 2005.

Exhibit 19:   True and correct copy of excerpts from a portion of the TTAB record that contains the testimonial transcript of Jan LaPointe dated February 28, 2007.

Exhibit 20:   True and correct copy of excerpts from a portion of the TTAB record that contains the discovery deposition of Jeffrey Mullen, President of Coryn Group, Inc., now Coryn Group II, LLC dated June 21, 2005.

Exhibit 21:   True and correct copy of excerpts from a portion of the TTAB record that contains the Thomson & Thomson search results conducted by AMResorts LLC in connection with the availability of the SECRETS mark by Eugene Renz, P.C., one of the former attorneys for AMResorts LLC and Coryn Group, Inc.

Exhibit 22:   True and correct copy of web pages from the Whois website showing the <secrets.com> domain name was registered on June 29, 2000.

Exhibit 23:   True and correct copy of federal trademark Registration No. 2,760,264 covering the mark SUNSCAPE for "resort hotel and restaurant services" dated September 2, 2003 as obtained by Coryn Group, Inc.

Exhibit 24:   True and correct copy of excerpts from a portion of the TTAB record that contains a certified copy of Canadian Registration No. TMA738064 as filed by Coryn Group, Inc. on November 14, 2001 to register the mark SECRETS in Canada for "resort hotel; hotel, restaurant and bar services."

Exhibit 25:   True and correct copy of excerpts from the discovery deposition of Leighton Moore dated September 17, 2009.

Exhibit 26:   True and correct copy of excerpts from Expert Report of Mr. Robert Reitter in determining the potential of confusion between SECRETS and SEACRETS dated July 2009.

Exhibit 27:   True and correct copy of the report and declaration dated September 14, 2009 prepared by Alex Simonson in rebuttal of the Expert Report of Kenneth Hollander

Exhibit 28:   True and correct copy of excerpts from a portion of the TTAB record that consist of the petition to cancel as filed by O.C. Seacrets, Inc. in January 2004 against Registration No. 2,772,061 covering the mark SECRETS as registered by The Coryn Group, Inc.

Exhibit 29:   True and correct copy of excerpts from the expert report of Jarosz dated September 18, 2009 in rebuttal of the Expert Report of Joseph Epps.

Exhibit 30:   True and correct copy of Doc. Nos. AMR00028446-28562 that was produced by AMResorts LLC during the course of this proceeding.

Exhibit 31:   True and correct copy of the discovery deposition of Francisco Javier Coll de san Simon, Chief Financial Officer for AMResorts LLC, dated October 13, 2009.

Exhibit 32:   True and correct copy of excerpts from a portion of the TTAB record that contains O.C. Seacrets' response to Interrogatory No. 29(c) as served on Coryn Group, Inc. on April 7, 2004.

Exhibit 33:   True and correct copy of a report generated by Google Analytics showing the geographical location of visitors to <seacrets.com> (PX-90221-90225) produced during the course of this proceeding.

Exhibit 34:   True and correct copy of excerpts from a portion of the TTAB record that consist of the discovery deposition of Alejandro Zozaya dated June 22, 2005.

## B.   Declaration of Karen A. Kovacs, Counsel for O.C. Seacrets, Inc.

Exhibit 35:   True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Silversands Riviera Cancun posted on September 25, 2009.

Exhibit 36:   True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Silversands Riviera Cancun posted on July 24, 2009.

Exhibit 37:     True and correct copy of a web page printed on November 18, 2009 from  showing a traveler review of Secrets Silversands Riviera Cancun posted on July 11, 2009.

Exhibit 38:     True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Silversands Riviera Cancun posted on June 23, 2009.

Exhibit 39:     True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Silversands Riviera Cancun posted on May 20, 2009.

Exhibit 40:     True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Maroma Beach Riviera Cancun posted on August 27, 2009.

Exhibit 41:     True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Maroma Beach Riviera Cancun posted on May 26, 2009.

Exhibit 42:     True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Maroma Beach Riviera Cancun posted on June 29, 2009.

Exhibit 43:     True and correct copies of web pages printed on November 18, 2009 from  showing a traveler review of Secrets Maroma Beach Riviera Cancun posted on December 4, 2008.

Exhibit 44:     True and correct copies of web pages printed on November 18, 2009 from <www.google.com> when the term "secrets" was entered into the search engine.

Exhibit 45:     True and correct copies of web pages printed on November 18, 2009 from <www.bing.com> when the term "secrets" was entered into the search engine.

**C.          Declaration of Roy E. Crockett, IT Coordinator for O.C. Seacrets, Inc.**

**D.          Declaration of Gary Lee Figgs, Vice President and CFO of O.C. Seacrets, Inc.**

Exhibit 46:     True and correct copy of a report entitled "Seacrets.com Web Statistics Reports - Key Phrase Search Summary (April 2008 - July 2009) (PX-80954-81324).

## I.    INTRODUCTION

Plaintiff/Counterclaim-Defendant The Coryn Group II, LLC and Third-Party Defendants The Coryn Group, Inc. and AMResorts, LLC (herein as "Coryn") have moved for partial summary judgment on the issues of damages and attorney fees.  Coryn has not moved on the issue of liability for its acts of infringement and unfair competition; the availability of permanent injunctive relief; nor has it challenged on motion for summary judgment whether the August 20, 2008 decision of the U.S. Trademark Trial and Appeal Board is supported by "substantial evidence."  The sole assertion by Coryn is that all of the equitable factors a court should now consider in awarding damages under 15 U.S.C. § 1117 allegedly favor Coryn, and there is no evidence, in its view, justifying that this case is "exceptional," meriting an award of attorney fees.

Defendant/Counterclaim-Plaintiff O.C. Seacrets, Inc. (herein "Seacrets") vigorously disagrees. There are genuine issues of material fact regarding each of the factors set forth by the court in *Synergistic International LLC v. Korman*, 470 F.3d 162, (4th Cir. 2006).  Specifically, Seacrets, as the undisputed prior user and federal registrant of the SEACRETS mark, sets forth the following genuine issues of material fact relative to each of the factors:

1.    While Seacrets admits there is, to date, no evidence of "bad faith" infringement by Coryn, there is ample evidence that Coryn has acted "willfully" in violation of Seacrets' prior use and registration, and also with a total wanton and reckless disregard of those prior rights.

2.    While Seacrets admits there is, to date, no evidence of "diverted sales," such evidence is not required where there is evidence of "reverse confusion" and "actual confusion" as well as loss opportunity costs.   As noted by some courts, there is economic injury when the senior user is "deprive[d] of the economic benefit of controlling and licensing the right to use the mark." *American*

1

*Farm Bureau Federation v. Alabama Farmers Federation*, 935 F. Supp. 1533, 1549 (M.D. Ala. 1996). Further, "actual injury" is demonstrated when there is evidence of reverse confusion or when there is evidence of actual confusion as here. See *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F. Supp. 2d 571 (M.D. N.C. 2009).

3.      While permanent injunctive relief against further advertisement and promotion of the SECRETS mark by Coryn certainly will provide Seacrets with needed prospective relief, only damages in the form of a disgorgement of Coryn's profits will fully compensate Seacrets for Coryn's blatant and reckless infringement and unfair competition over the past six years.

4.      Contrary to the allegations of Coryn, there has been no delay in charging Coryn with infringement. After being congratulated by a patron about his expansion into Mexico in late 2003, Mr. Leighton Moore, owner and president of Seacrets, moved swiftly by filing with the Trademark Trial and Appeal Board its petition for cancellation in January 2004. As a matter of law, Seacrets' alleged delay was not "inexcusable or unreasonable" when during all times, Seacrets was attempting to resolve the matter via the U.S. Patent and Trademark Office, nor has Coryn shown that it has been prejudiced in any way. See *Finance of America v. BankAmerica Corp.,* 502 F. Supp. 593 (D. Md. 1980); see also *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F. Supp. 1341 (E.D. P.A. 1972).

5.      In accordance with the two primary purposes of the Lanham Act, the public interest will be served by according Seacrets with the full investment it has made in the SEACRETS mark, and by preventing public confusion in deterring larger and financially stronger companies from overwhelming smaller trademark owners with blatant and reckless acts of infringement and unfair competition.

6.      While there is no evidence to date suggesting that Coryn is misrepresenting to the public that its services are actually sponsored, endorsed or affiliated with those of Seacrets (i.e., the historical

concept of palming off), in reverse confusion and in initial interest confusion cases, as here, there is ample evidence that by Coryn's "high end" advertising, Seacrets, as a consequence, is indirectly portrayed as the infringer or a "low class" knock-off of the SECRETS resorts. Within the modern vernacular for "palming off," Coryn's actions are creating confusion.

As to whether this is an "exceptional" case meriting an award of attorney fees, Seacrets respectfully submits that the evidence of actual confusion in this case, after trial, will merit an award of attorney fees. Further, an award of attorney fees is subject to an entirely different analysis than the analysis typically applied to damages and lost profits. *Schneider Saddlery Co., Inc. v. Best Shot Pet Products International, LLC*, 2009 WL 864072 fn. 31 (N.D. Ohio 2009).

For the forgoing reasons, Coryn's motion for partial summary judgment should be denied in its entirety.

## II.    STATEMENT OF MATERIAL FACTS

### A.    O.C. Seacrets, Inc.

Seacrets, a Maryland corporation, owns and operates a Jamaican island themed entertainment complex in Ocean City, Maryland. This entertainment complex, sitting amongst 300-400 imported palm trees and island foliage, presently consists of 17 bars, a restaurant with three areas for dining, ongoing entertainment at various stages throughout the complex, a separate night club, a jetting pier with moorings for boats, jet skis and floats for beach patrons, as well as hotel accommodations and two boutiques. [Ex. 1 Moore 10/02/06 Test. pp. 83-98]. As part of its services, Seacrets also serves as a choice site for weddings and provides related services for wedding receptions, birthdays, retirement parties, corporate functions and charitable events. Between 2004 and 2008, Seacrets, for example, has

been the site for 69 weddings, 228 private functions and 137 charitable events. [Ex. 2 Figgs Declaration].

