IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                                *
THE CORYN GROUP II, LLC,
                                *
     Plaintiff,
                                *
          v.                         CIVIL NO.: WDQ-08-2764
                                *
O.C. SEACRETS, INC.,
                                *
     Defendant.
                                *
```

*   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM OPINION

The Coryn Group II, LLC ("Coryn II") appealed the Trademark
Trial and Appeal Board's cancellation of Coryn II's registration
of its "SECRETS" mark for "resort hotel" services and its denial
of partial cancellation of O.C. Seacrets's ("O.C.") prior
registration of its "SEACRETS" mark for "restaurant and bar"
services.  O.C. cross-appealed and sued Coryn II, the Coryn
Group, Inc. ("Coryn I") and AMResorts ("AMR") for trademark
infringement and unfair competition under the Lanham Act and
Maryland common law.[1]  For the following reasons, (1) Coryn's
motion for partial summary judgment on O.C.'s counterclaims will
be granted in part and denied in part, and (2) O.C.'s motions to
exclude expert evidence will be denied.

---

[1] Coryn I, Coryn II, and AMR will be referred to collectively as
"Coryn."

I.  Background[2]

O.C., a Maryland corporation, owns and operates "Seacrets,"
a Jamaican-themed "entertainment complex" in Ocean City,
Maryland, with 17 bars, a restaurant, night club, stages for
live entertainment, two boutiques, and a hotel.  Leighton Moore
Dep. 83:10-98:8, Oct. 2, 2006 [hereinafter Moore Oct. 2 Dep.].
Although it operates year round, Seacrets is busiest during the
summer and on weekends hosts up to 5,000 patrons a day.  *Id*.
78:11-12; Leighton Moore Dep. 494:6, Oct. 4, 2006 [hereinafter
Moore Oct. 4 Dep.].  Seacrets's patrons are typically Ocean City
vacationers from Maryland, Virginia, Pennsylvania, Delaware,
Ohio, New Jersey, New York, and Washington, D.C.  *See* Michael
Noah Dep. 49:3-20, Oct. 5, 2006.  Seacrets advertises on local
television and radio stations, its website, which features live
streaming video, and "Irie Radio," an Internet radio station
that broadcasts from the complex.  Moore Oct. 4 Dep. 375:6-21;
381:6-471:19.

O.C.'s federally-registered trademark "SEACRETS" for
restaurant and bar services was issued in October 1997.  Opp.,
Ex. 3.  O.C. has applied to register SEACRETS for motel

---

[2] For the purposes of Coryn's motion for summary judgment, O.C.'s
"evidence is to be believed, and all justifiable inferences are
. . . drawn in [its] favor."  *Anderson v. Liberty Lobby*, 477
U.S. 242, 255 (1986).

services; the application has been suspended pending the outcome of this case.  Opp., Ex. 4.  O.C. also owns the web domain name "seacrets.com."  Opp., Ex. 1.

Coryn II, the successor in interest to The Coryn Group, owns and licenses trademarks for resort hotel services.  Jeffrey Mullen Dep. 72:10-12, June 21, 2005.  AMR manages the sales, marketing and administration of several resort hotels in Mexico and the Caribbean.  Kevin Wojciehowski Decl. ¶ 4.  The resorts operate under several different brands, including "Secrets," "Dreams," "Zoetry," and "Sunscape."  Kevin Wojciehowski Dep. 55:17-56:2, Sept. 30, 2009.

The first Secrets resort, Secrets Excellence Punta Cana, opened in Mexico in 2002.  Wojciehowski Decl. ¶ 7.  It ceased operating as a Secrets resort in 2006.  *Id.*  Four other Secrets resorts opened in Cancun, Mexico between 2003 and 2008.  *Id.* ¶¶ 8-10.  Three of these remain Secrets resorts.  *Id.*  In 2010, AMR plans to open two Secrets resorts in Montego Bay, Jamaica.  *Id.* ¶ 11.

The target markets for the Secrets resorts are the United States, Canada and Europe.  *See* Wojciehowski Dep. 125:14-24. AMR advertises Secrets throughout the United States, but its primary markets are Atlanta, Baltimore, Boston, Chicago, Denver, Detroit, New York, Philadelphia, Pittsburgh, and Washington,

D.C.  *Id*. at 127:18-24.  The advertisements are mainly directed
to tour operators and travel agents, who promote Secrets to
their clients.  *Id*. at 123:17-22.  AMR also advertises through
print, direct mail, radio, and the Internet.  *Id*. at 119:1-
125:6.

