IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                              *
THE CORYN GROUP II, LLC,
                              *
      Plaintiff,
                              *
           v.                        CIVIL NO.: WDQ-08-2764
                              *
O.C. SEACRETS, INC.,
                              *
      Defendant.
                              *
```

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

The Coryn Group II, LLC appealed the Trademark Trial and
Appeal Board's ("TTAB's") cancellation of its registered mark
"SECRETS" for "resort hotel" services and denial of partial
cancellation of O.C. Seacrets's ("O.C.") prior registration of
its "SEACRETS" mark for "restaurant and bar" services.  O.C.
cross-appealed and sued Coryn II, the Coryn Group, Inc. and
AMResorts, LLC (collectively "Coryn") for trademark infringement
and unfair competition under the Lanham Act and Maryland common
law.  Pending are various pretrial motions.  For the following
reasons, Coryn's motions to exclude evidence of the TTAB
decision and the testimony of Michael Noah will be granted.
Coryn's motions to exclude the testimony of Robert Reitter and
Leighton Moore will be denied, and decisions on its motions to

exclude internet statistics and evidence of non-party revenues will be deferred until trial.  O.C.'s motions will be denied.

I.   Background

O.C., a Maryland corporation, owns and operates "Seacrets," a Jamaican-themed "entertainment complex" in Ocean City, Maryland.  Leighton Moore Dep. 83:10-98:8, Oct. 2, 2006. Seacrets advertises on local television and radio stations, its website, and "Irie Radio," an Internet radio station that broadcasts from the complex.  Leighton Moore Dep. 375:6-21; 381:6-471:19 Oct. 4, 2006.  O.C.'s federally-registered trademark "SEACRETS" for restaurant and bar services was issued in October 1997.  ECF No. 94, Ex. 3.  O.C. has applied to register SEACRETS for motel services; the application has been suspended pending the outcome of this case.  *Id.,* Ex. 4.  O.C. also owns the web domain name "seacrets.com."  *Id.,* Ex. 1.

Coryn owns and licenses trademarks for resort hotel services.  Jeffery Mullen Dep. ¶ 72:10-12, June 21, 2005. AMResorts, LLC is one of many related entities owned by members of the Mullen family ("the AMR-Related Companies").  AMResorts, LLC manages the sales, marketing and administration of several resort hotels in Mexico and the Caribbean.  Kevin Wojciehowski Decl. ¶ 4.  The resorts operate under different brands, including "Secrets," "Dreams," "Zoetry," and "Sunscape," and

2

target travelers from the United States, Canada, and Europe.
Kevin Wojciechowski Dep. 55:17-56:2, 125:14-24, Sept. 30, 2009.

On June 22, 2000, Coryn filed an Intent-to-Use application
with the U.S. Patent and Trademark Office ("PTO") for the mark
"SECRETS" for "resort hotel" services.  Mot. Summ. J., Ex. 17.
On June 29, 2000, Coryn secured the web domain name
"secretsresorts.com."  ECF No. 94, Ex. 22.  On March 21, 2001,
the PTO issued a Notice of Publication of the SECRETS mark, and
the mark was published for opposition on April 3, 2001.  ECF No.
81, Ex. 18.  The application was not opposed, and the PTO issued
the registration to Coryn on October 7, 2003.  *Id.*, Ex. 20.

In 2002 or 2003, Leighton Moore, O.C.'s owner and
president, had conversations with two patrons who mistakenly
believed O.C. had opened a Seacrets in Mexico.  Moore Oct. 2
Dep. 44:14-19; Leighton Moore Dep. 16:14-17:20, Sept. 17, 2009.
Moore immediately called O.C.'s counsel, Barth X. deRosa, Esq.,
and instructed him to investigate the possibility of
infringement.  *See* Moore Sept. 17 Dep. 17:6-7.

On January 23, 2004, O.C. petitioned the TTAB for
cancellation of the SECRETS mark, alleging that the parties'
services were "closely related, if not identical" and that the
use of the SECRETS mark injured Seacrets "since it ha[d] no
control over the nature and quality of the services being

3

offered in connection with [the] confusingly similar . . . mark [SECRETS]." Compl., Ex. A. Coryn counterclaimed for partial cancellation and restriction of the SEACRETS mark. *Id*.

On August 20, 2008, the TTAB granted O.C.'s cancellation petition, and denied Coryn's counterclaims for partial cancellation and restriction. *Id*. On October 20, 2008, Coryn II appealed the TTAB's decision. ECF No. 1. On December 12, 2008, O.C. cross-appealed, counterclaimed against Coryn II—and filed a third-party complaint against the Coryn Group and AMResorts, LLC—for trademark infringement and unfair competition under the Lanham Act and Maryland common law. ECF No. 18.

II. Analysis

A. Coryn's Motions

1. Coryn's Motion to Exclude the TTAB Decision

Coryn has moved to exclude the TTAB decision from evidence which may be presented to the jury because it is irrelevant and unfairly prejudicial. ECF No. 149. O.C. contends that because the TTAB "examined the likelihood of confusion issue thoroughly," its "record and conclusions of fact will be of great assistance to the jury in deciding the question of infringement." ECF No. 151 at 5.

a.   Rules 401 & 403

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Evidence that is not relevant is not admissible.  Fed. R. Evid. 402.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Fed. R. Evid. 403.  Unfair prejudice is that which has an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *United States v. Queen,* 132 F.3d 991, 994 (4th Cir. 1997).  "A district court has wide discretion in admitting or excluding evidence under Rule 403."  *United States v. Kelly,* 510 F.3d 433, 437 n.3 (4th Cir. 2007)(internal quotation marks omitted).