### 1.   O.C. Seacrets, Inc. is the prior user and federal registrant.

It is undisputed that Seacrets is the prior user and federal registrant of the SEACRETS mark for the services listed above. The mark was first used in June 1988, and Seacrets filed its first application to federally register the SEACRETS mark for bar and restaurant services in 1995. This application resulted in the issuance of U.S. Registration No. 2,102,604 for SEACRETS in 1997 and served as the key registration that supported the TTAB decision in favor of Seacrets. [Ex. 3]. That registration is incontestable by reason of the declaration filed under Sections 8&15 in 2003. Because of its incontestability, the registration is now **conclusive** evidence of the validity of the SEACRETS mark, the validity of its ownership, and of Seacrets' rights to use the mark "exclusively" in commerce against all subsequently used and registered marks that are "confusingly similar" for closely related goods or services. [15 U.S.C. § 1115]. Seacrets also owns Application Serial No. 76/593,861 to register SEACRETS for motel services. The Seacrets motel/hotel opened in the spring of 1999 -- an entire year before Coryn filed its intent-to-use application to register SECRETS for a resort hotel in July 2000.[1] That pending application has been denied registration and is suspended by the U.S. Patent and Trademark Office pending disposition of this present proceeding. [Ex. 4].

███████████████████████████████████████████

███████████████████████████████████████████

---

[1]   On page 9 of its brief, Coryn attempts to create the impression that the Seacrets hotel/motel did not open until 2004. Testimony by three different witnesses establishes that the SEACRETS motel sign was first affixed to a building at the corner of 49th Street and Coastal Highway by Spring of 1999. [Ex. 5 Trapkin Test. pp. 20-21; Trapkin Dep. Exhibit 347 and 348; Ex. 10 Moore 10/04/06 Test. pp. 690-692; 709; Ex. 6 Gionetta Test. pp. 9-11].



[Ex. 1 Moore 10/02/06 Test. pp. 212-219, 249-258; Ex. 7 Moore 11/21/06 Test. pp. 140-149]. ████████

[Ex. 1 Moore 10/02/06 Test. pp. 252-253; 255-256].

[Ex. 8 Figgs 09/08/09 Test. pp. 248-249].

## 2.     Seacrets' customers and advertising.

On a typical summer weekend, Seacrets usually will serve between 4,000-6,000 patrons each day. [Ex. 1 Moore 10/02/06 Test. pp. 78-80; Ex. 10 Moore 10/04/06 Test. pp. 493-495]. ████████ [Ex. 9 Figgs 10/02/06 Test. p. 92]. Throughout the remainder of the year, Seacrets shifts to a more modest atmosphere focusing on dining, event planning, sports promotion and nightly entertainment at its night club or in the bar areas with DJs, comedians and miscellaneous acts. [Ex. 1 Moore 10/02/06 Test. pp. 167-180].

The SEACRETS customer will vary throughout the course of a day and will consist in part of families for daytime and evening dining, and couples and singles, 21 and older, for its bar and nightclub related services who are typically on vacation to Ocean City, Maryland. [Ex. 1 Moore 10/02/06 Test. pp. 80-82; 137-140].

Marketing has been in the form of the SEACRETS web site located at <www.seacrets.com>, <www.seacretslive.com> and <irieradio.com>. Print, radio and television advertising as well as miscellaneous advertising in the form of bus wraps for Ocean City transit buses and banner pulls by airplanes have been routinely used since 1988. [Ex. 10 Moore 10/04/06 Test. at pp. 364-366; p. 375; 398-411; 476-490; 496-503]. During the course of one year, for example, Seacrets aired over 9,000 radio advertisements on various stations throughout the Eastern Shore. [Ex. 10 Moore 10/04/06 Test. pp. 381-388]. Similarly, between January 26, 1998 and February 22, 1998, 343 spots for SEACRETS appeared on cable television in connection with various shows that aired on ESPN, USA, MTV, CNN, TNT, HDLN, TWC and VH1. [Ex. 10 Moore 10/04/06 Test. pp. 364-366]. Like Coryn's SECRETS resorts, the Seacrets complex has been the site of live radio and television broadcasts. [Compare Ex. 1 Moore 10/02/06 Test. pp. 83-98, Ex. 10 Moore 10/04/06 Test. pp. 381-388 with Ex. 13 Wojciechowski Dep. pp. 121-122; 164-165; 176-177].

Seacrets also has consistently sponsored for 23 years contests throughout the year where the winners will receive a free trip to Jamaica at the Sandals or Couples all-inclusive, or more recently to Cancun and other island destinations. [Ex. 1 Moore 10/02/06 Test. p. 151-159]. A billboard along Route 50 promoting SEACRETS for over twenty years has greeted many of the eight million people who visit Ocean City on an annual basis, two million of whom are first-time visitors. [Ex. 10 Moore 10/04/06 Test. pp. 468-476; Ex. 11 Noah Test. p. 18; 36-37]. While most of its patrons typically consist of the Ocean City vacationer who resides in the northeast area consisting of Maryland, Virginia, Pennsylvania, Delaware, Ohio, New Jersey, New York, and the District of Columbia [Ex. 11 Noah Test. pp. 48-49], web statistics and online boutiques sales indicate an audience for SEACRETS now stretching into almost every state as well as into other countries of the world. [Ex. 33 PX-90221-90224]. ■■■■■

██████████████████████████████████████████ [Ex. 9 Figgs Test. pp. 43-44; Figgs

Test. Exhibits 66 and 67].

### B.      The Coryn parties

#### 1.      Coryn Group, Inc., Coryn Group II, LLC and AMResorts, LLC.

The Coryn Group II, LLC and its predecessor, The Coryn Group, Inc., ████████████

██████████████████████████████████████████ [Ex. 12

Thaler Dep. at p. 14]. ████████████████████████

████████████████████████████ [*Id.* at pp. 13-16].  Similarly, AMResorts, LLC was

founded by Alejandro Zozaya in 2000, who is presently married to the former Ms. Janine Mullen. Since

its founding, Mr. Zozaya has served as the company's president and CEO.  [Ex. 15 Zozaya 09/29/06

Test. pp. 9-11].

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ [Ex. 13 Wojciechowski Dep. pp. 52-

60; See e.g., Ex. 30 at AMR00028530-28532].   Until 2007, AMResorts also managed and marketed

hotels under the SUNSCAPE brand.  Those contracts, however, were terminated.  [Ex. 31 Coll Dep. pp.

52-60]. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ [Ex. 31 Coll Dep. pp. 126-

129; Coll Dep. Exhibit 5]. ██████████████████████████

██████████████████████████████████████████████████████

[*Id.*].

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████   As noted by Mr. Joe Epps, Seacrets' damages expert,

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████   [Ex. 14 Epps

Damages Report 2-6 at p. 2].   ████████████████████████████████

████████████████████████   [*Id.* at 6].

At present, there are three hotels operating under the SECRETS mark in Mexico: SECRETS Capri, SECRETS Silversands and SECRETS Moroma.   The contracts to manage the SECRETS Excellence hotel in Punta Cana, Dominican Republic and the SECRETS Excellence hotel in Riviera Cancun, Mexico were prematurely terminated in 2006 by the owners of these particular hotels. [Ex. 15 Zozaya 09/26/06 Test. pp. 38-42].

In a decision that is only going to greatly exacerbate the ongoing confusion with the SEACRETS Jamaican-themed complex, two new resorts are scheduled to open under the SECRETS mark in Jamaica ████████████████████████.   [Ex. 13 Wojciechowski Dep. pp. 60-62].   ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████   [Ex. 30 AMR00028446-

28562 at 28527-28532; 28538; Ex. 34 Zozaya 06/22/05 Dep. pp. 17-19].   ████████████

████████████████████████████████████████████████████   [Ex. 30 at

AMR00028538].   Commensurate with this ongoing expansion will be a proportional and substantial increase in the advertising and promotion of the SECRETS resorts within the U.S.   A likely increase that, if not enjoined, will greatly exceed the ████████████ Coryn has already expended.   [Ex. 13 Wojciechowski Dep. pp. 322-325; Wojciechowski Dep. Exhibit 21].

### 2.   Coryn's customers and advertising.

AMResorts, LLC, a licensee of the SECRETS mark████████████████████████████ ████████████████████   [Ex. 16 AMR00029397-29418 at 29404].   While Coryn may allege that the SECRETS resorts offer an array of upscale amenities as an all-inclusive, the resorts, nevertheless, permit unlimited alcohol consumption.   Each hotel has a swim up pool bar and beach bar catering to the daily thirst of the vacationer, not to mention nonstop NFL action on big screen televisions located at the pool and beach side during the autumn football season.   [Ex. 13 Wojciechowski Dep. pp. 304-308; Ex. 15 Zozaya 09/26/06 Test. pp. 56-61].   As with any Cancun based resort, SECRETS enjoys its share and influx of the college students during spring breaks. [Ex. 17 Caponi Test. pp. 45-47]. Loud music permeates the pool area from 11:00 am to 6:00 pm, and its single vacationers can "discreetly meet" at the nightclub located at each resort operating under the highly suggestive name DESIRES.   [Ex. 18 LaPointe Dep. pp. 57-60].   Such night clubs offer, like SEACRETS, live music.   [*Id.*].   Mr. Wojciechowski, the Executive Vice President for Sales and Marketing for AMResorts, LLC, is not aware of the hotels' policy regarding topless bathing on the federally owned beach by many of its European and Latin American patrons who culturally prefer this seductive option.   [Ex. 13 Wojciechowski Dep. pp. 316-319].