On June 22, 2000, the Coryn Group filed an Intent-to-Use
application with the U.S. Patent and Trademark Office ("PTO")
for the mark "SECRETS" for "resort hotel" services.  Mot. Summ.
J., Ex. 17.  On June 29, 2000, Coryn secured the web domain name
"secretsresorts.com."  Opp., Ex. 22.  The same day, AMR's
counsel, Eugene R. Renz, Jr., Esq., requested a trademark
research report for the SECRETS mark from Thomson & Thomson.
Opp., Ex. 1.  The report--which noted O.C.'s registration for
SEACRETS and its "seacrets.com" domain name--was completed on
July 6, 2000.  *Id*.  Renz called AMR founder Alex Zozaya to
report the results, which he opined did not suggest any
potential problem for Coryn's use of the SECRETS mark.  Alex
Zozaya Dep. 23:7-24:5, Mar. 12, 2007.  On July 13, 2000, Renz
sent Zozaya a letter confirming that none of the registered
marks identified in the report would "present an obstacle to
[Coryn's] use and registration." of SECRETS.  Mot. Summ. J., Ex.
16 (Letter from Eugene E. Renz, Jr. to Alex Zozaya, July 13,
2000).  Renz stated that although "there were a number of

registrations for SECRETS with various spellings . . . none of
the citations [in the report] were for [Coryn's] services." *Id*.[3]
Renz enclosed a copy of the report.  *Id*.

On March 21, 2001, the PTO issued a Notice of Publication
of the SECRETS mark, and on April 3, 2001 the mark was published
for opposition.  *Id*., Ex. 18.  The application was not opposed,
and the PTO issued the registration to Coryn on October 7, 2003.
*Id*., Ex. 20.

In 2002 or 2003, Leighton Moore, O.C.'s owner and
president, had conversations with two patrons who mistakenly
believed O.C. had opened a Seacrets in Mexico.  Moore Oct. 2
Dep. 44:14-19; Leighton Moore Dep. 16:14-17:20, Sept. 17, 2009.[4]
Moore immediately called O.C.'s counsel, Barth X. deRosa, Esq.
whom he instructed to investigate the possibility of
infringement.  *See* Moore Sept. 17 Dep. 17:6-7.

---

[3] The PTO Intent-to-Use application for SECRETS defined Secrets's
services more narrowly than a similar application filed with the
Canadian Intellectual Property Office on November 14, 2001.
Opp., Ex. 24.  The services identified in that application were
"resort hotel" and "hotel, restaurant, and bar services."  *Id*.
The PTO application for SECRETS also differed from Coryn's July
19, 2001 PTO application for the SUNSCAPE mark, which was for
"hotel and restaurant services."  *Id*., Ex. 23.

[4] In September 2009, Moore testified that he has since been asked
"a few times a year" about Seacrets's affiliation with the
Secrets Mexican resorts.  Moore Sept. 17 Dep. 21:15-22.

On January 23, 2004, O.C. petitioned the PTO's Trademark
Trial and Appeal Board ("TTAB") for cancellation of the SECRETS
mark, alleging, *inter alia*, that the parties' services were
"closely related, if not identical" and that the use of the
SECRETS mark "cause[d] injury to [Seacrets] since it ha[d] no
control over the nature and quality of the services being
offered in connection with [the] confusingly similar . . . mark
[SECRETS]."  Compl., Ex. A (*O.C. Seacrets, Inc. v. Coryn Group*,
Cancellation No. 92042854 (TTAB 2008)).  Coryn counterclaimed
for partial cancellation and restriction of the SEACRETS mark.
*Id*.  On August 20, 2008, the TTAB held that O.C. had established
(1) "priority over [Coryn's] rights in the field of hospitality,
and in particular, to hotels and closely-related 'restaurant and
bar' services" and (2) "a likelihood of consumer confusion by
[Coryn's] registration of the SECRETS mark."  *Id*.  Accordingly,
the TTAB granted O.C.'s cancellation petition.  *Id*.  Coryn's
counterclaims for partial cancellation and restriction were
denied.  *Id*.

On October 20, 2008, Coryn II appealed the TTAB's decision.[5]
Paper No. 1.  On December 12, 2008, O.C. Seacrets cross-

---

[5] A dissatisfied party to a cancellation proceeding before the
Trademark Trial and Appeal Board may appeal by a civil action in
a U.S. District Court.  15 U.S.C. § 1071 (a)-(b) (2006).