b.   The TTAB Decision

The TTAB decision is relevant to several issues in this case.  But, its relevance is limited because "the standards governing likelihood of confusion in registration, cancellation, or opposition proceedings before the TTAB . . . can be different than the likelihood of confusion standard applicable in trademark infringement actions in a district court."  *Levy v.*

*Kosher Overseers Ass'n,* 104 F.3d 38, 41 (2d Cir. 1997). Here, the TTAB did not apply all likelihood of confusion factors used by the Fourth Circuit.[1]

Further, introduction of the TTAB decision is likely to confuse the jury and encourage a decision on an improper basis. Admitting evidence of the decision will likely cause the jury "to deliberate on the correctness of the previous fact finding, rather than retaining the open-minded, first impression approach to the issues our system prefers." *Rambus, Inc. v. Infineon*

---

[1] The Fourth Circuit has identified nine factors for assessing the likelihood of confusion:

> (1) The strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;(2) the similarity of the two marks to consumers;(3) the similarity of the goods or services that the marks identify;(4) the similarity of the facilities used by the markholders;(5) the similarity of advertising used by the markholders;(6) the defendant's intent;(7) actual confusion;(8) the quality of the defendant's product; and(9) the sophistication of the consuming public.

*George & Co. v. Imagination Entm't Ltd.,* 575 F.3d 383, 393 (4th Cir. 2009).

The TTAB did not address Coryn's intent or the quality of its product, which could mislead the jury. *See* Compl., Ex. A.; *B&B Hardware, Inc. v. Hargis Indus., Inc.,* --- F. Supp. 2d ---, 2010 WL 3515710, at *4 (E.D. Ark. Aug. 31, 2010)(concluding "it would be highly confusing and misleading to the jury. . . to admit the TTAB opinions into evidence" when the TTAB "use[d] a multi-factor test in the likelihood of confusion analysis, but not all of the factors [were] the same" as those used by the district court).

*Techs. AG,* 222 F.R.D. 101, 110 (E.D. Va. 2004). The jury is likely to give undue weight to the TTAB's findings, undermining its ability to reach its own determinations of the issues.[2] The decision's probative value is "substantially outweighed" by the danger of unfair prejudice and confusion. Coryn's motion to exclude evidence of the TTAB decision will be granted.

2.   Coryn's Motion to Exclude Internet Statistics

Coryn has moved to exclude certain internet statistics ("Web Stats") from evidence. ECF No. 174. Coryn argues that the Web Stats are not proper evidence of actual confusion, and should be excluded as irrelevant. *Id.* at 5. Alternatively, Coryn argues that the Web Stats are hearsay. *Id.*

a.   Relevance of the Web Stats

One element of a trademark infringement claim requires the plaintiff to show "that the defendant used the mark in a manner likely to confuse consumers." *People for the Ethical Treatment of Animals v. Doughney,* 263 F.3d 359, (4th Cir. 2001)(*quoting* 15 U.S.C. §§ 1114, 1125(a). The likelihood of confusion is analyzed under a multi-factor test, the seventh factor of which

---

[2]   *See Carter v. Burch,* 34 F.3d 257, 265 (4th Cir. 1994) (probative value of letter opinion substantially outweighed by danger of unfair prejudice when opinion decided the same issue before the jury "thereby making it likely that the jury would have placed undue weight on such evidence").

"asks whether there has been actual confusion, that is, reported
instances of individuals who have actually become confused about
the source of the services because of the similarities between
the parties' trademarks."[3]  Misspellings may show actual
confusion when their context demonstrates that "the source or
sponsorship of the two marks is confused."[4]

The Web Stats state that about five percent of web users
locate O.C.'s website by searching for "Secrets" or "Secrets
Ocean City" instead of "Seacrets."  ECF No. 174, Ex. 2.  As Gary
Figgs, O.C.'s chief financial officer, admitted in his
deposition, O.C. has no knowledge of whether these users "had
ever heard of the SECRETS Resorts located in Mexico or the
Caribbean."  Gary Figgs Dep. 28:14-20, Sept. 9, 2009.  The Web
Stats do not evidence actual confusion about the source or
sponsorship of the parties' goods; rather, the Web Stats only

---

[3]  *Popular Bank v. Banco Popular,* 9 F. Supp. 2d 1347, 1360 (S.D.
Fla. 1998).  Evidence of actual confusion may include consumer
inquiries about affiliation between the parties, misdirected
correspondence, other consumer testimony, and surveys. *See,
e.g., Popular Bank*, 9 F. Supp. 2d at 1360; *Schieffelin & Co. v.
Jacks Co.,* 850 F. Supp. 232, 245 (S.D.N.Y. 1994).

[4]  *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497,
504 (2d Cir. 1996).  *See also Louis Vuitton Malletier S.A. v.
Haute Diggity Dog, LLC,* 507 F.3d 252, 263 (4th Cir.
2007)(retailer's misspelling of defendant's mark was not
evidence of actual confusion when context of the misspelling
"indicate[d] confusion over how to spell the product name [and
not] any confusion over the source or sponsorship of the 'Chewy
Vuiton' dog toys").

show that some web users are confused about how to spell O.C.'s name.

Alternatively, O.C. argues that the Web Stats are relevant to the similarity of the marks.[5] Evidence that a different spelling does not "significantly change the meaning, pronunciation, [or] appearance" of a mark is relevant to this factor. *In re Cooper Crouse-Hings GmbH,* 2009 WL 1741921, at *3 (TTAB June 12, 2009). The Web Stats tend to show that the terms "Secrets" and "Seacrets" are not dissimilar to some consumers, which is relevant to the overall similarity between the parties' marks and the potential for confusion. *See id.* ("NEXT" and "NEXXT" were not dissimilar because "[m]any, if not most consumers, would pronounce NEXT and NEXXT identically and they would likewise believe that the words would have the same meaning"). The Web Stats will not be excluded as irrelevant.

b.   Hearsay

Coryn argues that if relevant, the Web Stats are hearsay, and are not within an exception to the hearsay rule. O.C. does

---

[5]   That factor asks whether the marks have a "similarity in appearance and sound which would result in confusion." *Pizzeria Uno Corp. v. Temple,* 747 F. 2d 1522, 1534 (4th Cir. 1984). It requires examination of "the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369 (Fed. Cir. 2005).