Though Coryn takes great pains to portray its hotels as high-class resorts and many no doubt agree with this portrayal, there are still numerous third-party reviews from Trip Advisor that offer a contrary and far different perception and vacation experience:

- "Beware of this place.  We are veteran travelers and have spent time at A.I. Resorts all over Mexico and the Caribbean.  We are very glad we only booked 4 nights at this joke hotel the beginning of September 2009.  . . . What a racket these people have they charge you stuff and as you check out rushing to the airport.  . . . these people are shysters and dishonest don't use their 'resort.'"  From *Trip Advisor*, Santa Fe, September 25, 2009 [Ex. 35].

- "What you read on the Internet and in the brochures is not what you get!  . . . the premium liquor is hidden and unavailable!  . . . After staying at an average of four (4) 5-star resorts per year that truly deserve that rating, Secrets Silversands does not meet the minimum expectation of a 1-star resort.  This resort should be kept a secret.  From *Trip Advisor*, US, July 24, 2009 [Ex. 36].

- ". . . the food was AWFUL.  We have been to many all-inclusive, and this place was just really bad."  From *Trip Advisor*, Louisville, July 11, 2009 [Ex. 37].

- "Our biggest mistake was giving what we thought was a trusted hotel and well runned organization, our personal credit card information. . . 4 days after our return, my credit card was fraudulently used to book airfare, and auto rental totaling more that $4800.  . . . BEWARE - The Secret Silversands in Mexico BLOWS." From *Trip Advisor*, Key West, June 23, 2009 [Ex. 38].

- ". . . The rooms smells like sewage.  . . . The rooms look so pretty online, until you walk in. . . . The entertainment staff, tried their best, but their best was a D-.  It was horrible.  It was nothing to do all night but drink."  From *Trip Advisor*, Goodyear, Arizona, May 20, 2009 [Ex. 39].

- "The pool scene was the heartbeat of this hotel during the day.  . . . yet the music from the pool speakers. . . could be heard at our rooms. . . the pool crowd showed signs of thoroughly enjoying the swim up bar usually around 1pm.  The crowd here is a mix of young 20 somethings to 60 somethings, lots of mingling, socializing throughout the pool. . ." From *Trip Advisor*, USA, August 27, 2009 [Ex. 40].

- ". . . Secrets sucked.  . . . The toilet smelled like raw sewage.  . . . there was actual mold growing on the walls in elaborate coral reef-like formations.  . . . There was an outdoor pavilion which featured loud nightly shows.  We couldn't block out the noise.  . . . Secrets was not at all what we were looking for, from loud, drunken 20-somethings to middle-aged swingers who hit indiscriminately on both me and my husband."  From *Trip Advisor*, Clemson, South Carolina, May 26, 2009 [Ex. 41].

- "Someone stole from our room, money and jewelry. . ." From *Trip Advisor*, Ft. Worth, TX, June 29, 2009 [Ex. 42].

- ". . . the resort has some serious issues when it comes to security." From *Trip Advisor*, NY, December 4, 2008 [Ex. 43].

The SECRETS hotels are marketed to North America consisting of the U.S., Canada and Mexico, and also to Europe. ███████████████████████████████████ ███████████████████████████████████████████████████ [Ex. 19 LaPointe Dep. pp. 269-272].

It should be noted that there have been no more than three SECRETS hotels jointly operating at any one time. These periods consisted of three hotels operating during October 2004 through October 2006, and three hotels that have been operating since August 2008. Notwithstanding the paucity in the number of SECRETS branded hotels, since January 2002 to July 2009, AMResorts has expended over ████████ in the U.S. in connection with the advertising and promotion of the SECRETS mark generating in excess of ██████ in revenues for the benefit of the hotels, tour operators, agents, and members of the Mullen family. [Ex. 30 AMR00028446-28562 at 28541, 28551, 28555]. These advertising sums do not include the cooperative advertising by its tour operators or 50,000 travel agents. [Ex. 13 Wojciechowski 09/30/09 Dep. pp. 159-164]. In terms of the multiples, during the period of 2002 through July 2009, Coryn expended approximately █ times the amount in advertising dollars than that expended by Seacrets for the same period. [Compare Ex. 13 Wojciechowski Dep. Exhibit 21 with Ex. 9 Figgs Test. pp. 43-44; Figgs Test. Exhibits 66 and 67].

While the advertising by Coryn has been "national in scope," AMResorts has focused on certain primary markets. [Ex. 13 Wojciechowski Dep. at pp. 127-128]. These primary markets have, indeed, been cities where the Mullen family airline, Brandan Aviation d/b/a USA 3000, coincidentally has a

hub: Philadelphia, Baltimore, Hartford, Columbus, Cincinnati, Cleveland, St. Louis, Milwaukee, Pittsburgh, Newark and Detroit. [Ex. 30 at AMR00028484]. Four of these metropolitan areas are directly within the target range of Ocean City, Maryland and the geographical areas from where people routinely visit the SEACRETS complex in Ocean City. [Ex. 11 Noah Test. pp. 48-49].

In accordance with the old adage, "sex sells," most of the advertisements and promotions for SECRETS hotels, as with some of the ads by Seacrets, convey sexual innuendo. While Coryn's witnesses prefer to cast such advertisements as suggestive of "romance and intimacy," to a single person, they no doubt suggest sex on the beach:



**(AMR00000344)**

Of primary concern is the cooperative advertising and promotion by tour operators and the 50,000 travel agents who with little control and free reign, tout SECRETS with ads in newspapers, on radio and occasionally on television. [Ex. 19 LaPointe 02/28/07 Test. pp. 191-196; 199-200; Ex. 13

Wojciechowski Dep. at pp. 236-238; 249-250; Wojciechowski Dep. Exhibit 10].   A representative sample of which appears as follows:



(AMR00013979)



(AMR00014004)



**(AMR00014007)**

By their own admission, Coryn has little control over such advertisements and their participants. In addition, there are no protocols in place to record the instances of confusion any of these travel agents or tour operators may encounter. [Ex. 19 LaPointe 02/28/07 Test. pp. 198-201]. Though not yet applicable to SECRETS, nothing would prevent AMResorts from promoting the SECRETS hotels on the back of cereal boxes as it has done with its companion brand - DREAMS, which has been promoted on the back of Post Honey Bunches of Oats®. [Ex. 13 Wojciechowski Dep. at pp. 173-176]. The DREAMS brand is, in all respects, equivalent to the SECRETS alleged level of operation, but permits families. While AMResorts touts its promotion to the wedding market, the advertising budget is typically ▆ of the entire annual ▆▆▆▆ typically expended, or approximately ▆▆▆ per year. [Ex. 13 Wojciechowski Dep. at pp. 257-258]. This sum is also directed to payment of other print publications like *Spa Finder*, *The New York Times*, *Gourmet* and *Meetings and Focus*. [Ex. 13 Wojciechowski Dep. at pp. 215-216].

### 3.      Adoption of the SECRETS Mark by Coryn

On page 10 of its brief, Coryn asserts that it adopted the "SECRETS mark without any knowledge of the SEACRETS mark or the SEACRETS facility in Ocean City, Maryland."  This assertion is only partly true and Mr. Zozaya's deposition testimony does not "square" with the chronological facts or Coryn's stated policy.  The evidence reveals that Mr. Zozaya was so enamored with the SECRETS mark that before any search of the trademark records was conducted or advice of counsel was obtained, Mr. Zozaya quickly instructed counsel, Mr. Renz, to file the application to federally register the mark on June 22, 2000, and shortly thereafter, retained and secured the domain names <secretsresorts.com> on June 29, 2000.  [Ex. 34 Zozaya 06/22/05 Dep. pp. 39-42; Ex. 22].  Thus he "adopted without knowledge." ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ [Ex. 20 Mullen 06/21/05 Dep. pp. 76-80]. In this particular case, only after securing the domain names and filing the application did Mr. Zozaya instruct counsel to undertake a search to determine the availability of the SECRETS mark for use and registration within the United States and provide his opinion -- an act that is after the ████████████ ███████████████████ [Ex. 34 Zozaya 06/22/05 Dep. pp. 39-45].

Mr. Zozaya's chronological discrepancy is evidenced by the date when the search results were obtained.  The search results from Thomson & Thomson were obtained on July 6, 2000 and there were no less than three references made to SEACRETS in that report: Seacrets' federal registration was noted as reference No. 4 on page 12, it was listed in the company name section on page 78, and its domain name <seacrets.com> was reference No. 4 in the domain name section on page 104.  [Ex. 21].  Only

after Mr. Zozaya had a teleconference with his attorney at that time, Mr. Eugene Renz, ███████

███████████████████████████████████████████████ [See Coryn's Ex. 16].  There is

no evidence of record that Mr. Renz, though a patent practitioner, is uniquely versed in trademark search

and availability protocol.

These factors greatly suggest that not only is Mr. Zozaya charged with constructive notice of

Seacrets' registration by reason of 15 U.S.C. § 1072, but that information about Seacrets' registration

and common law use were referenced in the search results and perhaps a topic of discussion between

Mr. Renz and Mr. Zozaya.  The search and opinion were mere afterthoughts by Mr. Zozaya, ████

███████████████████████████████████████████████████

█████████ "Where a defendant adopts a mark that is similar to a plaintiff's mark with knowledge of

that plaintiff's prior use, the court is entitled to infer that the defendant intended to trade on the goodwill

in the plaintiff's mark."  *The Christian Science Board of Directors of the First Church of Christ v.*

*Robinson*, 2000 WL 33422737 at *8 (W.D. N.C. 2000 March 29, 2000).

III.    **GENUINE ISSUES OF MATERIAL FACT PRECLUDE CORYN'S PARTIAL MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES AND DISGORGEMENT OF PROFITS UNDER 15 U.S.C. § 1117.**

In reviewing summary judgment motions, a court must view evidence in the light most favorable

to the non-moving party to determine whether a genuine issue of material fact exists.  See *Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  A fact is "material" only if its

resolution will affect the outcome of the lawsuit.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Determination of whether a factual issue is "genuine requires

consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide

'whether reasonable jurors could find a preponderance of the evidence that the [non-moving party] is entitled to a verdict.'" *Anderson*, at 252.