appealed, counterclaimed against Coryn II--and filed a third-party complaint against the Coryn Group and AMR--for trademark infringement and unfair competition under the Lanham Act and Maryland common law.  Paper No. 18.  On October 28, 2009, O.C. moved to exclude expert reports and testimony offered by Coryn. Paper Nos. 77, 70.  On October 29, 2009, Coryn moved for partial summary judgment on the monetary relief available to O.C. Paper No. 81.

II.  Analysis

    A.  Coryn's Motion for Summary Judgment

    Coryn seeks summary judgment that O.C. may not recover monetary relief under the Lanham Act, damages under Maryland common law, damages for "corrective advertising," or attorneys' fees on its counterclaims.

        1.  Standard of Review

    Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

2.   Monetary Relief under the Lanham Act

Under the Lanham Act, a successful plaintiff may, "subject to the principles of equity . . . recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. 1117(a).[6]  "The court shall

---

[6] It has been noted that "[t]here is a great deal of semantic confusion in [decisions] dealing with . . . monetary recovery for trademark infringement and unfair competition." 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30.57 (4th ed. 2009).  Courts have used "at least five ways of measuring monetary recovery:

> 1. An award to plaintiff measured by defendant's profits, either as a way of measuring plaintiff's loss or under an unjust enrichment theory;

8

assess such profits and damages or cause the same to be assessed

under its direction" and ensure that any relief awarded "shall

constitute compensation and not a penalty." *Id*. "The trial

court's primary function should center on making any violations

of the Lanham Act unprofitable to the infringing party."[7]

---

> 2. An award to plaintiff measured by its actual business damages;
>
> 3. An award to plaintiff measured by its own loss of profits caused by the wrong;
>
> 4. An award to plaintiff of punitive damages in addition to actual damages, for the purpose of punishing defendant; and
>
> 5. An award to plaintiff of reasonable attorney's fees incurred in prosecution."

*Id*. Some courts refer to all forms of monetary relief as "damages," but Professor McCarthy believes that this "only serves to promote confusion" in an already confused area of law. *Id*. Because O.C. seeks (1) actual damages, (2) Coryn's profits, and (3) attorneys' fees, the court will refer generally to "monetary relief" and will distinguish the types of relief as needed.

[7]*Vanwyk Textile Sys., B.V. v. Zimmer Mach. America.*, 994 F. Supp. 350, 380 (W.D.N.C. 1997) (*quoting Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1348 (7th Cir. 1994)). An award may be appropriate if the infringement has caused the defendant's unjust enrichment or damages to the plaintiff from a diversion of sales or loss of reputation or goodwill. *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 178 (3d Cir. 2005). An award may also be warranted if necessary to deter future infringement. *See id*. In any case, "the monetary relief granted . . . must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty." *Id*. To this end, the Court has discretion to

The Fourth Circuit has identified six nonexclusive factors that should be considered when awarding damages or a defendant's profits:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006).  A prevailing party is not required to make a showing on any one factor or even a majority of the factors, *see id*. at 175-76, and different or additional factors may be considered if the circumstances require, *id*. at 176.  In all cases, the Court must "weigh the equities of the dispute and exercise its discretion on whether an award is appropriate and, if so, the amount thereof."  *Id*.[8]

---

fashion an appropriate remedy, including by increasing or decreasing a jury's award.  *See, e.g.*, *id*. at 177; *Go Med. Indus. PTY, Ltd. v. Inmed* Corp, 471 F.3d 1264, 1274 n.4 (Fed. Cir. 2006).

[8] Although § 1117(a) states that an award of monetary relief is "subject to the principles of equity"--and *Synergistic* instructs that the Court should apply "appropriate equitable principles" in making the award--it appears that the question of the plaintiff's entitlement to monetary relief may be submitted to a jury.  Under § 1117(a), "[t]he court shall assess such profits and damages *or cause the same to be assessed under its direction*." 15 U.S.C. § 1117(a) (emphasis added).  *See also Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65 (1st Cir. 2008); *Quick Techs. v. Sage Group PLC*, 313 F.3d 338 (5th Cir. 2002); *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F.