not contest that the Web Stats are hearsay, but contends that they are admissible under Rule 803(6).

Generally, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is inadmissible as hearsay. Fed. R. Evid. 801(c). There are numerous exceptions.

Reports and documents prepared in the ordinary course of business are generally presumed trustworthy because "businesses depend on such records to conduct their own affairs" and "the employees who generate them have a strong motive to be accurate and none to be deceitful." *Rambus, Inc. v. Infineon Techs. AG,* 348 F. Supp. 2d 698, 702 (E.D. Va. 2004)(internal quotation marks omitted). Rule 803(6) provides an exception to the hearsay rule for such records of regularly conducted activity.[6]

---

[6]    A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time, by, or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity, if it was the regular practice of that business activity to make the memorandum, report, record, or data complication, all as shown by the testimony of a custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6).

To satisfy Rule 803(6), "each participant in the chain which created the record—from the initial observer-reporter to the final entrant—must generally be acting in the course of regularly conducted business." *Rambus,* 348 F. Supp. 2d at 706.[7]

On the record, it is unclear if the Web Stats were prepared by O.C. from its own information, or by an outside web-hosting company.[8] If the Web Stats were prepared by the web-hosting company, or using information supplied by that company, O.C. has not shown that it took any precautions to guarantee the Web Stats' accuracy, or that the web-hosting company prepared them in the ordinary course of business. At trial, the Web Stats may be admitted if O.C. can lay the proper foundation. The decision on Coryn's motion to exclude the Web Stats will be deferred.

---

[7] "When the source of the information in the business record is an outsider, the only way to save the record from the jaws of the hearsay exclusion is to establish that the business recipient took precautions to guarantee the accuracy of the information." *United States v. Pendergrass,* 47 F.3d 1166, 1166 (4th Cir. 1995)(*citing United States v. McIntyre,* 997 F.2d 687, 700 (10th Cir. 1993).

[8] Figgs testified that the Webs Stats were provided to O.C. by "AW Stats . . . the hosting company that hosts [O.C.'s] website." Figgs Dep. 23:4-10. But he also testified that after 2008 "our software . . . could track . . . key word searches . . . [w]e [did] not have the ability [to track searches] prior to April 2008," implying that the internet statistics were compiled by O.C. itself. *Id.* 29:5-30:4.

3.   Coryn's Motion to Exclude Michael Noah's
         Testimony

Coryn has moved to exclude the testimony of Michael Noah,
Ocean City's director of tourism about certain survey and
statistical information that Noah provided in his October 5,
2006 deposition and before the TTAB.  ECF No. 176.  Coryn argues
that Noah lacks personal knowledge to testify about the
documents, which are inadmissible hearsay.

        a.   Rule 602

Under Fed. R. Evid. 602, a witness may not testify about
matters outside his personal knowledge.  Testimony should be
excluded for lack of personal knowledge only when "in the proper
exercise of the trial court's discretion it finds that the
witness could not have actually perceived or observed that which
he testifies to."  *MBAFB Fed. Credit Union v. Cumis Ins. Soc'y,
Inc.,* 681 F.2d 930, 932 (4th Cir. 1982).

During his October 5, 2006 deposition, Noah testified about
his role as Ocean City's director of tourism and information he
received in that role, including weekly demoflush population
statements[9] prepared by the Ocean City Waste Water Department and

---

[9]  The demoflush population statements provide an "estimated
population for the Town of Ocean City based on the amount of
water usage within the town."  Michael Noah Dep. 14:14-17, Oct.
5, 2006.

visitor surveys undertaken by the Department of Tourism and
Ocean City's advertising agency, Richardson Downfeld.  Noah Dep.
14:14-15:5; 28:10-31:13.  Noah testified that his department
received the statements and surveys and described how the
documents were used.  *Id.*  Noah has sufficient personal
knowledge to testify about the existence of the documents and
their use, however, the contents of the documents are
inadmissible hearsay.

### b.   Visitor Surveys

O.C. argues that the visitor surveys are admissible under
Rule 803(6).  Although Noah's testimony is sufficient to show
that the surveys were made and maintained in the Department of
Tourism's regular course of business, *see* Noah Dep. 28:14-31:3,
the surveys—which collected online and in person responses of
Ocean City visitors—are hearsay within hearsay.[10]  Each layer of
hearsay must be within an exception to avoid exclusion of the
evidence.  Fed. R. Evid. 805.  O.C. has not identified the
hearsay exception that applies to the visitors' responses, or
indicated how the Department of Tourism ensured the accuracy of

---

[10]  The surveys included responses on topics such as length of
stay in Ocean City, whether the survey participant was a first-
time visitor, and alternate destinations considered.

the responses.[11]  Evidence of the visitor surveys is not

admissible for the truth of the matters asserted in them.

Coryn's motion to exclude the surveys and Noah's testimony based

on their contents will be granted.

c.    Demoflush Population Statements

O.C. argues that the demoflush population statements—which

give estimates of Ocean City's weekly population—are also

admissible under Rule 803(6).  Noah's testimony establishes that

the statements were kept in the ordinary course of business by

the Department of Tourism.  *See* Noah Dep. 13:10-16:16.  However,

the documents were not prepared by the Department of Tourism;

they were prepared by the Ocean City Waste Water Department.

*See id.* 14:7-15:2.

---

[11]  *See Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534, n. 52
(D. Md. 2007)("the source of the information memorialized in the
business record must have a business duty to transmit the
information" or "it may be possible to meet the requirements of
the business record exception . . . if . . . the recipient of
the information has a business duty to verify the accuracy of
the information provided.").  Other courts have excluded similar
surveys. *See, e.g., T. Harris Young & Assocs., Inc. v. Marquette
Elecs., Inc.,* 931 F.2d 816, 828 (11th Cir. 1991)(phone survey of
hospital employees was inadmissible under Rule 803(6) because
the employees did not report in the regular course of business
to the survey interviewers); *Dunn ex rel Albery v. State Farm
Mutal Auto. Ins. Co.,* 264 F.R.D. 266, 274 (E.D. Mich. 2009)
(customer survey conducted in ordinary course of business was
inadmissible hearsay within hearsay when it was "composed of
out-of-court statements of various healthcare providers intended
to prove their respective rates" for which proponent had not
identified a hearsay exception).