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party. See *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 107 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *see also Anderson,* at 252. ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict-whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed").

As a matter of law, if Seacrets prevails with its claims for trademark infringement and unfair competition under both federal and/or state law, Seacrets is entitled to its actual damages, the defendant's profits, and all costs subject to the principles of equity [15 U.S.C. § 1117]. In *Synergistic*, the Fourth Circuit in 2006 clarified its interpretation of 15 U.S.C. § 1117 and affirmatively ruled that no longer was it necessary for the trademark owner to prove "bad faith" before receiving an award of damages. See *Synergistic*, 470 F. 3d at 175. Rather, the court declared that various factors should be considered and that any such award should specify the factors the court considered in making the award. See *Id.*

Following both the Third and Fifth Circuit Courts of Appeal, the decision in *Synergistic* is a key departure from a longstanding precedent within this circuit.[2]   Only in recent months have the courts

---

[2]   Compare, for example, the language from *Synergistic*, "in other words, a lack of willfulness or a bad faith. . . does not necessarily preclude such an award," at 470 F. 3d. at 175, with the language from *Sterling Acceptance* "in order to be entitled to an accounting and a recovery of defendant's profits, the plaintiff must prove that the defendant acted in bad faith." *Sterling Acceptance Corporation v. Tommark, Inc. d/b/a Sterling Associates*, 227 F. Supp. 2d 454 (D. Md. 2002); *A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc.*, 61 F. Supp. 2d 426, 433 (D. Md. 1999).

begun to articulate and apply the *Synergistic* factors in connection with the granting or denial of monetary awards.  None of these factors, however, are exclusive.  As the court in *Synergistic* clearly recognized, courts are free to examine any other equitable factors that may be relevant to the specific dispute.  *Synergistic*, at 176.

A thorough and complete examination of each of these factors reveals that many genuine issues of material fact exist as applied to this case and that these factors, rather than favoring Coryn, actually favor Seacrets.

**A.     There is ample evidence of willful infringement by Coryn together with a reckless and wanton disregard of Seacrets' rights in and to the SEACRETS mark.**

**1.     Coryn improperly conflates "bad faith" with "willfulness."**

The first factor identified by the court in *Synergistic* is generally whether the infringer had the intent to confuse or to deceive.  In other words, whether there is evidence of "bad faith" or "willfulness." Contrary to Coryn's legal argument, courts now draw a clear distinction between "bad faith" and "willfulness."[3]  A finding of either one favors a monetary award to the trademark owner.

In order to prove bad faith, the plaintiff must show that the defendant acted with "willful deception" or "with the deliberate intent to cause confusion, mistake or deceive purchasers." *Sterling Acceptance, supra; Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F. Supp. 2d 460, 488 (D. Md. 1999).  In 2007, the Supreme Court offered a more apt characterization of "willfulness" in *Safeco Ins. Co. of America et al. v. Charles Burr et al.,* 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed. 2d 1045 (2007):

> "[W]illfully is a word of many meanings whose construction is often dependant on the context in which it appears, and where willfulness is a

---

[3]   See *A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc.*, 61 F. Supp. 2d 426, 433 (D.C. M.D. 1999) where the court equated "bad faith" with "willfulness" ("OPSC's willfulness, hence bad faith, justifies the decision that it be made for at least some of its profits," based on the defendant's "persistent use of a mark" cognizant it was potentially infringing).

statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Id.* at 2208.

Equally germane is the Court's observation about reckless behavior as "conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 2215. "Finally the judge was on solid ground in finding that the infringement was willful; Softbelly's had chosen the name. . . with reckless disregard for the likelihood of consumer confusion." *Ty Inc. v. Softbelly's Inc.*, 517 F.3d 494 (7th Cir. 2008). "Courts have held that an infringer's actions are willful where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights. [Citation omitted]. Thus, knowledge need not be actual; constructive knowledge will suffice." *Microsoft Corporation v. Grey Computer, et al.*, 910 F. Supp. 1077, 1091 (D. Md. 1995).

The court in *Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F. Supp. 2d 571 (M.D. N.C. 2009), in adhering to the Supreme Court's distinction between "bad faith" and "willfulness," recently noted that a finding of "willfulness," though less than "bad faith," would, nevertheless, weigh in favor of a monetary award. As stated:

> ". . . The jury in this case found that BOIS willfully infringed the Maryed mark. . . the court, therefore accepts this jury finding of willfulness and weighs this factor in favor of SCJ. However, the court, nevertheless, concludes that even if BOIS willfully infringed the Maryed mark, BOIS did not act fraudulently or in bad faith. . ." *Id.* at 588.

The court in *Buzz Off* found that the following evidence supported the jury's finding of willfulness:

- that the infringer knew about the prior user's mark and, nevertheless, deliberately used a confusingly similar mark;

- that the infringer tried to obtain rights to the trademark owner's mark;

- that the infringer knew the trademark owner objected to the junior user's mark based on potential confusion;

- that the infringer knew the existence of a likelihood of confusion but deliberately continued to infringe rather than change its mark after negotiations broke down.

**2.    The evidence of record supports a finding of willfulness and of a reckless and wanton disregard of Seacrets' rights.**

The evidence of record, while it may not support a finding of "bad faith," clearly supports a finding of "willful infringement" and a reckless disregard of Seacret's prior rights.  The evidence also closely parallels the facts in *Buzz Off*.

Like Bois in *Buzz Off*, Coryn had actual knowledge of the SEACRETS mark before commencing use.  The Thomson & Thomson search report referenced Seacrets' prior registration and common law use, no less than at three different points.  [Ex. 21].    Though one may never know the exact topics of conversation because of the attorney-client privilege, it is clear that Mr. Zozaya, before commencing use of SECRETS, is charged not only with constructive notice by reason of 15 U.S.C. § 1072 but also had actual knowledge about the existence of SEACRETS registrations and use as derived from the Thomson & Thomson pages.  "[C]ircumstantial evidence of copying, particularly of the use of a contested mark with knowledge of the protected mark at issue is sufficient to support an inference of intention of infringement where direct evidence is not available." *Schneider Saddlery Co. Inc. v. Best Shot Pet Products International, LLC,* 2009 WL 864072 (N.D. Ohio 2009) citing *Therma-Scan, Inc. v. Thermoscan, Inc,* 295 F.3d 623, 638-639 (6th Cir. 2002).

Such an inference is further bolstered by the subsequent acts of Mr. Renz.  When Mr. Renz filed the initial application to register SECRETS on behalf of Coryn, he described the services only as "resort hotel," wherein the company's applications for SUNSCAPE, in contrast, included not only resort hotel services but also "restaurant services."   [Compare Coryn's Ex. 17 to Motion for Summary Judgment

with Seacrets' Ex. 23].    In other words, in order to avoid an obvious refusal by the Trademark

Examiner based on a conflict with Seacrets' prior use and registration, Mr. Renz eliminated that portion

of the description from the identification of goods and services, but included it with other applications

for registration of SUNSCAPE.   [*Id.*].   The restaurant and bar language, was also included in the

application to register SECRETS filed in Canada on November 14, 2001.   [Ex. 24].   The mere fact

Coryn relies on the advice of counsel offers no refuge when that advice is untimely or after the fact.

"Counsel's advice must be timely requested and honestly relied upon in shaping one's conduct.

Otherwise, counsel's advice is a sham, a smokescreen . . .."   *Cuisinarts, Inc. v. Robot-Coupe*

*International Corporation*, 580 F. Supp. 634 (S.D. N.Y. 1984).

Coryn, like the infringer in *Buzz Off*, also knew that Seacrets objected to the use of the

SECRETS mark based on a potential for confusion when Seacrets filed it petition to cancel in January

2004.   Yet in spite of that filing, Coryn continued to invest and promote the SECRETS mark, even when

it was operating only one hotel between 2006 and 2008. [See Coryn's Motion for Summary Judgment at

p. 6].

During the March 2005 meeting between Mr. Zozaya and Mr. Moore, like the infringer Bois in

*Buzz Off* ███████████████████████████████████████████████████ [Ex. 25

Test. pp. 212-214].[4] ██████████████████████████████████████████

████████████████████████

Finally, even after Seacrets testified about the evidence of actual confusion, and even after the

TTAB found a likelihood of confusion on August 20, 2008, Coryn, like Bois in *Buzz Off*, continued its

infringement by expanding use of the SECRETS mark onto two additional hotels in Mexico (SECRETS

---

[4]   In the transcript, Mr. Zozaya's name is incorrectly spelled as "Mr. Sorga."

Silversands and SECRETS Maroma), and continues with its plans to open two additional hotels in Jamaica and ███████████████████ for 2010. [Ex. 13 Wojciechowski Dep. pp. 60-62]. Thus, when the Excellence Group terminated the contract with AMResorts, LLC in 2006, AMResorts had only one hotel using SECRETS and could have readily changed to a different mark but yet it chose to continue with expansion of the SECRETS brand.

This evidence, more than a preponderance, is sufficient to support a finding of willfulness by Coryn to infringe the SEACRETS mark, as well as a continued pattern of acting in total disregard of these rights. This factor does not favor Coryn but, not surprisingly, strongly favors Seacrets, and creates issues of material fact. Even if Seacrets' evidence of willfulness were not as strong as it is, the existence of "willfulness" is generally not the court's determination to make. "Intent is a quintessential jury issue." *First Dakota National Bank v. Saint Paul Fire and Marine Ins. Co.,* 2 F.3d 801, 811 (8th Cir. 1993).