Coryn argues that it is entitled to summary judgment on the availability of monetary relief because, based on the undisputed facts--and after considering the equities--no reasonable fact-finder could make an award to O.C.  Coryn discusses the six *Synergistic* factors and argues that because O.C. has insufficient evidence to support a finding in its favor on any of them, the balance of the equities precludes a monetary award. Although Coryn acknowledges that the factors are nonexclusive--and that, in the Fourth Circuit, none is *required* to support an award--its approach fails to recognize that (1) depending on the facts of the case, other considerations may be relevant to the fact finder's decision and (2) a finding that the equities favor the defendant may merely diminish--but not preclude--an award.[9]

These considerations are relevant here because one of O.C.'s theories of infringement is based on "reverse

---

Supp. 2d 571 (M.D.N.C. 2009).  At least one court has held that a plaintiff claiming monetary relief has the right to a trial by jury. *See Oxford Indus., Inc. v. Hartmarx Corp.*, 15 U.S.P.Q.2d 1648 (N.D. Ill. 1990).

O.C. has demanded a jury trial on its counter- and third-party claims, and both parties appear to assume that the question of O.C.'s entitlement to a monetary award may be submitted to a jury.

[9] Nominal damages may be awarded under 15 U.S.C. § 1117(a). *See, e.g.*, *Belmonts v. Dimucci*, 101 F.3d 684 (2d Cir. 1996) (table case); *Downtowner/Passport Int'l Hotel Corp. v. Norlew, Inc.*, 841 F.2d 214, 220 (8th Cir. 1988).

confusion."[10]   The *Synergistic* factors are not easily applied to

a claim of reverse confusion.   For example, "whether the

defendant had the intent to confuse or deceive . . . addresses

whether there has been a willful infringement."   *Synergistic*,

---

[10] As the Seventh Circuit has explained:

> Reverse confusion occurs when a large junior user
> saturates the market with a trademark similar or
> identical to that of a smaller, senior user.  In such
> a case, the junior user does not seek to profit from
> the goodwill associated with the senior user's mark.
> Nonetheless, the senior user is injured because the
> public comes to assume that the senior user's products
> are really the junior user's or that the former has
> become somehow connected to the latter.  The result is
> that the senior user loses the value of the trademark-
> -its product identity, corporate identity, control
> over its goodwill and reputation, and ability to move
> into new markets.

*Sands, Taylor & Wood*, 978 F.2d at 957 (*quoting Americtech, Inc.
v. American Information Techs. Corp.*, 811 F.2d 960, 964 (6th
Cir. 1987))(internal quotation marks omitted).

Reverse confusion is not "forward confusion," which occurs
"when customers mistakenly think that the junior user's goods or
services are from the same source as or are connected with the
senior user's goods or services."  *Id*.  "In such a case, the
junior user attempts to capitalize on the senior user's goodwill
and established reputation by suggesting that the product comes
from the same source as does the senior user's product."  *Id*.

Although the Fourth Circuit has not adopted the doctrine of
"reverse confusion," *Dick's Sporting Goods, Inc. v. Dick's
Clothing and Sporting Goods*, 1999 U.S. App. LEXIS 19942, at *35
(4th Cir. Aug. 20, 1999), it has been applied in this district,
*Bridges in Organizations, Inc. v. Bureau of Nat'l Affairs, Inc.*,
19 U.S.P.Q.2d 1827 (D. Md. 1991), and in at least six circuit
courts of appeals, *see* 4 McCarthy 23.10 n.7 (collecting cases).

470 F.3d at 175.  Focusing mainly on the "intent to confuse or deceive," Coryn argues that this factor requires "proof that [it] deliberately intended to copy [from O.C.] or confuse consumers, leading them to believe that [its] . . . services are associated with [O.C.]."  Mot. Summ J. 14.[11]  O.C. focuses on "willfulness" and relies on cases defining willfulness as a knowing or reckless disregard of the mark holder's rights.[12]

*Synergistic*'s "willfulness" seems to contemplate "forward confusion," in which the junior user "attempts to trade on the senior's user's goodwill and reputation."  *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:10 (4th ed. 2009).  In examining scienter in a reverse confusion case, the focus is on whether junior user has selected the infringing mark despite knowledge of the senior user's mark--not whether the junior user intended to trade on the senior user's goodwill and reputation.  *See* 4 McCarthy, § 23:10 (collecting cases).  Determining willfulness in this reverse confusion case

---

[11] Coryn cites cases defining willful infringement as involving the specific intent to cause consumer confusion.  *See, e.g.*, *Quick Techs. V. Sage*, 313 F.3d 338 (5th Cir. 2002); *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993).