Rule 803(6) "requires that either the custodian of the business records or 'other qualified witness' lay a foundation before the records are admitted." *United States Commodity Futures Trading Comm'n v. Dizona,* 594 F.3d 408, 415 (5th Cir. 2010). "A qualified witness is one who can explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met." *Id.* Noah's testimony does not provide the foundation necessary for admitting the statements as a business record under Rule 803(6),[12] and O.C. has not argued that the statements are admissible under any other exception. Coryn's motion to exclude the demoflush population statements and Noah's testimony about their contents will be granted.

4.   Coryn's Motion to Exclude Leighton Moore's Testimony

Coryn has moved to exclude the testimony of Leighton Moore, O.C.'s owner, about instances of actual consumer confusion as irrelevant and unfairly prejudicial, or as inadmissible hearsay. ECF No. 196 at 3. Coryn seeks to exclude Moore's statements that customers have approached him and asked "if [he] was involved with . . . a SECRETS in Mexico." Moore Dep. 16:14-22.

---

[12] Noah admitted not knowing how the demoflush statements were prepared or the source of the data on which they are based. *See* Noah Dep. 28:2-9.

These statements are not irrelevant.  They are direct evidence of actual confusion between O.C. and Coryn's marks.[13] The statements are also not inadmissible hearsay.  A hearsay statement is "offered into evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801 (c).  Moore's testimony is offered to prove that O.C.'s customers asked about its relationship with Coryn; not to prove the truth of the assertion—i.e., that a relationship between the parties existed.[14]

Further, the statements do not lack a proper foundation because Moore does not know the names of the persons who made them.  Moore's personal knowledge of statements made to him

---

[13]  *Gazette Newspapers, Inc. v. New Paper, Inc.*, 934 F. Supp. 688, 696 (D. Md. 1996) (plaintiff's testimony that "at least 15 people called to ask him about the relationship of 'the Frederick Gazette' to the Gazette chain" was relevant to the likelihood of confusion).  Although some courts have indicated that inquiries about the relationship between two entities "are arguably premised upon a *lack* of confusion," *Nora Beverages v. Perrier Grp.*, 269 F.3d 114, 124 (2d Cir. 2001) (emphasis in original), there is no Fourth Circuit authority for excluding Moore's testimony on that basis.

[14]  *Lyons P'ship, LP v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (children's statements identifying alleged infringers' costumes as Barney were not hearsay because they were offered "merely to prove that the children . . . *expressed their belief* that those persons were Barney," which was "direct evidence of the children's . . . reactions.") (emphasis in original).

satisfies Rule 602;[15] that the testimony is self-serving is a credibility concern for the jury, not a basis for exclusion. *United States v. Redfern,* 142 Fed. Appx. 673, 674 (4th Cir. 2005). Coryn's motion to exclude the testimony of Leighton Moore will be denied.

     5.    Coryn's Motion to Exclude Robert Reitter Report and Testimony

Coryn has moved to exclude the expert report and testimony of Robert Reitter ("the Reitter Report"). ECF No. 127. Coryn contends that the Reitter Report should be excluded (1) under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and (2) because its probative value is substantially outweighed by the danger of unfair prejudice or jury confusion. *Id.* at 5-6. Coryn also argues that the Reitter Report should be excluded as untimely under Fed. R. Civ. P. 26 and 37(c). ECF No. 144 at 3.

     a.    Rule 702 and *Daubert*

Under Rule 702, expert testimony is admissible if it will assist the trier of fact and is (1) "based upon sufficient facts or data," (2) "the product of reliable principles and methods, and" (3) "the principles and methods [have been applied]

---

[15]  *See MBAFB,* 681 F.2d at 932 (evidence should be excluded under Rule 602 only if court finds "that the witness could not have actually perceived or observed that which he testifies to").

reliably to the facts of the case." Fed. R. Evid. 702. As the Court explained in *Daubert,* evidence is admissible under Rule 702 if "it rests on a reliable foundation and is relevant." 509 U.S. at 597. The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Id.* at 590.[16]

> b.   Rule 403

Expert testimony may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. *Daubert* recognized that expert testimony "can be both powerful and quite misleading because of the difficulty of evaluating it." *Id.* at 595. Thus, in applying Rule 403, the Court "exercises more control over experts than . . . lay witnesses." *Id.*

> c.   The Reitter Report

Reitter, the senior vice-president of a Nebraska survey company, was retained by O.C.'s counsel, Dickinson Wright, PLLC, to study the potential for confusion between Coryn and O.C.'s marks. Robert Reitter Decl. ¶¶ 1-2.

---

[16]   Because these matters are well-briefed and supported, no hearing is necessary. *See United States v. Davis,* 602 F. Supp. 2d 658, 663 (D. Md. 2009).

Reitter showed survey participants web pages from Coryn's Secrets' resorts, the Bellagio casino and hotel, and the Broken Sound Club residential community. ECF No. 127, Ex. A at 5.[17] After viewing the web pages, the survey participants were shown a picture of the entrance to Seacrets containing O.C.'s mark or listened to a Seacret's radio advertisement. *Id.* Participants were then exposed to pictures or radio ads of two third-party marks, and asked whether they believed there was a connection between any of the web pages and any of the pictures or radio ads. *Id.* at 5-6.