### B.      Whether sales have been diverted.

#### 1.      Coryn narrowly interprets this factor with mechanical precision rather than with equitable consideration

The second factor a court should consider is whether any sales have been diverted by reason of the infringement and the extent to which the "plaintiff had entered the market area where the infringement occurs." *Synergistic,* 470 F. 3d. at 175. While Seacrets readily admits that it cannot show, but for Coryn's infringement, it would have made a sale, such a diversion of sales is not always necessary, particularly in cases involving reverse confusion. As recently noted by the court in *Buzz Off*:

> "Under the 'reverse confusion' doctrine, the injury to Maryed and SCJ was based on BOIS' extensive use of a mark infringed upon and overwhelmed Maryed's prior, senior use of its mark, creating a likelihood of consumer confusion, even if there was no consumer who were mislead into buying BOIS Apparel when they really wished to purchase Maryed's netwear products instead. *Id.* at 585.

*　　　*　　　*

> Having reviewed the evidence presented and BOIS's contentions, the court concludes that SCJ presented sufficient evidence from which the jury could find that SCJ and Maryed were injured as a result of BOIS' infringement in this case, under a theory of "reverse confusion" and loss to Maryed and SCJ of the MARYED mark which impaired the ability of Maryed and SCJ to continue use of the mark for the MARYED net wear products. *Id.* at 585.

Neither is a diversion of sales necessary to the recovery of the infringer's profits in contrast to an award of actual damages.  "When this Court considers both the plain statutory text of the Lanham Act. . . it seems clear that Schneider need not show a particular diversion of its own sales to recover profits from Best Shot." *Schneider Saddlery Co.* at *18.

**2.     The actual injury and harm to Seacrets is overwhelming.**

The evidence of record creates a genuine issue of material fact and supports a finding that this factor actually favors Seacrets.  As indicated, there is clear evidence of reverse confusion. Between the periods of 2002 to July 2009, Coryn has expended in excess of ▮▮▮▮ to advertise and promote the SECRETS mark within the United States.  [Ex. 13 Wojciechowski Dep. pp. 322-325; Wojciechowski Dep. Exhibit No. 21] -- a sum that is ▮ times greater than the amount expended by Seacrets for the same period, the smaller albeit senior user of the mark.  [Compare with Ex. 9 Figgs Test. pp. 43-44; Figgs Test. Exhibits 66-67].  Coryn's sum does not include the amounts expended by the vast number of tour operators and the 50,000 travel agents that have contributed additional monies as part of their cooperative advertising to promote the SECRETS mark.  [Ex. 13 Wojciechowski Dep. pp. 159-164].

Simply put, the advertising for SECRETS resorts by Coryn and its agents and tour operators is pervasive.  Collectively, it consists, in part, of a high ranking internet presence, e-mail blasts, banner ads, print, radio, occasional television, billboard and contests.  While Coryn's advertising allegedly is

national in scope, its Executive Vice President of Sales and Marketing Department, Mr. Wojciechowski, made the point during his deposition that it is focused on certain primary markets that include major metropolitan areas within the range of O.C. Seacrets in Ocean City, Maryland.  These primary markets include: Baltimore, Philadelphia, Pittsburgh and Newark, all of which are within the 400 to 500 mile radius for the typical vacationer who frequents Ocean City, Maryland.  [Compare Ex. 13 Wojciechowski Dep. pp. 127-128 with Ex. 11 Noah Dep. pp. 48-49].

The evidence of actual confusion, which also is considered to be evidence of actual injury or damage, is unmatched for a typical infringement action.  Mr. Moore has consistently testified that numerous patrons over the years have congratulated him on his expansion into Mexico or at least have inquired about his operations overseas.  [Ex. 1 Moore 10/02/06 Test. p. 44; Ex. 25  Dep. pp. 15-24; 125-128]. The TTAB found this testimony to be evidence of actual confusion.  [Coryn's Ex. 21 to Motion for Summary Judgment at p. 22].

After four and a half years of contentious litigation and development of a relatively expansive record by TTAB standards, the TTAB found that there is apt to be a likelihood of confusion between SEACRETS and SECRETS.  TTAB decisions are to be given substantial weight by the district courts. See *Driving Force, Inc. v. Manpower, Inc.*, 498 F. Supp. 21, 28 (E.D. P.A. 1980).  In the absence of new evidence to the contrary, all findings of fact by the TTAB are to be given great deference by the courts. See *Id.*

During the course of this appeal and counterclaim, Seacrets' expert, Mr. Robert Reitter, conducted a study to determine the potential for reverse confusion between SEACRETS and SECRETS. Though no survey is perfect, when exposed to AMResorts' web site for SECRETS resorts and a radio commercial and/or photograph of the SEACRETS complex from 49th Street and Coastal Highway, Mr.

Reitter's survey measured a net confusion rate of 26% among likely visitors to Ocean City, Maryland. [Ex. 26 Reitter's Survey Report at p. 2].  Even Coryn's own survey conducted by Mr. Kenneth Hollander recorded a similar gross rate of confusion of 33.5% when his use of the improper control SEA CREST is properly discounted.  [Ex. 27 Simonson Rebuttal Report at p. 12-14].  In the Fourth Circuit, confusion results in excess of 10% is considered evidence of actual confusion.  *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F. 3d. 455, 467 (4th Cir. 1996).

Seacrets' web statistics reveal that for the period between April 2008 and July 2009, ███████ people or 27% of its visitors to the SEACRETS web site used the natural spelling for "secrets" together with some other terminology in order to find and locate the SEACRETS web site.  [See Crockett Declaration and Figgs Declaration - Ex. 46].  This evidence is very significant and highly indicative of initial interest confusion which most courts recognize.  As stated, "infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of confusion."  See J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:6, pp. 23-30 (June 2009).

What is occurring is simply this: someone hears about SEACRETS either via word of mouth or, perhaps, via a print, radio or television ad.  The natural inclination is to log on to a search engine such as Google or MSN (now Bing) and type in the natural spelling "secrets" to find more information.  When this is done, the potential purchaser is immediately taken to the web sites for SECRETS resorts, which is usually the first or second listing in the search results.  [Ex. 44 and 45].  Once the person realizes that SECRETS resorts is not the SEACRETS in Ocean City, Maryland, then the statistics reveal a large number of internet users will begin using other terminology in their efforts to locate SEACRETS.  The evidence indicates such people will typically type in such search phrases as "secrets in O.C.," "secrets in

Ocean City Maryland," "secrets in Maryland," "secrets bar," "secrets restaurant," etc. [Ex. 46]. This is different from confusion over similar domain names or use of metatags in an infringer's web sites, situations where the test for initial interest confusion has been routinely applied. See, e.g., J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:6, pp. 23-30 (June 2009). The technology to record this information only became available to Seacrets in April 2008. [Declaration of Roy Crockett - Ex. 46].

A common sense inference can be made that over ▮▮▮▮ visitors needed to and did, in fact, add such additional terminology to find the SEACRETS web sites after first being directed to the Coryn web site at <secretsresorts.com>.  While no one knows for sure whether any of these visitors may have thought SEACRETS to be a knock-off Coryn's alleged high-end resort, the Reitter survey, nevertheless, suggests that at least 26% are likely to continue to believe that there is some joint association, sponsorship or affiliation between the two entities.  In other words, of these ▮▮▮▮ visitors, approximately ▮▮▮▮ are apt to continue to believe the entities to be related in some manner.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [Ex. 8 Figgs 09/08/09 Dep. pp. 185-190; 192-193; Ex. 25  Dep. pp. 220-223; 230-233].  Thus, while there is no evidence to date of diverted sales, such evidence is not required where, as here,  there is evidence of reverse and actual confusion impacting lost opportunity, Seacrets' reputation, and the value and goodwill of the SEACRETS mark.  Such evidence is sufficient to demonstrate "actual injury" and a genuine issue of material fact.

**C.      Adequacy of other remedies.**

   **1.      Injunctive relief alone will not compensate Seacrets for the willful and reckless infringement by Coryn.**

Under the third *Synergistic* factor, a court should consider whether other remedies are adequate. In connection with trademark infringement and unfair competition actions, injunctive relief is usually the other available remedy.  Nothing prevents the award of both an injunction and a monetary award. See e.g., *A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc.,* 61 F. Supp. 2d 426, 433 (D. Md. 1999).

In the event Seacrets proves successful with its claim for federal trademark infringement and unfair competition, nationwide injunctive relief against further advertising and promotion of SECRETS in the U.S. will provide the key prospective relief sought by Seacrets.  As noted by the court in *Buzz Off*, a permanent nationwide injunction is the only way to "remedy future infringement" and prevent the ongoing "reverse confusion."  *Buzz Off*, 606 F. Supp. 2d. at 571.

The issue, however, is whether a permanent injunction for prospective relief provides enough equitable relief to compensate Seacrets for the past infringement. "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party."  *Roulo v. Russ Berrie Co.,* 866 F.2d. 931, 941 (7th Cir. 1989).  Here, courts look to see whether the infringer has been unjustly enriched. "It seems scarcely equitable . . . for an infringer to reap the benefits of a trademark he has stolen, force the registrant to the expense and delay of litigation, and then escape payment of damages on the theory that the registrant suffered no loss. . . It is therefore essential that the trial courts carefully fashion remedies which will take all economic incentive out of trademark infringement."  *A.C. Legg Packing Co.,* 61 F. Supp. 2d. at 433 citing *United States Olympic Committee v. Union Sport Apparel, et al.,* 1983 WL 51932, 220 U.S.P.Q. 526 (E.D. V.A. 1983).

Not surprisingly, only a disgorgement of Coryn's profits will adequately compensate Seacrets for the infringement that has occurred since 2002. Coryn stole the mark, it forced Seacrets to the expense and delay of litigation, and now argues injunctive relief is apt to be sufficient since Seacrets suffered no loss. Coryn could have avoided such a result had it ceased use of the mark following initiation of the petition to cancel, after it was disclosed that evidence of actual confusion was occurring, when it was operating only one hotel between 2006 and 2008, and/or after it lost before the TTAB. Instead, it chose a different path.