[12] *See, e.g.*, *Visible Sys., Inc. v. Unisys Corp.*, 551 F.3d 65, 75; *Gucci America, Inc. v. Daffy's, Inc.*, 354 F.3d 228, 239 (3d Cir. 2003).

may require Coryn's mere knowing or reckless disregard of O.C.'s rights.

The second factor--whether sales were diverted as a result of the infringement--also appears to assume a case of forward confusion.  Coryn argues that O.C. is ineligible for a monetary award because O.C. has not shown lost sales from consumer confusion between the parties' marks.  Mot. Summ. J. 16.  Such a showing is not required in a reverse confusion case:

> Under [the] 'reverse confusion' doctrine, the injury to [the plaintiff] was based on [the defendant's] extensive use of a mark that infringed upon and overwhelmed [the plaintiff's] prior, senior use of its mark creating a likelihood of consumer confusion, even if there were no consumers who were misled into buying [the defendant's products] when they really wished to purchase [the plaintiff's] instead.

*Buzz Off*, 606 F. Supp. 2d at 585 (applying *Synergistic*). Evidence "establishing that [the defendant's] extensive use of [its] mark overwhelmed [the plaintiff's] prior use and essentially usurped the value of [the plaintiff's] mark" favors a monetary award.  *Id*. at 588.  Determining whether an award is appropriate based on this factor may require different considerations than were discussed in *Synergistic*.

The remaining factors--the adequacy of other remedies, whether the plaintiff unreasonably delayed asserting its rights, the public interest, and whether the infringement involved

"palming off"--are more easily addressed in a reverse confusion case.  But the weight, if any, given them is within the sound discretion of the fact finder.  Coryn's approach fails to recognize that the *Synergistic* analysis is flexible and case-specific.

Coryn argues that the undisputed evidence would support no monetary award.  O.C. has presented evidence that Coryn--a larger company whose primary markets overlap somewhat with O.C.'s--filed an Intent-to-Use application for a mark similar to O.C.'s before performing a trademark search.  Even after a search revealed the registration of the SEACRETS mark for "restaurant and bar services"--which are similar to the services identified in SECRETS's PTO application[13]--Coryn continued to use the SECRETS mark.  Shortly after the opening of the first Secrets hotel in Mexico, patrons began asking Seacrets's owner, Leighton Moore, if Seacrets had expanded into Mexico.  Moore promptly petitioned the TTAB for cancellation of the SECRETS mark, and the TTAB found that Coryn's use of the mark was likely to cause consumer confusion.  The TTAB's findings are confirmed by Robert Reitter's expert study for Seacrets that found 26 percent of likely visitors to Ocean City, Maryland were confused

---

[13] And are the same as those identified in its Canadian Intellectual Property Office registration.

between the parties' marks.  Opp. Ex. 26.  Viewing this evidence in the light most favorable to O.C., a reasonable jury may conclude that a monetary award would be appropriate.

### 3.  Monetary Relief under Maryland Law

The parties agree that because the standards for infringement are the same under federal and Maryland law, the test for monetary relief is the same.  *See Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 460 (D. Md. 2002).  Thus, because O.C. has made a sufficient showing on its Lanham Act claims to survive summary judgment, the same is true for its Maryland claims.

In addition to the relief available under the Lanham Act, Maryland law permits punitive damages "upon a showing that the injury complained of was inflicted maliciously, wantonly or fraudulently."  *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, 1989 U.S. Dist. LEXIS 17486, at *55-56 (D. Md. April 27, 1989). A plaintiff must be awarded at least nominal compensatory relief to be eligible for punitive damages.  *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 340 A.2d 705, 708 (1975).

O.C. concedes that there is no evidence that Coryn has acted fraudulently or maliciously.  Opp. 40.  But O.C. argues that there is evidence of "wantonness," or "extreme recklessness and utter disregard for" its rights.  *See Dennis v. Baltimore*

16

*Transit Co.*, 189 Md. 610, 56 A.2d 813, 817 (1948).  O.C. has presented evidence that, viewed in the light most favorable to it, may support a finding that Coryn acted in utter disregard of O.C.'s rights in the SEACRETS mark.  Coryn is not entitled to summary judgment on the availability of punitive damages.