Coryn argues that the Reitter Report is "methodologically flawed" and lacking "probative value" because it failed to approximate the actual marketplace conditions in which consumers view its mark. ECF No. 127 at 5-9. Coryn contends that Reitter improperly removed from its web page: (1) the website title bar with the text "Secrets Resorts & Spas," and (2) copyright and contact information. *Id.* at 7.[18]

---

[17] For the control group, references to Secrets on Coryn's web page were replaced with "Sunscape." ECF No. 127, Ex. A at 5.

[18] Coryn also argues that Reitter removed "virtually all of the text . . . describ[ing] the services offered under the SECRETS mark" from the bottom of its web page. ECF No. 127 at 7. O.C. argues that Reitter showed survey participants the text describing Secrets' services, but a computer error prevented that text from printing on the copies of the report it served on Coryn in October 2009. ECF No. 131 at 4. O.C. has provided an affidavit of Reitter that he "instructed [his] company's IT

"Survey evidence is generally admissible in cases alleging trademark infringement under the Lanham Act." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 576, 580 (S.D.N.Y. 2007). However, "[e]xpert testimony concerning survey results may not be reliable if the survey format does not accurately gauge consumer confusion between the marks at issue." *The Learning Network, Inc. v. Discovery Commc'ns, Inc.,* 153 F. Supp. 2d 785, 789 (D. Md. 2001). A survey must be "designed to examine the impression presented to the consumer by the accused product. Therefore, [it] must use the proper stimulus, one that tests for confusion by replicating marketplace conditions."

---

Department to . . . delete only the toolbar" from the screenshots of Coryn's web page, and that "[u]pon receiving the cropped screenshots . . . [he] confirmed that the instructions had been followed and only the toolbar information had been removed." Robert Reitter Aff. ¶ 2, May 24, 2010. Reitter states that "[t]he allegation that [he] had removed the . . . text from the stimuli shown to the respondents in the 2009 survey is simply incorrect." *Id.* ¶ 7. Reitter's October 8, 2009 deposition also confirms that he did not remove the text, and O.C. has provided an affidavit of Dickinson Wright's chief information officer explaining how the computer error occurred. Robert Reitter Dep. 52:10-19, 53:6-8, 67:10-68:6, Oct. 8, 2009; Michael Kolb Aff. ¶ 5, May 24, 2010. There is no evidence that the same error occurred when Reitter conducted the survey. O.C. has shown by a preponderance of the evidence that Reitter did not remove the text, and at trial he may be cross-examined about how he conducted the survey. His report will not be excluded on this basis. *See Daubert,* 509 U.S. at 590 (proponent of evidence must prove admissibility by preponderance of the evidence).

*Conopco, Inc. v. Cosmair, Inc.,* 49 F. Supp. 2d 242, 253

(S.D.N.Y. 1999) (citation omitted). But, a survey need not

perfectly replicate the marketplace to be reliable.[19]

Removal of the web address bar and copyright and contact

information is not a basis for excluding the Reitter Report.

Coryn relies on *The Learning Network, Inc. v. Discovery*

*Communications, Inc.,* 153 F. Supp. 2d 785 (D. Md. 2001), but the

survey excluded in that case is distinguishable. There, the

expert also removed the web address bar from the web page print-

out that survey participants viewed, but the removal required

exclusion because it deprived the participants of "sufficient

clues" to determine that they were viewing the Learning Network

website as multiple companies' logos appeared on the print-out.[20]

Thus, the participants' responses to questions such as whether

"the company, organization or people who own—or put out—this

website engage[] in any activities, business or services *other*

---

[19]   *See Learning Network,* 153 F. Supp. 2d at 789 (survey not
unreliable because stimulus was presented through a "medium
different from that used by the consumer in the marketplace");
*Trouble v. Wet Seal,* 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001)
("no survey can construct a perfect replica of 'real world'
buying patterns").

[20]   *Learning Network,* 153 F. Supp. 2d at 790-91 ("the appearance
of the website, once stripped of the 'title bar' and URL, could
lead to the conclusion that it was a 'bazaar' type website
presenting goods and services from various providers.").

than this website" were not reliable. *Id.* at 788 (emphasis in original).

Here, removal of the web address bar and copyright and contact information did not deprive survey participants of sufficient information to determine that the print-out was the Secrets' web page. "Secrets Resorts & Spas" appears prominently in three locations on the page and is the only logo portrayed. Further, knowledge of the web address and other removed information was not necessary for survey participants to reliably answer Reitter's questions about the relationship between the Secrets' web page and the other visual and audio stimuli.

The Reitter Report is not unreliable under Rule 702 and *Daubert* because the web address bar and copyright and contact information were removed; rather, the removal goes to the report's weight and may be addressed by Coryn's expert and on cross-examination.[21] Coryn's criticisms of the Reitter Report

---

[21] *See Wet Seal, Inc.,* 179 F. Supp. 2d at 308 ("a survey must use a stimulus that . . . tests for confusion by *roughly* simulating marketplace conditions" and a survey that is "fairly prepared and . . . directed to relevant issues" is admissible.) (emphasis added)(*quoting Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir. 1994)); 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 32:170 (4th ed. 2009)("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence.").

are straightforward and unlikely to be misunderstood by the jury.[22]  Exclusion under Rule 403 is also not warranted.

### d.   Rules 26 & 37

Coryn argues that if reliable, the Reitter Report should be excluded under Fed. R. Civ. P. 37 (c) because the timely served report did not contain accurate copies of the Secrets' web page that Reitter showed survey participants, and O.C. did not correct this error until Coryn moved to exclude.  ECF No. 144 at 3-5.

Under Fed. R. Civ. P. 26, a party must disclose to its opponent all experts who may testify at trial.  The disclosure must be accompanied by a report prepared and signed by the expert containing "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them," and "(iii) any exhibits that will be used to summarize or support them."  Fed. R. Civ. P. 26 (a).  Rule 26(e) requires supplementation of the expert disclosure if it is "incomplete or incorrect."  Fed. R. Civ. P. 26 (e).