> **2.    Disgorgement of Coryn's Profits is the only remedy to compensate Seacrets for the willful and reckless infringement.**

Contrary to the factual assertions by Coryn in pages 19 through 20 of its brief, there is substantial evidence to support a finding of willful infringement in this case and that Seacrets has suffered actual injury by reason of the reverse confusion, forward confusion and initial interest confusion that it is experiencing. Indeed, the evidence of actual confusion and actual injury in this case provides that "something more" that is alluded to by Professor McCarthy.[5] The evidence of willfulness by Coryn and the evidence of actual injury in the form of actual confusion is overwhelming. In sum:

- The Thomson & Thomson report to Mr. Zozaya specifically disclosed information about SEACRETS registration and SEACRETS common law use. [Ex. 21].

- In an effort to get around Seacrets' prior use and registration for bar and restaurant services with the Trademark Examiner, Coryn limited its application to "resort hotel," but for the other Coryn brands such as SUNSCAPE, deliberately included "restaurant services" in the identification of goods and services. [Compare Coryn's Ex. 18 with Seacrets' Ex. 23].

---

[5]    On page 19 of its brief, Coryn cites to J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 30:58 (4th Ed. 2009) wherein Professor McCarthy alluded to the fact that courts look for "something more" before awarding monetary damage. What Coryn leaves out is the sentence where Professor McCarthy states that ". . . evidence of actual confusion of some customers or evidence of actual losses sustained by plaintiff will often supply the missing element. . ." *Id.* at 30:58, page 30-135.

- Despite prior TTAB precedent finding that bar and restaurant services are closely related to resort hotel services, Coryn deliberately proceeded with use of the SECRETS mark. *See e.g., Venture Out Properties LLC v. Wynn Resorts Holdings, LLC,* 2007 WL 39112, 81 USPQ 2d 1887 (TTAB 2007) (". . . Moreover, we note that in the past the Board has found hotel and restaurant services to be related such that purchasers would ascribe a common origin to them when rendered under similar marks. . ..")

- Despite the filing of the petition to cancel in January 2004 and the disclosure of instances of actual confusion in response to discovery requests and depositions, Coryn deliberately continued with use and proceeded to overwhelm Seacrets with national advertising at a rate that is ▮ times the amount typically expended by Seacrets. [Compare Ex. 13 Wojciechowski Dep. Exhibit 21 with Ex. 9 Figgs Test. pp. 43-44; Dep. Exhibits 66-67].

- Despite Mr. Moore declaring his intention in March 2005 to spend his "last dime" in an effort to enjoin Coryn's use, Coryn continued to use the SECRETS mark in blatant and reckless disregard of the confusion and the prior rights in and to the SEACRETS mark and name. [Ex. 25 Dep. at pp. 213-214].

- Despite the TTAB August 20, 2008 decision affirmatively establishing a likelihood of confusion, Coryn continued to use the mark for SECRETS Capri, and expanded use onto the SECRETS Silversands and SECRETS Morona in total disregard of that decision, and instances of actual confusion. [Coryn's Memorandum in Support of Summary Judgment at p. 6].

- Despite Seacrets' claims for federal infringement and unfair competition, Coryn continues to expand use of SECRETS onto additional resorts in Jamaica which are scheduled to open in 2010 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [Ex. 30 at AMR00028527-28528; 28538].

- These business decisions have been made notwithstanding testimony about instances of actual confusion, SEACRETS survey showing a net level of 26% reverse confusion, Coryn's own survey showing a 33.5% level of gross forward confusion, and web statistics showing initial interest confusion, namely ▮▮▮ visitors to Seacrets' web site who use the natural spelling for SECRETS as well as other terminology to find SEACRETS once they realize that the SECRETS resorts are not the SEACRETS in Ocean City, Maryland. [Ex. 26 Reitter's Report at pp. 2; Ex. 27 Simonson's Rebuttal Report at pp. 9-14; Crockett Declaration and Figgs Declaration - Ex. 46].

Although the courts generally may be disinclined to award monetary relief, they have done so when the evidence is so indicative of a willful infringement, actual confusion and when the infringer continues to act in total disregard of the senior user's rights, particularly at the expense of the smaller,

senior user.  In such cases, not only is injunctive relief merited to curb the ongoing infringement and reverse confusion, but past compensation is the only way to properly compensate the senior user for his injury.  Without such an award, companies who are financially stronger than the senior trademark owner will have a *carte blanche* incentive to outspend and out-litigate the smaller trademark owner at the risk of a prospective injunction sometime way in the future, provided the smaller senior user has the tenacity and resources to litigate.

> **D.      There has been no unreasonable or inexcusable delay by Seacrets in charging Coryn with infringement, nor has there been any prejudice by Coryn.**

> **1.      Coryn misinterprets this factor.**

Mere delay in bringing suit is not, of itself, sufficient to constitute laches in a trademark infringement case.  See *Finance of America v. BankAmerica Corp.,* 502 F. Supp. 593 (D. Md. 1980) citing *Rothman v. Greyhound Corp.,* 175 F.2d. 893, 895 (4th Cir. 1949).  Instead, Coryn must establish that the delay was unreasonable or inexcusable and that it had suffered injury or prejudice as a result of the delay. See *Id.* citing *Gardner v. Panama Railroad Co.,* 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) (per *curiam*); *Tobacco Workers International Union Local 317 v. Lorillard Corp.*, 448 F.2d 949, 958 (4th Cir 1971).

On page 26 of its brief, Coryn attempts to improperly suggest that Seacrets sat on its rights because it did not file a trademark opposition in time, in contrast to its petition for cancellation.  The Lanham Act permits any person who believes he or she would be damaged by registration of the mark to challenge that registration either during the 30-day publication stage of the application or within five years following the date of registration by reason of prior use.  [Compare 15 U.S.C. § 1063 with 15 U.S.C. § 1064]. These provisions, in part, not only afford trademark owners the right to challenge, but

also to correct the potential errors by the Trademark Examiners when they might overlook a prior application or registration.

In this particular case, Coryn filed its application under the intent-to-use provisions of Section 1(b) on June 22, 2000, meaning that it had no use of the mark when it filed its initial application. [15 U.S.C. § 1051(b)(1)]. Its application was published for opposition purposes on April 3, 2001, and Coryn *still* did not have use of the mark. [Coryn's Ex. 18]. Seacrets admits that it did not catch wind of the publication of Coryn's application during publication between April 3 and May 3, 2001, but because of the cancellation provisions, this omission has no legal consequence. "Best Shot also notes that Schneider did not contest any of its trademark applications, but the significance of this observations is negligible at most on these facts." *Schneider Saddlery*, 2009 WL 864072 at *2 fn. 4.

### 2. Seacrets' filing a petition to cancel tolls any delay or *laches*.

The delay in this case was not unreasonable or inexcusable. Once Mr. Moore was congratulated by a patron about his expansion into Mexico during the fall of 2003, an investigation was conducted, and a petition to cancel Coryn's rights was filed with the U.S. Patent and Trademark Office in January 2004. [Ex. 1 Moore 10/02/06 Test. p. 44; Ex. 28]. This act was done within four months following the issuance of Coryn's registration, even though Seacrets had five years to file a petition to cancel. [15 U.S.C. § 1064]. Despite Coryn's allegation of delay and *laches*, the Trademark Trial and Appeal Board affirmatively found no delay or *laches* by Seacrets in asserting its rights. [Coryn's Ex. 21 at pp. 8-11].

On page 10, Coryn also argues that Seacrets did not charge Coryn with infringement until 2008. This assertion is neither factually nor legally correct. Legally, in its petition to cancel, Seacrets alleged that Coryn's use and registration of SECRETS would lead to a likelihood of confusion. [Ex. 28 ¶ 6 and ¶ 14]. While such assertions are not enough to create a judiciable controversy for purposes of the

Declaratory Judgment Act, they are enough, as a matter of law, to put the junior user (Coryn) on notice that its use and registration is considered an infringement. Thus, as a matter of law, Coryn was put on notice of the infringement claim as early as January 2004. See generally *Finance of America*).

Factually, in March 2005, Mr. Zozaya visited and met with Mr. Leighton Moore, owner of Seacrets, to discuss potential settlement. While those settlement discussions enjoy protected status under Rule 408 of the Federal Rules of Evidence, when it became obvious that settlement was not possible, Mr. Moore put Mr. Zozaya on notice that Mr. Moore would spend "his last dime" defending his name. [Ex. 25 Moore 09/17/09 Dep. at pp. 213-214]. Additionally, during discovery, Coryn was put on notice that Seacrets was encountering instances of actual confusion as early as April 2004 in response to interrogatories and in 2006 during the Moore Testimony. [Ex. 1 Moore 10/02/06 Test. p. 44; Ex. 32 at p. 28 - Response to Interrogatory No. 29(a)]. Thus, from both a legal and factual standpoint, Coryn has had ample and practical notice that Seacrets was concerned not only with registration of the SECRETS mark by Coryn but that Coryn's use was creating actual confusion with SEACRETS and that Seacrets was determined to get Coryn to cease use of the mark.

Like the plaintiff in the *Finance of America,* Seacrets waited four years before making its counter-claims because it made a "decision not to file suit until the TTAB released its opinion." *Id.* at 595. The fact those proceedings concerned the right to registration in contrast to use does not render Seacrets' course of action unreasonable or inexcusable. Thus, contrary to Coryn's suggestions, Coryn was noticed with a clear charge of infringement as early as January 2004.

Not only does Seacrets' petition for cancellation and subsequent statements put Coryn on practical notice of an infringement, but it also tolls the *laches* period as it pertains to any relief under the Lanham Act. Indeed, this issue was squarely addressed by this court in *Finance Company of America,*

32

which followed the Eastern District of Pennsylvania's decision in *Alfred Dunhill v. Kasser Dist. Prod. Corp.*, 350 F. Supp. 1341 (E.D. Pa. 1972), the very same court jurisdiction where Coryn and AMResorts are both located and conduct business.   While the facts in *Alfred Dunhill* involved an opposition proceeding, the principle is equally applicable to the cancellation proceedings under 15 U.S.C. § 1064 as stated:

> "While a successful opposition only acts to prevent registration and not use, as a practical matter, it puts the defendant on notice that, at the least, the plaintiff is not going to 'sleep on its rights,' and indeed, in our view, goes even further and puts the defendant on notice that the opposer also protests its use of the confusingly similar mark.   Thus, the defendant acted at its own peril when it continued to use the mark after the default in the Patent Office." *Id.* at 1367.