### 4.   Corrective Advertising

Coryn argues that it is entitled to summary judgment on O.C.'s request for damages for corrective advertising to alleviate the confusion caused by Coryn's use of the SECRETS mark.  Mot. for Summ. J. 24.  O.C. has not opposed this aspect of Coryn's motion.  Accordingly, the Court will grant summary judgment for Coryn on O.C.'s request for corrective advertising damages.

### 5.   Attorney Fees

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  Coryn has moved for summary judgment on O.C.'s ability to recover attorney fees.  Determining O.C.'s entitlement to attorney fees now would be premature.  The Court will address any request for attorney fees after trial.

Accordingly, Coryn will be granted summary judgment on O.C.'s request for corrective advertising damages; the remainder of its motion will be denied.

B.  O.C.'s Motions to Exclude Expert Testimony

O.C. has moved to exclude the expert report of Kenneth A. Hollander, part of the expert report of John C. Jarosz, and any related testimony.  O.C. contends that the reports and testimony should be excluded (1) because they fail to satisfy the standards for expert testimony in Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and (2) because their probative value is substantially outweighed by the danger of unfair prejudice or jury confusion.

1. Rule 702 and *Daubert*

Under Rule 702, expert testimony is admissible if it will assist the trier of fact and is (1) "based upon sufficient facts or data," (2) "the product of reliable principals and methods, and" (3) "the principals and methods [have been applied] reliably to the facts of the case."  Fed. R. Evid. 702.  As the *Daubert* Court has explained, evidence is admissible under Rule 702 if "it rests on a reliable foundation and is relevant."  *Daubert*, 509 U.S. at 597.  The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence.  *Id*. at 590.[14]

---

[14] Because these matters are well-briefed and supported, no hearing is necessary.  *See United States v. Davis*, 602 F. Supp. 2d 658, 663 (D. Md. 2009).

18

2.   Rule 403

Expert testimony may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. *Daubert* recognized that expert testimony "can be both powerful and quite misleading because of the difficulty of evaluating it." *Id.* at 595. Thus, in applying Rule 403, the Court "exercises more control over experts than . . . lay witnesses." *Id.*

3. The Hollander Report

Hollander, president of a California consumer research firm, was retained by Coryn to determine the extent to which the SECRETS mark is likely to cause confusion with the SEACRETS mark. Mot. in Limine, Ex. A. Hollander performed an Internet-based consumer confusion survey that targeted people who had "visited an adults-only resort in the Caribbean or Mexico in the past 12 months or would be likely to do so in the coming 12 months"--*i.e.*, potential Secrets patrons. *Id.* Participants were divided into a "test" group and a "control" group. *Id.*[15]

---

[15] In consumer confusion surveys, the use of a control group is meant to account for "background noise," *i.e.*, responses that are based not on the content being evaluated, but on partici-pants' preexisting beliefs, inattention, or guessing. *See* Shari Seidman Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* 256-57 (2d ed. 2000).

The test group was shown web pages from Seacrets and Secrets and were asked if they believed they were operated by the same company or were otherwise affiliated.  *Id.*  The control group survey was similar in all respects except that the SECRETS mark on the Secrets web pages was changed to "SEA CREST."  *Id.*  Hollander reported a "net confusion rate" of 1.5 percent.  *Id.*

O.C. argues that Hollander failed to apply industry standards in designing and implementing the survey; thus, his report and testimony should be excluded.  "Survey evidence is generally admissible in cases alleging trademark infringement under the Lanham Act."  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 580 (S.D.N.Y. 2007).  "While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare."  *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993).  Usually, objections based on flaws in the survey's methodology are properly addressed to the trier of fact.  *See id.*[16]  "Unlike

---

The rate of confusion in the control group is subtracted from that of the test group to arrive at the "net confusion" figure. *See* 6 McCarthy, § 32:187.

[16] *See also, e.g.*, *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 121 (3d Cir. 2004) (survey's technical unreliability goes to the weight not admissibility); *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1262-63 (9th

novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997).

O.C. argues that the Hollander Report is inadmissible because (1) the "universe" of the survey was incorrectly defined;(2) the control stimulus was improper; (3) confusion as to sponsorship was not measured; and (4) there was no validation of the survey.[17] These arguments relate to alleged technical deficiencies of the Report and are properly addressed to the trier of fact.[18] The issues O.C. raises are straightforward,

---

Cir. 2001) (same); *Pediamed Pharm, Inc. v. Breckenridge Pharm.*, Inc., 419 F. Supp. 2d 715, 729 n.20 (D. Md. 2006)(same); 6 McCarthy, § 32:170 ("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence.").