---

[22]  *See Ellis v. Int'l Playtex, Inc.,* 745 F.2d 292, 304-05 (4th Cir. 1984)(district court properly admitted statistical evidence over Rule 403 objection when evidence was "understandable to a jury of average intelligence and experience" and "critical to the outcome of the case").

Under Rule 37 (c), "[i]f a party fails to provide information . . . required by Rule 26 (a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37 (c); *see also Proctor v. Tsao,* 164 F.3d 625, 625 (4th Cir. 1998) (exclusion is a matter of the trial court's discretion).

The decision to exclude under Rule 37 (c) is guided by four factors: "(1) the importance of the . . . testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Metts v. Airtran Airways, Inc.,* 2010 WL 4183020, at *2 (D. Md. Oct. 22, 2010). Exclusion is "a drastic remedy, and it is [generally] not imposed unless the party's conduct is in bad faith or callous disregard of the discovery rules." *Tritchler v. Consolidation Coal Co.,* 91 F.3d 134, 134 (4th Cir. 1996). But, bad faith is not required to support exclusion. *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 597-98 (4th Cir. 2003).

The Reitter Report provides important evidence of confusion between the parties' marks, and Reitter is one of only

two experts O.C. has designated to address confusion.[23]  The

computer error does not show "bad faith or callous disregard,"

*Tritchler,* 91 F.3d at 134*,* and Coryn has had a correct copy of

the Reitter Report since May 26, 2010, ECF No. 131.  Trial is

not scheduled to begin until October 31, 2011.  ECF No. 216.

The corrected report is not significantly different from the

version O.C. first served on Coryn, and Coryn has ample time

before trial to prepare.[24]  Coryn will not be prejudiced by

admission of the Reitter Report, and its motion to exclude will

be denied.

> 6.    Coryn's Motion to Exclude Evidence of Non-Party
>       Revenue and Profits

Coryn has moved to exclude evidence of revenues and profits

of non-parties as irrelevant and unfairly prejudicial.  ECF No.

179 at 4-7.  Specifically, Coryn seeks to exclude portions of

the report of Joe Epps, O.C.'s damages expert, about revenues of

the AMR-Related Companies, which are separate from AMResorts,

LLC, but appear on the consolidated financial statements of its

parent company.  *Id.* at 2-3.   O.C. argues that financial

---

[23] *Sullivan v. Glock, Inc.,* 175 F.R.D. 497, 507 (D. Md. 1997)
("the court should evaluate whether the expert . . . is central
to the sponsoring party's case, or merely one of several experts
who will testify on the same point.").

[24] *See id.* ("Perhaps the most important consideration . . . is
the amount of time remaining before trial.").

information about the AMR-Related Companies is relevant to damages because "the corporate structure of the various . . . entities has permitted the booking of profit and loss in a manner that . . . understat[es] the revenue and income of AMResorts, LLC," the named party.   ECF No. 185 at 7.

A successful plaintiff in a trademark case may recover "(1) defendant's profits, (2) any damages suffered by the plaintiff, and (3) the costs of the action."   15 U.S.C. § 1117(a).   "In assessing [the defendant's] profits the plaintiff shall be required to prove [the] defendant's sales only; [the] defendant must prove all elements of cost or deduction claimed."   *Id.* "[T]he nature of the proof required [to show the defendant's profits] depends on the circumstances of the case," *DSPT Int'l, Inc. v. Nahum,* 624 F.3d 1213, 1223 (9th Cir. 2010), and "the court may enter judgment, according to the circumstances . . . for any sum above the amount found as actual damages, not exceeding three times such amount."   15 U.S.C. § 1117(a).[25]   "The trial court's primary function should center on making any

---

[25]   In deciding if enhancement is warranted, courts consider: (1) the defendant's intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the defendant's conduct unprofitable, and (6) whether "it is a case of palming off." *Synergistic Int'l, LLC v. Korman,* 470 F.3d 162, 175 (4th Cir. 2006).

violations of the Lanham Act unprofitable to the infringing

party." *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am.,* 994 F.

Supp. 250, 380 (W.D.N.C. 2008) (*quoting Sands, Taylor & Wood v.*

*Quaker Oats Co.,* 34 F.3d 1340, 1348 (7th Cir. 1994)).

In determining the defendant's profits under the Lanham

Act, non-party financial evidence may be relevant if it is used

to show profits that were earned by the defendant.[26]  To the

extent O.C. intends to use the financial evidence of the AMR-

Related Companies to show AMResorts, LLC's actual profits or

losses, the evidence is relevant to a Lanham Act damages award.[27]

However, O.C. may not use such evidence simply to show that

other AMR-Related Companies—who are not parties—profited from

---

[26] *See Am. Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d
321, 339-40 (5th Cir. 2008)(profits earned by the defendant were
the defendant's profits for purposes of the Lanham Act although
the defendant—a rice farming cooperative—had passed the profits
on to its farmer members); *cf. LG Elecs. v. Whirlpool Corp.,*
2010 WL 3397358, at *8 (N.D. Ill. Aug. 24, 2010) (portion of
domestic plaintiffs' profits, which were booked for tax purposes
as profit to its non-party Korean parent, could be considered in
expert Lanham Act damages report because the expert found that
"the profit booked in Korea [was] profit on LG products sold [by
the named plaintiff] in the United States" and there was no
"double-booking of profit").

[27]  Epps states that AMResorts, LLC, "as part of the Mullen
Family interests and control, has the ability to record revenue
and expense as may best benefit [it]," which has "skew[ed]
revenues and expenses between the [Mullen Family] companies" and
"has had the impact of severely understating the *actual income
earned by AMR[esorts], LLC.*"  Joe Epps Rebuttal Rep. at 11
(emphasis added).  Coryn has not argued that Epp's methodology
is unreliable.