While the Fourth Circuit apparently has not ruled on this issue, there are at least three very good reasons to follow this line of authority.   First, as in this particular case, any other result will prove illogical and greatly encourage forum shopping.   It would be illogical and ironic since the Coryn parties are located in the Eastern District of Pennsylvania and are subject to this rule.   Thus, for Coryn to allege that the petition to cancel did not put them on notice, is disingenuous and puts form over legal substance and practicality.

Second, in prescribing the opposition and cancellation procedures as an alternative to federal district court actions, Congress not only attempted to lessen the case load of the federal district courts, but gave the public an option to have the "experts" at the U.S. Patent and Trademark Office and Trademark Trial and Appeal Board offer their initial views in the hopes that their decision would bring such business disputes to a cost effective resolution.   See *Driving Force, Inc. v. Manpower, Inc.*, 498 F. Supp. 21, 28 (E.D. P.A. 1980) (stating "We believe that the body is better equipped than are the courts to make an initial determination as to trademark registration and infringement").   To rule that a TTAB

proceeding does not toll *laches* or delay would encourage parties to bypass this alternative route and proceed directly to court. Such a result is neither intended by the Lanham Act of 1946 nor wise.

Finally, in the situation where the losing party wants to appeal, Congress has provided a dual approach. The losing party could appeal the TTAB decision directly to the Circuit Court of Appeal for the Federal Circuit or to a U.S. District Court. If it chooses the latter, then under 15 U.S.C. § 1071(b), the losing party will do so at it peril. While it would be afforded a *de novo* review of the entire TTAB record, nothing prevents the filing of a counterclaim for infringement and unfair competition, which typically occurs with appeals under 15 U.S.C. § 1071(b). This process clearly indicates that a district court appeal is a continuation of the TTAB proceeding by accepting into evidence the entire TTAB record with the right of either party to make additional claims and present new evidence.

As the evidence of record indicates, rather than charge directly to a federal district court, Seacrets chose the alternative and the less expensive TTAB route to have the "experts" make the initial decision about confusion. See *Driving Force* at 25 (stating that the TTAB "ought to have the opportunity to apply its expert, specialized knowledge and experience"). It was Seacrets' hope that if it prevailed with the TTAB, that Coryn would be persuaded to voluntarily phase out use of the SECRETS mark. Had it done so, Coryn would not now have any monetary exposure. Rather than appeal the unfavorable decision to the Circuit Court for the Federal Circuit, which would bypass any counterclaims, Coryn, undeterred, sought a district court appeal and did so at its peril. It cannot have it both ways.

### 3.      Coryn fails to allege any prejudice.

Similarly, from a practical matter, in order to have *laches*, the junior user must have relied on the senior user's alleged delay to its detriment. "To invoke an equitable estoppel . . . against the plaintiff, he must be chargeable with *inexcusable* delay which *prejudiced* the *innocent* defendant." *Alfred Dunhill* at 1364 citing *Callman*, Section 87.3(b), p. 127. There has been no prejudice to Coryn nor has Coryn alleged such prejudice in its motion. Coryn has continued what it did prior to the cancellation proceeding. It has continued to manage, market and promote the SECRETS brand in the U.S. for its hotels. In fact, just prior to the August 20, 2008 decision by the TTAB, Coryn was managing and marketing only one SECRETS branded hotel. Its expansion of the SECRETS mark onto Silversands and Moroma in Autumn of 2008 was done so at its peril as well as its announced plans to open two new SECRETS hotels in Jamaica in 2010. This case has been ongoing since 2004, and any business decision by Coryn during this period was done with full knowledge. Any prejudice is due to Coryn's own reckless disregard of Seacrets' rights, not to any inexcusable delay by Seacrets. "That defendants made a business judgment to go ahead with its use despite the possibility, and concomitant risks, of legal action by the plaintiff cannot now be used to bar the plaintiff from pursuing its legal rights." *Finance of America* at 597. As a consequence, rather than favor Coryn, this factor greatly favors Seacrets and raises a genuine issue of material fact.

### E.      The public interest.

### 1.      The public interest is served by a disgorgement of Coryn's profits.

The fifth factor considers the public interest in making the infringing misconduct unprofitable and addresses the balance that a court should strike between a plaintiff's right to be compensated for the infringement activities and the statutory right of the defendant not to be a assessed a penalty. *See e.g.*

*Buzz Off, supra*.  While a defendant should not be assessed a penalty, this does not mean that the defendant is entitled to keep the profits it has unjustly obtained.  Not only does the evidence raise genuine issues of material fact, but the evidence favors Seacrets in receiving an appropriate award of Coryn's profits.  In other words, this is exactly the type of case where the public interest dictates an award of monetary damages in the form of a disgorgement of profits, and the key reasons for its enhancement.

### 2.    Coryn's willfulness and reckless behavior should be made unprofitable.

Not only is there strong evidence of a willful infringement, but there is equally strong evidence that Coryn has acted in total reckless and wanton disregard of Seacrets' prior rights.  Most importantly, this is a classic reverse confusion case where the larger and financially stronger junior user overwhelms the market with advertising and promotion in an effort to usurp the value and goodwill of the senior user's mark.  As noted in *Buzz Off*, "[R]everse confusion protects 'smaller senior users. . . against larger, more powerful companies who want to use identical or confusingly similar trademarks.'"  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 228, 57 U.S.P.Q.2d 1097 (3rd Cir. 2000) quoting *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 475 (3rd Cir. 1994).

### 3.    There is a stronger public interest in a disgorgement of profits when "reverse confusion" is involved.

The evidence indicates that Coryn and AMResorts are part of a vast and complex structure that are owned indirectly or directly by members of the Mullen family and The Mullen Family, LLC.  As closely held companies, transparency is kept to a bare minimum.  Nonetheless, in making presentations to potential investors and others, it does not take the Mullen family long to present a unitary picture of assets and strength estimated at ███████ for 2009, only just to juxtapose form over substance, as here, when a financial liability presents a clear and present danger.  The representation of annual

revenues approaching ███████ is approximately ██ times the annual revenues earned by Seacrets. [Ex. 30 at AMR00028480; 28501; 28514; and 28535 when added].  Now with a potential for liability, it argues that AMResorts operates at a loss and that the SECRETS mark is not all that important.  (". . . ███████████████████████████████████████████████████████████████ ").

[Ex. 29 Jarosz Report at p. 2]

Unlike the S.C. Johnson Company in *Buzz Off*, there is no anti-competitive effect posed by an award to Seacrets -- just the opposite.  While that anti-competitive effect tempered the courts' award to SCJ in *Buzz Off*, the reverse confusion and size of Coryn in contrast screams here for the opposite result. There is a public interest in discouraging larger companies from creating reverse confusion in total disregard of the rights of the smaller senior user.

Further, unlike the decreasing and limited use of the mark by the plaintiff's in *Buzz Off* which further tempered the monetary award, this case is just the opposite.  Right when Seacrets began exploring potential expansion [Ex. 25 Moore 09/17/09 Dep. pp. 220-223; 230-233], Coryn began to overwhelm the market with advertising that, as a consequence, casts Seacrets as the low-level infringer or knock-off. ████████████████████████████████████████████████ ██████████████████████ [Ex. 25 Moore 09/17/09 Dep. pp. 96-97; 108-109; Ex. 8 Figgs 09/08/09 Dep. pp. 185-190; 192-193; Ex. 47].

The lost opportunity costs to the small senior user are the very damages envisioned by disgorgement of an infringer's profits.  Without it, smaller senior users are at the mercy of larger companies who are better poised to outspend, out-litigate and overwhelm the marketplace with an infringing mark.  As a consequence, the public interest favors the disgorgement of profits in this case for the blatant acts of infringement and unfair competition by Coryn.

### F.    Palming off.

The sixth factor to be considered under *Synergistic* is whether there is any evidence of "palming off." As noted by Professor McCarthy in *McCarthy on Trademarks and Unfair Competition*, § 25.1 (March 2009), there is much semantic confusion over the meaning attributed to "palming off" or its synonym "passing off."

> "The terms "palming off" or "passing off" have been used by various courts to refer to at least three different and distinct situations: (1) substitution of one brand of goods when another brand is ordered; (2) trademark infringement where the infringer intentionally meant to defraud and confuse the buyers; and (3) trademark infringement where there is no proof of fraudulent intent, but there is a likelihood of confusion of buyers."

Insofar as "palming off" as used by the Fourth Circuit is intended to mean a substitution of branded goods or services for another, or that Coryn intentionally meant to defraud the buyer, Seacrets readily agrees there is no such evidence to date. On the other hand, insofar as the term "palming off" has been used in the modern vernacular to connote a likelihood of confusion, then Seacrets readily disagrees. The evidence of actual confusion in this case in terms of reverse confusion, forward confusion and initial interest confusion is overwhelming. Hence, under this latter connotation for "palming off," genuine issues of material fact exist and have been detailed throughout Part III of this brief.

## IV.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE CORYN'S PARTIAL MOTION FOR SUMMARY JUDGMENT ON THE ISSUES OF DAMAGES AND PUNITIVE DAMAGES UNDER MARYLAND COMMON LAW

### A.    Actual Damages

On page 25 of its brief, Coryn argues that the standards for infringement are the same under both the federal and the common law of Maryland citing *Sterling Acceptance Corp.*, 227 F. Supp. 2nd at 460.