[17] The applicable professional standards for survey research are discussed in Shari Seidman Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* 229-276 (2d ed. 2000).

[18] O.C.'s argument that the universe of survey participants was improperly defined appears not only to challenge the survey's reliability but also its relevance. O.C. argues that because it has alleged "reverse confusion," the proper universe was potential Seacrets patrons and that because Hollander surveyed only potential Secrets patrons, the report should be excluded. Although a survey intended to measure reverse confusion should be directed to the senior user's customer base, *see* 6 McCarthy, § 32:159, Hollander's failure to conduct such a survey does not render the Report irrelevant. O.C. is also claiming infringement based on "forward confusion," and Coryn has appealed the TTAB's

and, with the aid of cross-examination and O.C.'s rebuttal
witness, a jury will be able to determine whether the asserted
technical deficiencies undermine the Report's probative value.[19]
The clarity of the issues also diminishes any risk of prejudice
or jury confusion.  There being no other objection to the
admissibility of the Report, Coryn has shown by a preponderance
of the evidence that the report is relevant and reliable.
Accordingly, O.C.'s motion will be denied.

  4. The Jarosz Report

  Jarosz was retained by Coryn as a rebuttal expert on the
monetary recovery to which O.C. would be entitled should it
prove infringement.  His report addresses only the amount of
Coryn's profits that are attributable to its use of the SECRETS
mark; it does not address actual damage to O.C.  Jarosz argues
that the report of O.C.'s expert, Joe Epps, is flawed, *inter
alia*, because it recommends a disgorgement of all profits made
by Coryn during the period of alleged infringement rather than
those that may be attributed to its use of the allegedly

---

finding of forward confusion.  The Report is relevant to those
claims.

[19] The Court recognizes that the flaws O.C. notes are potentially
serious, but even assuming the accuracy of O.C.'s criticisms,
"[v]igorous cross examination, presentation of contrary
evidence, and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but
admissible evidence."  *Daubert*, 509 U.S. at 596.

infringing mark.  Opp., Ex. A.  Jarosz's report presents two alternatives to Epps's calculation: (1) the price Coryn would have had to pay O.C. for the right to use the SECRETS mark (*i.e.*, an "avoided royalty")[20] and (2) a calculation of Coryn's profits from the Secrets resorts based on the incremental benefit of the SECRETS name.  *Id.*

O.C. moves to exclude only the first alternative.  It argues that Jarosz's use of the hypothetical royalty as a measure of profits attributable to infringement is irrelevant, unreliable and confusing.  It cites cases in which courts have refused to base a monetary award on hypothetical royalties,[21] and one case in which a court granted a party's motion to exclude expert testimony about the same.[22]  Coryn notes that many other

---

[20] Jarosz opines that because the "incremental benefits accruing to [Coryn] from use of the 'Secrets' name appear to be minimal . . . . [Coryn's] profits associated with the alleged infringement are best reflected in the form of a royalty payment of no higher than 3 percent of revenues.  Failure to pay a royalty, from an economic perspective, represents the alleged ill-gotten gains retained by [Coryn]."  *Id.*

[21] *See, e.g., M2 Software, Inc. v. Viacom, Inc.*, 223 Fed. Appx. 653 (9th Cir. 2007); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197 (3d Cir. 1999); *Apollo Theatre Found., Inc. v. Western Int'l Syndication*, 2005 WL 1041141 (S.D.N.Y. May 5, 2005); *Trovan Ltd. v. Pfizer, Inc.*, 2000 WL 709149 (C.D. Cal. May 24, 2000).

[22] *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1359955 (S.D.N.Y. May 18, 2006).

courts[23]--including district courts in this circuit[24]--have

permitted such evidence.[25]

       With the exception of *Juicy Couture*,[26] none of the cases

cited by either party has discussed the *admissibility* of

reasonable royalty testimony as an alternative measure of a

defendant's profits; they have only discussed the weight such

evidence deserves in the assessment of monetary relief.