the Secrets' mark.[28]  The third-party financial evidence is irrelevant and prejudicial if not connected to the named parties' profits and losses.[29]

It is unclear from the record how O.C. intends to use this evidence at trial, and whether that use will be unfairly prejudicial.  O.C. may seek to introduce the evidence for a proper purpose at trial, and the decision on Coryn's motion to exclude will be deferred until trial.

B.  O.C.'s Motions

1.  O.C.'s  Motion for Summary Affirmance

O.C. seeks summary affirmance of the TTAB's decision because Coryn lacks evidence of a "[]sufficient character to merit a change in the TTAB findings of fact and conclusion of

_____

[28]  O.C. did not seek to add any of these parties as trademark infringement defendants until May 7, 2010, over a year after the deadline set by the scheduling order.  ECF No. 123.  This Court denied O.C.'s motion for leave to amend the scheduling order on October 19, 2010.  ECF No. 162.

[29]  The language of the Lanham Act is clear—a successful plaintiff in a trademark infringement action may recover the "defendant's profits," and to prove the defendant's profits, the plaintiff must show the "defendant's sales."  15 U.S.C. § 1117(a).  The Act does not allow for recovery of profits not attributable to the defendant.  *See Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen,* 152 F.3d 283, 288 (4th Cir. 1998) ("except in the rare circumstance when there is a clearly expressed legislative intent to the contrary or when a literal application would frustrate the statute's purpose or lead to an absurd result" courts must apply the plain language of a statute).

law." ECF No. 159 at 2. Coryn argues that this Court already determined that its appeal raised questions sufficient to preclude summary affirmance,[30] and that O.C.'s motion is untimely.[31]

This Court denied O.C.'s first motion for summary affirmance, finding that Coryn had "raised several colorable arguments in its appeal." *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.,* 2009 WL 3488445, at *1 (D. Md. Oct. 22, 2009). This Court's "role in reviewing the Board's decision also counsel[ed] against summary affirmance" because Coryn's "principal reason to challenge the Board's decision in district court rather than the Federal Circuit [was] the opportunity to submit new evidence." *Id.* (*citing Glendale Int'l Corp. v. U.S. Patent and Trademark Office,* 374 F. Supp. 2d 479, 484 n.7 (E.D. Va. 2002). O.C. has provided no new arguments in support of its second summary affirmance motion.

---

[30]  "Summary affirmance of a case is appropriate 'when the position of one party is so clearly correct as a matter of law that no substantial question regarding the outcome of the appeal exists.'" *Branch-Williams v. Dep't of Veterans Affairs,* 311 Fed. Appx. 335, 335 (Fed. Cir. 2008)(*quoting Joshua v. United States,* 17 F.3d 378, 380 (Fed. Cir. 1994)).

[31]  The deadline for dispositive motions was November 2, 2009. ECF No. 57.  O.C. filed its second motion for summary affirmance on October 14, 2010.  ECF No. 159.

As this Court previously noted, Coryn is entitled to present new evidence to support its appeal. It is not limited to presenting evidence that was not available during the TTAB proceeding.[32] In its opposition to O.C.'s current motion, Coryn relies on: (1) the expert witness report of Kenneth Hollander ("the Hollander Report"), (2) the September 17, 2009 deposition of Leighton Moore, (3) new evidence of third-party use of the mark "Secrets" within the hospitality industry, and (4) new evidence of consumer sophistication. As Coryn has shown a "substantial question" about the appeal's outcome,[33] O.C.'s motion for summary affirmance will be denied.[34]

> ## 2. O.C.'s Motion to Exclude Evidence of Product Quality

O.C. has moved to exclude evidence of the quality of the parties' products and services. ECF No. 181. Specifically, O.C. seeks to exclude "documents and testimony concerning awards and recognitions of the parties." ECF No. 181 at 6. O.C. anticipates that this will include evidence that it is

---

[32] *See, e.g.*, *Dickinson v. Zurko,* 527 U.S. 150, 164 (1999) (district court review "permits the disappointed applicant to present to the court evidence that the applicant did not present to the PTO").

[33] The Hollander Report and Moore's deposition are relevant to actual confusion between the parties' marks—the most important likelihood of confusion factor. *George & Co.,* 575 F.3d at 398.

[34] Coryn's motion to strike O.C.'s motion for summary affirmance will be denied as moot. ECF No. 160.

recognized as a "block long homage to cheap beer and the
fraternity party," while Coryn's resorts are viewed as luxury
properties. *Id.* O.C. contends that this evidence should be
excluded because it is irrelevant and inadmissible hearsay.

"Not all [likelihood of confusion] factors are of equal
importance, 'nor are they always relevant in any given case.'"
*George & Co.,* 575 F.3d at 393 (*quoting Anheuser-Busch, Inc. v. L
& L Wings, Inc.,* 962 F.2d 316, 320 (4th Cir. 1992)). O.C.
argues that evidence of product quality is only relevant when
the infringing good is a knockoff of the plaintiff's product.
Here, Coryn's products are priced at or above O.C.'s.

In cases involving cheap knockoffs, product quality is
relevant to show the defendant's "reliance on the similarity of
the two marks to generate undeserved sales." *Sara Lee Corp. v.
Kayser-Roth Corp.,* 81 F.3d 455, 467 (4th Cir. 1996). However,
that does not make evidence of product quality irrelevant in
cases like this. *See id.* Rather, the marked difference in
quality "makes it less likely that consumers would confuse the
two products." *Cartier, Inc. v. Sardell Jewelry, Inc.,* 294 Fed.
Appx. 615, 620 (2d Cir. 2008). The evidence O.C. seeks to
exclude is relevant.

O.C. contends that if relevant, "to the extent that Coryn
intends to introduce at trial statements from the book *MTV Road*

*Trips U.S.A.* and/or newspaper articles to provide a comparison

between the alleged quality of Coryn's products and services and

[its own products and services], the evidence should be . . .

excluded because it [is] hearsay." ECF No. 181 at 9. O.C.