In other words, the courts in the District of Maryland will look exclusively to the damage provisions of the Lanham Act for determining damages under the common law. Seacrets does not disagree with this assertion. Thus, if the *Synergistic* factors favor an award, then damages under the common law should be made as well. As set forth in Part III herein, there are genuine issues of fact that preclude Coryn's motion for summary judgment which equally apply here. Indeed, contrary to Coryn's argument, the *Synergistic* factors favor Seacrets rather than Coryn. When considered in their entirety, they do raise genuine issues of material fact. Accordingly, Coryn's motion should be denied as it seeks to preclude an award of damages under the common law of Maryland

### B.    Punitive damages

While punitive damages are not available under the Lanham Act, they are recognized under the common law of Maryland. To recover punitive damages, two key elements must be met. First, the plaintiff must show that the "injury complained of was inflicted maliciously, **wantonly**, or fraudulently." *Seidelman Yachts, Inc. v. Pace Yacht Corp.,* 1989 WL 214497 (D. Md. 1989). Second, as a necessary condition for the recovery of punitive damages, plaintiff must prove an underlying award of compensatory damages. *Shabazz v. Bob Evans Farms, Inc.* 163 Md. App 602, 881 A.2d 1212 (Md. App 2005). As noted by the court in *Shabazz*, in a proper case a nominal damage award will support a punitive damage award. *Id.*   "Nominal compensatory damages are damages awarded when a compensable injury has been proven but it is impossible to calculate the actual loss that has been suffered." *Id.* at 1234.

In analyzing the supporting cases, the court in *Shabazz* took special note of this court's decision in *Five Platters, Inc. v. Purdie,* 419 F. Supp. 372 (D. Md. 1976) which involved a claim for common law trademark infringement and unfair competition under the common law of Maryland. Even though

the plaintiff did not present proof of actual losses as a result of the wrongful acts, the plaintiff sustained

substantial damages in an "unspecified amount which is difficult of precise proof." *Five Platters, supra*

at 383. Because of this, the court ruled that there were nominal compensatory damages which supported

the punitive award. See *Id.*

> **C.    The evidence of record supports a finding of Coryn's "wanton" infringement in total disregard of Seacrets' rights meriting an award of punitive damages.**

While Seacrets agrees that there is no evidence to date that supports a finding of fraud or

malicious behavior on behalf of Coryn, there is, in contrast, ample evidence supporting a finding that

Coryn has acted in a "wanton" disregard of Seacrets' prior rights.  In this connection, the term "wanton

act" is readily defined by Black's Law Dictionary: Revised 4th Edition (1968) as "one done in reckless

disregard of the rights of others, evincing a reckless indifference to consequences to the … reputation or

property rights of another… and in such conduct as indicates a reckless disregard of the just rights…of

others…or the consequence of action."  As detailed in Part III herein, the evidence of Coryn's wanton

behavior is overwhelming and can be summarized in brief form as follows:

- Seacrets is the prior user and federal registrant of the SEACRETS mark.

- Coryn had constructive knowledge and actual knowledge of those rights before it commenced use of the SECRETS mark.

- Coryn has continued to use the SECRETS mark and to expand the use notwithstanding evidence of actual confusion and the findings by the Trademark Trial and Appeal Board that its registration and use is apt to create a likelihood of confusion.

Simply put, Coryn does not care about the confusion Seacrets is experiencing and what Seacrets

has incurred.  It has and continues to exhibit, as the larger junior user, a total disregard of the

consequence of its actions and business decisions.

40

Though Seacrets may not be able to calculate a precise amount of monetary damages it has incurred by Coryn's infringement, it has evidenced actual confusion, has clearly been deprived of its ability to control its reputation and licensing of its mark, and has been placed in a state of business limbo because of the infringement, each of which, under *Buzz Off*, is sufficient to evidence actual injury or harm, though incapable of a precise monetary loss.  Like in *Five Platters*, the evidence is sufficient to support a finding of nominal compensatory damages to underlie an award of punitive damages in this case.  As a consequence, genuine issues of material fact exist as to the "wanton" acts by Coryn and whether Seacrets would be entitled to a punitive award under Maryland's common law.

## V.     GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF ATTORNEY FEES.

As Coryn points out in its memorandum in support of its motion for summary judgment, attorneys' fees are awarded in "exceptional" cases in accordance with 15 U.S.C. § 1117(a).  The term "exceptional" has been defined by the Fourth Circuit as a situation in which the defendant's conduct was "malicious, fraudulent, willful, or deliberate."  See *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370, 60 U.S.P.Q.2d 1109 (4th Cir. 2001); see also *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 60 USLW 2636, 22 U.S.P.Q.2d 1050 (4th Cir. 1992).

As detailed in Section III.A.1. herein, Coryn has acted willfully, deliberately, and with a reckless disregard for Seacrets' prior rights in the SEACRETS mark.  While Coryn attempts to use the "advice of counsel" defense to exculpate itself, the record suggests that such "advice" was an afterthought -- and perhaps a "smokescreen:"

- Coryn had actual knowledge of Seacrets' prior registration and common law use insofar as it received a copy of the Thomson & Thomson search report requested by Coryn's counsel, Eugene Renz, Jr. which included at least three references to the SEACRETS mark [Exhibit 21];

- Coryn's application for SECRETS was filed before it received the availability opinion of its attorney, Eugene Renz, Jr. [Compare Coryn Ex. 18 with Coryn Ex. 16];

- Coryn included "restaurant services" in its application for SUNCSCAPE marks but refrained from including that phrase in its SECRETS application [Compare Coryn Ex. 18 with Seacrets Ex. 22-24];

- Coryn included "restaurant and bar services" in its application to register SECRETS in Canada [Ex. 24];

- Coryn continued to invest in and promote the SECRETS brand after Seacrets objected to its use via the cancellation proceeding before the Trademark Trial and Appeal Board [See Coryn's Motion for Summary Judgment at p. 6];

- ██████████████████████████████████████████████████ [Ex. 25 Moore 09/17/09 test. at pp. 212-214]; and

- Coryn exacerbated its infringement by expanding its use of the SECRETS mark onto two additional hotels after Seacrets testified about actual confusion between the parties and the TTAB's finding of a likelihood of confusion [See p. 6 - Coryn's Memorandum in Support of Summary Judgment; Ex. 30 at 28527-28528].

The evidence indicates that all of the above actions were willful, deliberate, and performed with a reckless disregard for Seacrets' prior rights in the SEACRETS mark. In view of its actions, Coryn simply cannot be characterized as an innocent infringer. Accordingly, insofar as such an award is within the discretion of the judge, any ruling beforehand would appear premature, especially considering the issues of material fact concerning Coryn's pattern of willful actions in a wanton disregard of Seacrets rights.

## VI.   CONCLUSION

As the old adage goes, "there is always two sides to a story." Coryn endeavors to portray Seacrets as nothing less than a "party bar" with "cheap beer," while others, in contrast, portray the Secret's resorts as a "joke hotel" with suggestive fantasies of sex on the beach. The truth, no doubt, lies somewhere in between. In reality, the way either party is portrayed has little relevance to the likelihood

of confusion engendered by Coryn's willful acts of infringement in total disregard of Seacrets' prior use and registration for an otherwise confusingly similar mark for closely related services.

With all factors considered, the equities strongly favor a disgorgement of Coryn's profits.  There is nothing else that remotely compensates Seacrets for the harm to its mark, its reputation, and its good will.  As the larger and more viable company, Coryn has had numerous opportunities to cease use of the SECRETS mark with little or no impact on its bottom line -- it, instead, chose a different path and has opted to outlitigate and outspend the smaller senior user in the gamble Seacrets would simply "go away."  Contrary to its cost-benefit bet, Seacrets has chosen to defend its name and to prosecute this reckless infringement.

With the likely prospect of liability and permanent injunctive relief, Coryn is now claiming "innocence" and that the SECRETS mark is, in reality, not all that significant or important.  To Seacrets, the matter is important.  As the infringer, Coryn stole the mark, put Seacrets to the costs of litigation, delayed potential expansion, and now Coryn attempts to exculpate itself from the wrongdoing with mechanical precision but without equitable consideration -- "no harm, no foul."  There is no better case for equity and a just award to Seacrets.   Coryn's Motion for Summary Judgment should be denied in its

entirety.  There is sufficient, if not ample, evidence to persuade a jury to warrant a disgorgement of

Coryn's profits, punitive damages, and an award of attorney fees and costs.

Respectfully submitted,

O.C. SEACRETS, INC.

Dated:  November 19, 2009

Karen A. Kovacs (Bar No. 15708)
DICKINSON WRIGHT PLLC
1875 Eye Street, N.W., Suite 1200
Washington, D.C. 20006
Telephone: (202) 457-0160
Facsimile: (202) 659-1559
kkovacs@dickinsonwright.com
*Attorney for Defendant, Counterclaim Plaintiff,*
*Third-Party Plaintiff O.C. Seacrets, Inc.*

Samuel D. Littlepage
Barth X. deRosa
H. Jonathan Redway
Steven D. Lustig
DICKINSON WRIGHT PLLC
1875 Eye Street N.W., Suite 1200
Washington, D.C. 20006
Telephone: (202) 457-0160
Facsimile: (202) 659-1559
*Of Counsel for Defendant, Counterclaim Plaintiff,*
*Third-Party Plaintiff O.C. Seacrets, Inc.*

DC 5836-143 145292

44

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Defendant/Counterclaim-Plaintiff O.C. Seacrets, Inc.'s Memorandum in Opposition to the Coryn Group II, LLC and AMResorts, LLC's Motion for Summary Judgment together with the Declarations of Barth X. deRosa, Karen A. Kovacs, Roy E. Crockett and Gary Lee Figgs has been served upon counsel of record on November 19, 2009, via first class mail, postage prepaid, as identified below:

J. Kevin Fee
Kristin H. Altoff
Daniel S. Marks
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

_____
Barth X. deRosa