Although some courts and commentators have attempted to derive a

principal to explain the different ways hypothetical royalty

evidence has been treated, *see* 5 McCarthy § 30:85 (citing

cases), the issue appears to be case-specific.  No court has

---

[23] *See, e.g., Go Med. Indus. PTY, Ltd v. Inmed Corp.*, 471 F.3d
1264 (Fed. Cir. 2006); *Sands, Taylor, & Wood v. Quaker Oats Co.*,
34 F.3d 1340, 1343 (7th Cir. 1992); *Adidas America, Inc. v.
Payless Shoesource, Inc.*, 2008 WL 4279812 (D. Or. Sept. 12,
2008); *R&R Partners, Inc. v. Tovar*, 2007 WL 1202802 (D. Nev.
Apr. 23, 2007); *Icon Solutions, Inc. v. Ikon Office Solutions,
Inc.*, 1998 WL 314672 (E.D. Pa. 1998); *American Farm Bureau Fed'n
v. Alabama Farmers Fed'n*, 935 F. Supp. 1533 (M.D. Ala. 1996).

[24] *See Buzz Off Insect Shield, LLC v. S.C. Johnson & Son,* 606 F.
Supp. 2d 571 (M.D.N.C. 2009); *Clear Blue, Inc. v. Clear!Blue,
Inc.,* 2008 WL 5232897 (W.D.N.C. Dec. 12, 2008); *U.S. Olympic
Comm. V. Union Sport Apparel*, 220 U.S.P.Q. 526 (E.D. Va. 1983).

[25] Among these cases are cases O.C. relies upon for its "reverse
confusion" theory: *Buzz Off* and *American Farm Bureau*.

[26] Coryn correctly notes that *Juicy Couture*'s exclusion of the
expert's testimony on hypothetical royalty rates was based as
much on the flaws of that expert report as it was on the court's
rejection of hypothetical royalty method of calculating monetary
relief.  *See Juicy Couture*, 2006 WL 1359955, at *4.

announced a *per se* bar against the presentation or consideration of such evidence.

Jarosz's report and testimony are relevant and unlikely to mislead the jury.  O.C.'s main objection to Jarosz's opinion is that it is too speculative--*i.e.*, because O.C. and Coryn never contemplated a licensing agreement for the mark, Jarosz's calculation of the royalty is baseless.  This criticism may be adequately addressed through cross-examination and the presentation of contrary evidence.  Given that Jarosz's hypothetical royalty measurement is merely offered as one way of estimating Coryn's profits attributable to the infringement--which will be presented with his second alternative and in rebuttal to still another alternative proposed by Epps--there is little risk that the jury will accord it undue weight. Providing the jury with another perspective is likely to assist it in making what is certain to be a difficult calculation.

O.C. has also argued that Jarosz's report and testimony should be excluded because his calculation of the hypothetical royalty is flawed because he misapplied the so-called *Georgia-Pacific* factors. *See Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).[27]  The

---

[27] The *Georgia-Pacific* factors were originally used in patent and trade secret cases, but have been applied, with variations, in

*Georgia-Pacific* factors are not required for royalty calculation, but courts have recognized them as useful in trademark cases. *See, e.g.*, *A&L Labs., Inc. v. Bou-Matic, LLC*, 2004 WL 1745865, at *2. (D. Minn. Aug. 2, 2004). Thus, Jarosz did not choose an unreliable method of calculation. O.C.'s objections to Jarosz's opinions about the individual factors go to the weight of his testimony and report, not their admissibility. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11 th Cir. 2003) ("The identification of . . . flaws in generally reliable . . . evidence is precisely the role of cross-examination.").

Accordingly, O.C.'s motion to exclude the Jarosz report will be denied.

---

trademark and unfair competition cases. *See Sands, Taylor & Wood*, 34 F.3d at 1351-52; *A&L Labs., Inc. v. Bou-Matic, LLC*, 2004 WL 1745865, at *2. (D. Minn. Aug. 2, 2004). The factors that Jarosz considered were (1) O.C.'s willingness to license the mark, (2) the level of consumer awareness of O.C.'s mark, (3) evidence of royalty rates paid in similar contexts, (4) how names similar to SECRETS have been used by Coryn, (5) the benefit Coryn could expect to generate as a result of using the infringing mark as opposed to some other name, and (6) other factors unique to this case. Opp., Ex. A.

III. Conclusion

For the reasons stated above, Coryn's motion for partial summary judgment will be granted in part and denied in part, and O.C.'s motions to exclude expert testimony will be denied.


March 30, 2010                    _____/s/_____
Date                             William D. Quarles, Jr.
                                 United States District Judge