speculates that these items will be offered for the truth of the

matter asserted. *Id.* In the abstract, this Court is not able

to determine whether Coryn will introduce these items for the

truth of the matter asserted. O.C. may make this objection at

trial, and the Court will evaluate it then. O.C.'s motion will

be denied.

### 3. O.C.'s Motion to Exclude Evidence of Third-Party Use

O.C. has moved to exclude evidence of third-party use of

the mark "Secrets" as irrelevant. ECF No. 158 at 8-9.

Specifically, O.C. seeks to exclude evidence that four small

hotels or bed and breakfasts, and one beach resort, use "Secret"

or "Secrets" in their names.[35] Coryn argues that the evidence is

relevant to show that O.C.'s mark is weak. ECF No. 165 at 5.

The first likelihood of confusion factor addresses the

strength of the plaintiff's senior mark. The stronger the

---

[35] They are the Secret Bed & Breakfast Lodge, Secret Garden Inn
& Cottages, Secret Garden Bed and Breakfast Inn, Secrets Inn
Lake Tahoe, and Secret Harbour Beach Resort. ECF No. 158 at 5.
They are located in Alabama, California, Oregon, and the United
States Virgin Islands. *Id.*

senior mark, the greater the likelihood that a junior user's use will confuse the public. *Synergistic Int'l,* 470 F.3d at 171. "The strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir. 1997).

In assessing overall strength, two considerations apply: (1) a mark's conceptual strength, meaning the relationship between the mark and the goods or services it is used for, and (2) its commercial strength, meaning the degree to which the mark is known by the consuming public. *World Gym Licensing Ltd. v. Fitness World, Inc.,* 47 F. Supp. 2d 614, 621-22 (D. Md. 1999).

A mark's conceptual strength depends on "the linguistic or graphical peculiarity of the mark" considered in relation to the product or services for which the mark is used. *CareFirst, Inc. v. First Care, P.C.,* 434 F.3d 263, 296 (4th Cir. 2006). "[T]he frequency with which a linguistic or graphical term is used in other trademark registrations must be carefully examined" in evaluating conceptual strength. *Synergistic Int'l,* 470 F.3d at 173-74.  If a mark is frequently used in the same field by different companies, the third-party use "prove[s] that some segment of the [] marks which both contesting parties use has a

normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that [it] is relatively weak." *Petro Stopping Ctrs.,* 130 F.3d at 94 ("petro" is commonly used in gas station marks, therefore it is a weak mark within that industry).

O.C. argues that Coryn's evidence that third-parties within the hospitality industry use the term "Secrets" is irrelevant because the third-party users, who are geographically remote, do not heavily promote their marks. According to O.C., this evidence is *de minimis.* O.C.'s arguments go to the weight of the third-party use evidence, not its relevance. *See Petro Stopping Ctrs.,* 130 F.3d at 93-94 ("The frequency with which a term is used [by third-parties] is indeed relevant to the distinctiveness inquiry . . . . This is *especially* true when the number of [uses] is great."). The evidence will not be excluded. O.C.'s motion will be denied.[36]

> ### 4. O.C.'s Motion to Exclude Evidence of Consumer Sophistication

O.C. has moved to exclude evidence of consumer sophistication. ECF No. 182. O.C. argues that consumer sophistication is irrelevant, and unfairly prejudicial. *Id.* at

---

[36] O.C. also argues that some of the third-party evidence is inadmissible hearsay. O.C. may make this objection at trial, and the Court will address it then.

3. Specifically, O.C. seeks to exclude evidence about "the relative expense of services offered under Coryn's SECRETS mark." *Id.* at 5.

Consumer sophistication "considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus., Inc v. Bacardi & Co. Ltd.,* 412 F.3d 373, 390 (2d Cir. 2005). Consumer sophistication may be shown through expert opinions or surveys and evidence of "the nature of the product and its price." *Rosetta Stone Ltd. v. Google, Inc.,* 730 F. Supp. 2d. 531, 544 (E.D. Va. 2010).

O.C. argues that evidence of consumer sophistication should only be considered when the relevant market is not the public at-large. Although consumer sophistication is *most* relevant to likelihood of confusion when the relevant market is not the public at-large, that does not make it irrelevant in all other cases. *See Sara Lee Corp.,* 81 F.3d at 467 ("Barring an unusual case, buyer sophistication will only be a key factor when the relevant market is not the public at-large.").

Further, the relevant market is only potential buyers of the parties' products. *Rosetta Stone,* 730 F. Supp. 2d at 544.

Here, that is not the public at-large.[37]  Coryn's evidence of

consumer sophistication, which tends to show that purchasers

will exercise a high degree of care in booking expensive

Secrets-branded resorts, is relevant to the likelihood of

confusion and not unfairly prejudicial.[38]  O.C.'s motion to

exclude the evidence will be denied.

III.   Conclusion

For the reasons stated above, Coryn's motions to exclude

evidence of the TTAB decision and Michael Noah's testimony will

be granted, and its motions to exclude internet statistics and

evidence of non-party revenues will be deferred until trial.

Coryn's other motions to exclude and its motion to strike will

be denied.  O.C.'s motions will be denied.


March 9, 2011                    _____/s/_____
Date                             William D. Quarles, Jr.
                                 United States District Judge

---

[37]  All Secrets-branded resorts are located outside the United
States, restricting the market for Coryn's products to
international travelers.  The relevant market for Coryn's
products is further limited to persons willing to spend hundreds
or thousands of dollars a night when travelling. *See* Lisa
LaPointe Aff. ¶ 12 & Ex. 3, Aug. 13, 2009.

[38]  *Compare Rosetta Stone,* 730 F. Supp. 2d at 545 (consumer
sophistication relevant when market was limited to web users
"willing to invest money and energy in the time-intensive task
of learning a language") *with George & Co,* 575 F.3d 383, 389 &
393 (consumer sophistication irrelevant in infringement action
related to inexpensive "generic dice game").