IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>THE CORYN GROUP II, LLC,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>CIVIL NO.: WDQ-08-2764</td></tr>
<tr><td>O.C. SEACRETS, INC.,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

AMENDED MEMORANDUM OPINION

The Coryn Group II, LLC ("Coryn II") appealed the Trademark
Trial and Appeal Board's ("TTAB") cancellation of its
registration for the mark "SECRETS" for "resort hotel services"
and its denial of other relief.  O.C. Seacrets ("O.C.")
counterclaimed against Coryn II, and sued the Coryn Group, Inc.,
and AMR Resorts, LLC, (collectively "Coryn") under the Lanham
Act and Maryland common law.  For the following reasons, Coryn's
motion for leave to file a surreply will be granted.  Coryn's
motion for judgment as a matter of law or for a new trial will
be granted in part and denied in part.  O.C.'s motion to amend
the judgment or for a partial new trial will be denied, and its
motion for a permanent injunction will be granted as modified.[1]

---

[1] As no hearing is necessary, Coryn's request for a hearing, ECF
No. 297, will be denied.  O.C.'s motions to seal will be
granted.  ECF Nos. 289, 310.

I.    Background[2]

    A.    O.C. Seacrets

    O.C., a Maryland corporation, owns and operates "Seacrets," a Jamaican-themed "entertainment complex" in Ocean City, Maryland.  Tr. 41:15, 49:20-21.

    When Leighton Moore, O.C.'s owner, began to develop Seacrets in 1987, he planned to build bars, add restaurants, a nightclub, and eventually a hotel.  After he completed the hotel, he wanted to franchise the complex "either in the United States or possibly down in the islands." Tr. 47:11-22.[3]  Moore created the name SEACRETS by combining "sea" and "secrets" to "indicate that it was on the ocean, and it was kind of a private place[,] . . . a place that was hidden." Tr. 54:2-17.

    O.C. first used the mark SEACRETS for two bars and a Restaurant in 1988.  Tr. 50:3.  The complex included a beachfront, with palm trees and a deck.  Tr. 51:11-18.  From 1988 to 1997, O.C. bought surrounding property and added more bars, kitchens, dining areas, and a stage to the complex.  Tr. 59:1-25, 60:1-17.

---

[2] The facts are taken from the evidence at trial and the TTAB record.

[3] Moore has no documentary evidence of his plan to franchise O.C. before litigation in this case.  Tr. 127:2-16.

SEACRETS began to turn a profit in 1990.  Tr. 53:8-13.
Between January 1999 and December 2008, O.C. reported over $155
million in revenues.  Tr. 264:24-25, 265:1-8.

O.C.'s federally registered trademark "SEACRETS" was issued
on October 7, 1997 for "restaurant and bar services."  Tr.
298:12.  O.C. has applied to register SEACRETS for motel
services; the application has been suspended pending the outcome
of this case.  Tr. 88:23-25.

In 1998, O.C. bought a ten-unit motel near the complex.
Tr. 60:18.  In spring 1999, O.C. placed a sign reading "Seacrets
Motel" on the hotel.  Tr. 64:16-21.  In 1999, O.C. provided
maid, maintenance, laundry, and reception services at the motel.
Tr. 65:24-25, 66:1-9.  From 1999 to 2004, O.C. allowed band
members retained to play at the complex to stay at the motel in
exchange for a reduced performance fee.  Tr. 63:14-25, 64:1-5.
Moore estimated that he saved almost $1 million through the
performance discounts.  Tr. 64:6-9.  O.C. reported no financial
revenue from the hotels before 2005.  Tr. 108:24-25, 109:1-8.
During that period, O.C. purchased several nearby condominium
complexes and used them as motel rooms for performers.  Tr.
69:4-25, 111:7-19, 112:3-8.

In 2001, O.C. opened a nightclub on the property, Morley
Hall.  Tr. 61:6.  In 2003, O.C. broadened its entrance "so
people could come in easier and quicker," and added metal

3

detectors "to make sure we never did have a problem."   Tr. 62:1-9.

In late 2003, two customers asked Moore if O.C. "was affiliated with or knew of a Secrets that was being built or was in Mexico."   Tr. 80:21-25, 81:1.   Customers ask Moore if O.C. is connected with Secrets "at least two or three times a year."   Tr. 81:11-16.   Moore was not aware of any customers who came to O.C. "thinking that they were in Coryn's Secrets in Mexico or in Jamaica."   Tr. 82:1-4.

By 2004, O.C. had a pier for private boats to moor at the complex.   Tr. 62:10-13.   In 2004, O.C. opened the hotel to the public.   Tr. 64:8, 108:10-13.   About 18 of the 34 hotel rooms are available to the public for rent.   Tr. 109:17-22.   Hotel revenue accounts for no more than 2% of O.C.'s revenue.   Tr. 100:23-25.

Most O.C. customers come from within a four-hour radius of Ocean City, Maryland.   Tr. 17-23.   O.C. owns the web domain name "seacrets.com."   Tr. 50:20.   SEACRETS advertises on local television and radio stations, its website, and "Irie Radio," an Internet radio station that broadcasts from the complex.   Tr. 165:16-25, 166:1-25, 171:1-25.   It advertises in local print media and on airplane banners that are flown across the Ocean City beaches.   Tr. 117:19-25.   It places two to three ads per day on the cable networks ESPN, The Weather Channel, The

4

Discovery Channel, The Learning Channel, VH-1, MTV, and the
Resort Video Guide.[4]  Tr. 171:19-23, 173:2-3.  Portions of the
national network television shows *The Amazing Race* and *America's
Next Top Model* have been filmed at Seacrets.  Tr. 171:9-17.
Some of O.C.'s advertisements state that there is a "party . . .
at Seacrets all week long."  Tr. 118:1-3.

On September 15, 2011, O.C. proposed rebuilding the hotel,
expanding it and attaching it to the nightclub.  Tr. 72:14-23,
73:1-17.  By November, 2011, O.C. had published a franchise
disclosure document and had contacted "several prospective
franchisees."  Tr. 74:14-17.  The franchise offering states that
O.C. owns the mark SEACRETS for food, beverage, and hotel
services, and that hotel services are part of the offering.  Tr.
74:24-25, 75:1-6.  The franchise offering requests royalty
payments of 10% on hotel revenue and 6% on food and beverage
revenue, for the SEACRETS mark, operation and design guidance,
training, marketing, and ongoing support.  Tr. 75:16-17, 133:12-
25, 134:1-15.

O.C. has never lost a sale of services to Coryn.  Tr.
125:19-21.  Moore was unable to "quantify any specific financial
harms that (O.C.) suffered as a result of the [alleged]
infringement."  Tr. 137:10-13.

---

[4] Resort Video Guide is a local cable network. Tr. 172:103.

B.   Coryn's Secrets Resort

AMResorts, LLC is one of several related entities owned by members of the Mullen family ("the AMR-Related Companies").  Tr. 363:2-25, 364:10-22.  AMResorts, LLC manages the sales, marketing and administration of several all-inclusive, five-star resort hotels in Mexico and the Caribbean.  Tr. 292:4-6, 16-24. The resorts operate under different brands, including "Secrets," "Dreams," "Zoetry," and "Sunscape," and target travelers from the United States, Canada, and Europe.  Tr. 292:9-18, 402:11-17. Their target consumers have an annual household income of over $100,000.  Tr. 401:13-18.

The Coryn Groups own the licenses for the brands.  Tr. 365:3-4.  The resorts are in Mexico, the Caribbean, the Dominican Republic, and Jamaica.  Tr. 292:15-16.  AMResorts manages about 10,000 rooms in the hotels.  Tr. 292:17-18.

AMResorts's hotels advertise that they provide "unlimited luxury," which is "the luxury version of the traditional all-inclusive resorts."  Tr. 292:22-24.  Accordingly, patrons' restaurant and bar expenses are included in the resort price. Tr. 293:8-13.

On June 22, 2000, Coryn filed[5] an intent-to-use application for the mark SECRETS for "resort hotel services" with the United

---

[5] Alex Zozaya, President of AMResorts, testified that Eugene Renz, Coryn's attorney, filed the application on behalf of

States Patent and Trademark Office ("USPTO").[6]  Tr. 324:5-7,

323:2-13.  On June 29, 2000, Coryn's attorney, Eugene Renz,

requested a report on similar trade names so that he could

decide whether Coryn would be able to register the mark SECRETS

for "resort hotel services."[7]  Tr. 320:7-13.  On July 6, 2000,

Renz told Coryn that

> there were a number of registrations for SECRETS with
> various spellings, . . . [but] none of the citations
> were for your services.  . . .  [W]e believe that no
> registered SECRET mark would present an obstacle to
> your use and registration.

Tr. 322:21-25, 372:7-12.  The letter discussed some of the

similar marks, but not O.C.'s SEACRETS mark.  Tr. 372:19-25.

Renz also gave Coryn the search results, but Coryn did not read

them, relying instead on Renz's advice; in the search of "resort

---

Coryn, and decided to register the SECRETS mark for "resort
hotel services" and not "restaurant services," after Zozaya told
Renz "what the business would be like."  Tr. 328:21-23, 329:1-5.
The service marks for AMResorts's other brands of all-inclusive
resorts are also registered for "resort hotel services" and not
"restaurant services."  Tr. 375:6-22.

[6] On the same day, an agent for Coryn applied for protection of
the SECRETS mark in Canada for "resort hotel; hotel, restaurant,
and bar services."  Tr. 329:6-25, 330:1-6.  At some point, Renz
or another attorney filed for protection of the SECRETS mark in
Jamaica for "food and drink" and "temporary accommodation."  Tr.
10-19.

[7] This was the first trademark search Coryn had done for SECRETS.
Tr. 324:8-10.  Zozaya testified that he had checked the Hotel
Travel Index Guide, which compiles all hotel names, and searched
the Yahoo! internet search engine for hotels called SECRETS, and
found none.  Tr. 367:6-25, 368:1-9.

hotels" with marks similar to "SECRETS," O.C.'s SEACRETS mark
was fourth on the list.  Tr. 327:5-25.

Also on June 29, 2000, Coryn secured the web domain name
"secretsresorts.com."  ECF No. 94, Ex. 22.  On March 21, 2001,
the PTO issued a Notice of Publication of the SECRETS mark, and
the mark was published for opposition on April 3, 2001.  ECF No.
81, Ex. 18.

In late 2001 Coryn began to use the SECRETS mark in
advertising; it opened the first SECRETS Resort in January 2002.
Tr. 300:5-7.  On October 7, 2003, the USPTO registered the
SECRETS mark and assigned it U.S. Registration No. 2772061.  ECF
No. 296 Attach. 2 at A54 [hereinafter "Cancellation Pet."].
The application was not opposed, and the PTO issued the
registration to Coryn on October 7, 2003.  *Id.*, Ex. 20.

SECRETS Resorts include bars and restaurants, which are not
called Secrets.  Tr. 307:5-12.  As with food services at the
other AMResorts hotels, the cost of food and drinks at those
bars and restaurants is included in the resort price.  Tr.
293:8-13.  SECRETS Resorts are members of the "Preferred Hotels"
network, a certification that SECRETS--like other "Preferred
Hotels"--meets "Standards of Excellence, an extensive quality
assurance program."  Tr. 385:16-25, 386:1-11.  Some of the
SECRETS Resorts were named to the top ten all-inclusive hotels
in the world and Condé Nast's Golden List, and have been

recognized in *Travel + Leisure* and *Trip Advisor*; all SECRETS
Resorts have been awarded four-diamond status from AAA.   Tr.
387:5-19.

Coryn reaches most of its consumers through travel agents.
It also uses direct mailing to consumers of high-end products
and airport advertisements, as well as advertising on its
website.   Tr. 401:2-12.

Coryn advertises Secrets Resort in magazines sold in Ocean
City.   Tr. 90:12-20.   In September 2011, a travel agent entered
O.C. and attempted to distribute brochures advertising Apple
Vacations and Secrets Resorts on the property.   Tr. 91:5-20,
92:4-7.

C.   The TTAB Cancellation

On January 23, 2004, after the SEACRETS customers asked
Moore about his connection to SECRETS, O.C. petitioned for
cancellation of the SECRETS mark.   Cancellation Pet. at A54.

On August 20, 2008, the TTAB ordered the cancellation of
Coryn's registration because O.C. had a priority of usage in its
SEACRETS mark and there was a likelihood of confusion between
the marks.   ECF No. 1 Attach. 2 at 27 [hereinafter "Cancellation
Op."].   The TTAB also denied Coryn's petition for partial
cancellation or restriction because it found that the proposed
restrictions would not avoid confusion.   *Id.*

By August 2008, Coryn was operating one SECRETS Resort and had begun construction on two others.[8]  Tr. 352:5-14.  Coryn continued construction and, by the end of 2010, six SECRETS Resorts were open to the public, including two in Jamaica.  Tr. 354:13-24, 355:11-12.  In late 2011, Coryn opened a seventh SECRETS Resort, and it plans to open another in 2012.  Tr. 358:6-14.

D.   Other Resorts and Hotels

Several hotels in the United States use the marks SEACREST, SECRET, or SECRETS; O.C. has not challenged their uses.  Tr. 129:11-25, 130:1-25.  They advertise online but other forms of advertisement have not reached Ocean City; they use SECRET or SECRETS with other words, such as SECRET HARBOUR or SECRETS INN. *Id.*

E.   Litigation in this Court

On October 20, 2008, Coryn appealed the TTAB's decision to this Court.  ECF No. 1.  On December 10, 2008, O.C. counterclaimed for trademark infringement and unfair competition under the Lanham Act and Maryland common law.  ECF No. 29.

A jury trial was held from October 31 through November 8, 2011.  Alex Zozaya, AMResorts's president, conceded that: (1)

---

[8] Before January 2007, two other SECRETS Resorts operated; AMResorts stopped servicing those two Resorts by January 2007. Tr. 351:22-25, 352:1-6.  It is not clear whether the resorts continued to operate under the SECRETS mark.

SEACRETS and SECRETS are used for "vacation destinations," (2) for "a fun . . . island experience" (3) that includes "restaurant and bar services," and involves (4) sand, sun, ocean, palm trees, "music and dancing and events." Tr. 314:21-25, 315:1-25, 316:1-6. Moore acknowledged that SECRETS offers more luxurious options than SEACRETS. Tr. 98:8-25, 107:6-25, 108:1-13, 113:25, 114:1-25.

There was also evidence that some restaurants, such as Planet Hollywood, expand into the hotel industry. Tr. 303:2-15.

O.C. presented testimony from Robert Reitter, a market researcher. Tr. 449:22. Reitter had conducted a survey to test potential consumers' reactions to SECRETS and SEACRETS. Tr. 453:15-16. Reitter included 225 people in the test group and the same number in his control group. Reitter concluded that, after seeing photos of a luxury beach resort called SECRETS,[9] 29.8% of the participants shown a photo of SEACRETS Hotel "thought that the Ocean City Seacrets was affiliated or connected with Secrets." Tr. 458:11-25, 511:21-23. 67.6% of those participants said they came to that conclusion because of "the similarity of the name." Tr. 512:2-16.

---

[9] Alongside photos of several other luxury resorts with different names. Tr. 458:11-25, 459:1-7. The control group viewed the same pictures, but the name SECRETS was replaced with the name SUNSCAPE. Tr. 459:7-13.

Other participants heard a SEACRETS radio advertisement after viewing the luxury resort images. Some 33.9% thought SEACRETS was affiliated with SECRETS; 89.5% of those participants thought so because of the names.[10] Tr. 512:13-19.

Coryn introduced testimony from its expert, Kenneth Hollander, another market researcher. Tr. 706:7-12. Hollander conducted a confusion survey that found little to no consumer association of SECRETS and SEACRETS. Tr. Vol. IV at 77:14-20. He also critiqued Reitter's survey, and criticized Reitter's choice of participants, stimuli, questions asked, and the control group. Tr. Vol. IV at 84:14-24.

On November 3, 2011, the fourth day of trial, Coryn moved for judgment as a matter of law. ECF No. 263. On November 7, 2011, O.C. moved for judgment as a matter of law on its federal trademark infringement and unfair competition claims, and separately on its Maryland law claims. ECF Nos. 272, 273. The motions were denied.

On November 8, 2011, the jury returned a verdict for O.C. It concluded that Coryn had infringed O.C.'s rights in the SEACRETS mark, O.C. was entitled to $1 in compensatory damages, none of which represented Coryn's profits, and it found that

---

[10] Of control group members who saw a picture of SEACRETS, 6.9% associated that mark with SUNSCAPE. Of control group members who heard the radio ad, 5.7% associated the mark with SUNSCAPE. Tr. 512:20-25, 513:1-3.

Coryn's infringement was willful, and O.C. was entitled to $265,035 in punitive damages. ECF No. 279. Shortly after, the Court affirmed the TTAB's cancellation of the SECRETS mark. ECF No. 295.

On November 14, 2011, O.C. moved for a permanent injunction. ECF No. 284. On November 22, 2011, O.C. moved for attorney's fees. ECF No. 288. On December 23, 2011, O.C. moved to amend the judgment or for a partial new trial. ECF No. 296. On December 27, 2011, Coryn renewed its motion for judgment as a matter of law and alternatively sought a new trial. ECF No. 298. On January 17, 2012, Coryn moved for leave to file a surreply opposing O.C.'s motion for permanent injunction. ECF No. 311. All motions were opposed. ECF Nos. 293, 305, 306, 312.[11]

II.  Discussion

    A.  Coryn's Motion for Judgment as a Matter of Law or a New Trial

Coryn contends that it is entitled to judgment as a matter of law or a new trial because (1) it did not infringe O.C.'s SEACRETS mark, (2) even if it did, O.C. is not entitled to punitive damages, and (3) even if O.C. is entitled to punitive damages, the jury award violated Coryn's right to due process of law. ECF No. 298 Attach. 1.

---

[11] O.C. filed two unopposed motions to seal. ECF Nos. 289, 310. Those motions will be granted.

1. Standards of Review

i. Judgment as a Matter of Law

Under Fed. R. Civ. P. 50, after trial a district court should grant judgment as a matter of law against a party when that "party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149 (2000).[12]

The Court must review all the evidence in the record, and draw all reasonable inferences in favor of the nonmoving party; the Court may not make credibility determinations or weigh the evidence. *Id.* at 150.

> [T]he court should review the record as a whole, [but] it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Edmondson v. Am. Motorcycle Ass'n, Inc.,* 7 F. App'x 136, 146 (4th Cir. 2001) (*quoting Reeves, Inc.,* 530 U.S. at 151).[13]

ii. New Trial

Under Rule 59(a), a district court may grant a new trial if: "(1) the verdict is against the clear weight of the

---

[12] *See also Anheuser-Busch, Inc. v. L.&L. Wings, Inc.,* 962 F.2d 316, 318 (4th Cir. 1992) (reversing district court's grant of judgment as a matter of law because the evidence permitted the jury to conclude there was no likelihood of confusion of the marks).

[13] The Court must not "assume[] the jury's role in determining whether an ordinary consumer would likely be confused by the [alleged infringing mark]." *Anheuser-Busch,* 962 F.2d at 318.

evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crain Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). In determining whether to grant a new trial, the court may weigh the evidence and consider witness credibility. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

### 2. Infringement

To prove infringement, O.C. had to prove, by a preponderance of the evidence, that it owned a protectable mark, and Coryn's use of SECRETS creates a likelihood of confusion. 15 U.S.C. § 1114(a)(1); *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009). Coryn contends that no reasonable jury could conclude that there was a likelihood of confusion of the marks. ECF No. 298 Attach. 1 at 5, 24. "As a 'cross-section of consumers,' the jury is particularly 'well-suited to evaluating whether an ordinary consumer would likely be confused.'" *Super Duper, Inc. v. Mattel, Inc.*, 382 F. App'x 308, 313 (4th Cir. 2010) (*quoting Anheuser-Busch, Inc. v. L.&L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992)), *cert denied*, 131 S. Ct. 1003 (2011).

To determine likelihood of confusion, factfinders and courts in the Fourth Circuit consider nine factors:

15

> (1) the strength or distinctiveness of the plaintiff's
> mark as actually used in the marketplace; (2) the
> similarity of the two marks to consumers; (3) the
> similarity of the goods or services that the marks
> identify; (4) the similarity of the facilities used by
> the markholders; (5) the similarity of advertising
> used by the markholders; (6) the defendant's intent;
> (7) actual confusion; (8) the quality of the
> defendant's product; and (9) the sophistication of the
> consuming public.

*George & Co.*, 575 F.3d at 393 (citations omitted).  Evidence of

actual confusion is "often paramount in the likelihood of

confusion analysis."  *Id.* (internal quotation marks and

citations omitted).

> i.   Strength of O.C.'s Mark

Coryn contends that a reasonable jury would have to

conclude O.C.'s mark is weak because the evidence showed "a

variety of third-party uses of the SECRETS mark."  ECF No. 298

Attach. 1 at 12-13.  O.C. counters that though SEACRETS has "a

suggestive quality," the evidence showed that the mark is strong

because it is a coined mark that has been used for over 20 years

and extensively advertised and promoted across the nation.  ECF

No. 305 at 11-12.

In assessing overall strength, two considerations apply:

(1) a mark's conceptual strength, meaning the relationship

between the mark and the goods or services it is used for, and

(2) its commercial strength, meaning the degree to which the

mark is known by the consuming public.  *George & Co.*, 575 F.3d at 393-95.

>           a.    SEACRETS is Suggestive

Suggestive, arbitrary, and fanciful marks are conceptually strong marks.[14]  *Id.*  Suggestive marks require "the exercise of some imagination . . . to associate a suggestive mark with the product."  *George & Co.*, 575 F.3d at 394.  A mark that combines two words to create something that sounds like an English word, but is spelled differently and "conjures favorable images" of the product or service

> may not be wholly fanciful (because it is phonetically
> identical to a common word) or arbitrary (because it
> is not actually a 'real' word), [but] it is
> unquestionably suggestive, and therefore a strong,
> distinctive mark.

*Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 465 (4th Cir. 1996).  Evidence that third-parties use the mark undermines the conceptual strength of a mark.[15]

Federal registration is *prima facie* evidence that a mark is, at least, suggestive, or that it is descriptive and has

---

[14] Descriptive marks are weak unless they have acquired a secondary meaning, and generic marks are always weak and not entitled to protection.  *George & Co.*, 575 F.3d at 393-95.

[15] *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 270 (4th Cir. 2006) (finding the mark CAREFIRST conceptually weak for health care, even though it was suggestive, because of "substantial third-party use of the words 'Care,' 'CareFirst,' and 'First Care' in the health care industry").

acquired secondary meaning.  *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528-29 (4th Cir. 1984).

The jury heard evidence that: (1) the SEACRETS mark is federally registered, Tr. 298:12, and (2) SEACRETS is a coined term, combining the English words "sea" and "secrets," and does not exist in the English language, Tr. 54:2-17.  The combination of "sea" and "secrets" was sufficient for the jury to conclude that the mark is suggestive, and thus conceptually strong.  *See George & Co.*, 575 F.3d at 394; *Sara Lee*, 81 F.3d at 465.  Also, the jury could have inferred from the federal registration that the mark is suggestive or has acquired secondary meaning.  *See Pizzeria Uno*, 747 F.2d 1528-29.[16]

> b.    SEACRETS is Commercially Strong

The commercial strength inquiry is "similar to the 'secondary meaning' inquiry," and considers the plaintiff's investment in and extent of advertising, commercial success, and length and exclusivity of use of the mark; consumer studies identifying the mark with the source,[17] "unsolicited media

---

[16] The jury also heard evidence of third-party use of similar marks, such as SECRET, SECRETS, and SEACREST.  Tr. 129:11-25, 130:1-25.  The jury was entitled to accept Moore's testimony that names such as Secret Harbour and Seacrest, sounded different or were always used with other words.  Tr. 129:11-25, 130:1-25.

[17] Consumer studies that link the mark to its source are "generally thought to be the most direct and persuasive way of establishing secondary meaning" and commercial strength.  *George*

coverage of the plaintiff's business," and plagiarizing attempts on the mark. *George & Co.*, 575 F.3d at 395 (*citing Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)).

The jury heard evidence that (1) O.C. used the SEACRETS mark continuously from 1988 to 2011, (2) O.C. pays for advertisements with the SEACRETS mark in local and national media including television shows, and (3) O.C. has enjoyed enough success to expand each year since 1990, reporting $155 million in revenue for ten recent years. Tr. 50:3-7, 165:16-25, 166:1-25, 171:1-25, 264:24-25, 265:1-8. From this, the jury could conclude that SEACRETS had at least some commercial strength.

Accordingly, the jury heard sufficient evidence on the first factor to support a likelihood of confusion finding.

## ii. Similarity of the Marks

To determine whether the marks are confusingly similar, the factfinder considers whether the marks are similar in sight, sound, and meaning. *George & Co.*, 575 F.3d at 396. The factfinder must consider the similarity in the context of "the manner in which the marks are used," *id.*, because "a comparison of the texts of the two marks alone is insufficient," *CareFirst*,

---

& *Co.*, 575 F.3d at 396 (internal citation omitted). However, lack of such evidence does not automatically defeat commercial strength--or the other considerations would become irrelevant.

434 F.3d at 271.[18]   However, similar or identical words, with similar placements in the marks, that are "prominent feature[s]" of both marks, can render the marks confusingly similar despite other, dissimilar words in each mark.   *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee*, 396 F.3d 1369, 1372 (Fed. Cir. 2005).[19]

The jury heard and saw evidence that SECRETS and SEACRETS sound the same and differ by only one letter.   Tr. 312:7-11, 313:15-19.   Though, as Coryn argues, each mark is sometimes displayed with other components, such as "Bar & Grill" for SEACRETS and "Resorts & Spas" or "Maroma Beach" for SECRETS, the jury could have concluded that SECRETS and SEACRETS predominate the commercial impression for O.C. and Coryn and that, because of their auditory and apparent similarity, they were confusingly similar.   *See Palm Bay Imports*, 396 F.3d at 1372.

---

[18] In addition to the design of a mark, words that commonly appear with it are relevant.   *CareFirst*, 434 F.3d at 271 (CareFirst mark was "very different" in appearance from First Care mark because "the CareFirst mark is almost always paired with the Blue Cross Blue Shield language, while the First Care mark is always presented by itself, or at most with the suffix 'P.C.'   In contrast to the accouterments surrounding CareFirst's mark in its public appearances, First Care presents its mark plainly and without any graphics.").

[19] Concluding the marks VEUVE CLICQUOT and VEUVE ROYALE are confusingly similar, although CLICQUOT was the dominant word in the VEUVE CLICQUOT mark, because VEUVE was also prominent and important in marketing the product, and VEUVE was the dominant feature of VEUVE ROYALE mark.   *Palm Bay Imports*, 396 F.3d at 1372.

### iii. Similarity of the Services

The services "need not be identical or in direct competition with each other" to be similar. *George & Co.*, 575 F.3d at 397 (*citing CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001)).

> [B]ecause the rights of an owner of a registered trademark extend to any goods that might be, in the minds of consumers, "related," i.e. put out by a single producer, the more accurate inquiry is whether the public is likely to attribute the products and services to a single source.

*CAE*, 267 F.3d at 679. If the parties offer "some of the same . . . services," a factfinder may conclude that the services are similar, though the parties also offer distinct services. *Id.*

The jury heard evidence that there is some overlap between "restaurant and bar" services and "hotel service" industries. Tr. 303:19-25, 304:1-10. It could accept Moore's testimony that he had planned, from the beginning, to build a large hotel on the SEACRETS complex. Tr. 47:7-20. It also heard and could accept that: (1) SEACRETS and SECRETS are used for "vacation destinations," (2) for "a fun . . . island experience" (3) that includes "restaurant and bar services," and involves (4) sand, sun, ocean, palm trees, "music and dancing and events." Tr. 314:21-25, 315:1-25, 316:1-6. From that evidence, the jury could conclude that the services are sufficiently similar.

iv.  Similarity of the Facilities

The jury heard evidence that SEACRETS and SECRETS have a
hotel, dining and drinking venues, sand, sun, ocean, palm trees,
"music and dancing and events."  Tr. 314:21-25, 315:1-25, 316:1-
6.  From that evidence, it could conclude that the facilities
were sufficiently similar, despite the differences in quality
Coryn highlighted.  *Cf. CareFirst*, 434 F.3d at 273 (no
similarity when there are "basic differences between [parties']
modes of distributing their products" because CareFirst did not
operate clinics and First Care only operated clinics).

v.  Similarity of Advertising

In comparing advertising, the factfinder considers the
media, geographic scope, appearance, and content of the parties'
advertisements.  *CareFirst*, 434 F.3d at 273.  The jury heard
evidence that Coryn markets SECRETS Resorts primarily to travel
agents around the country--including in Ocean City--and through
national magazine advertisements, but also through direct
mailing to potential consumers.  Coryn also markets nationally
and internationally through the SECRETS website.  Tr. 91:1-16,
401:2-12.  The jury heard that O.C. markets SEACRETS through
promotional features on national television shows, local
magazines, print publications, and billboards, and local and
internet radio.  Tr. 170:1-25, 171:1-17, 174:8-19, 175:13-24.

Though O.C. and Coryn's advertisements do not completely overlap in scope or media, the jury could conclude that both parties advertised nationally and in Ocean City, with similar media.[20]

### vi.  Coryn's Intent

In a reverse confusion[21] claim, the factfinder considers whether the junior user adopted the infringing mark knowing, or recklessly disregarding, the senior user's mark--not whether the junior user intended to trade on the senior user's goodwill and reputation.  *See* 4 McCarthy, § 23:10 (collecting cases). Willfulness in a reverse confusion case can be as little as knowing or reckless disregard of the senior user's rights when

---

[20] The parties rely on exhibits admitted at trial, which were returned to them after trial.  As they have not given copies of those exhibits to the Court, the Court is unable to consider the content and appearance of the advertisements, identified only by exhibit numbers.

[21] The Fourth Circuit has not adopted the doctrine of reverse confusion. *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501 (table), 1999 WL 6391685, *12 (4th Cir. 1999) ("To date, this Court has not adopted the doctrine of reverse confusion.").  However, courts within the circuit have applied that doctrine. *See, e.g., Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F. Supp. 2d 571 (M.D.N.C. 2009) (applying reverse confusion doctrine based on *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3rd Cir. 2000)); *Takeall v. Pepsico, Inc.*, 809 F. Supp. 19, 23-24 (D. Md. 1992) ("[S]ummary judgment is also warranted on the plaintiff's claims for 'reverse confusing and passing off.'").  *But see MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 347 (4th Cir. 2001) (Niemeyer, J.) (dissenting because the suit presented "a classic case of 'reverse confusion'" (*citing A&H Sportswear*, 237 F.3d at 228)).

the junior user first uses the mark.  *See* ECF No. 119 at 12-13

(Court's opinion, discussing entitlement to monetary relief).[22]

The jury heard evidence that, after filing its intent-to-

use application but before opening its first SECRETS Resort,

Coryn received an opinion letter from its attorney that

mentioned similar registrations[23] and, in an attachment, a list

of similar marks, including SEACRETS.  Tr. 322:21-25, 327:5-25,

372:7-25.  That evidence could support an inference that, when

it opened the first SECRETS, Coryn knew of or recklessly

disregarded O.C.'s rights in the SEACRETS mark.  *See* 4 McCarthy,

§ 23:10.[24]

---

[22] Continued use of a mark after receiving notice that a senior
user claims rights in is generally irrelevant, unless the
evidence shows that it was done in bad faith, without a good
faith belief that the use was not infringing.  *Renaissance
Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 F. App'x
239, 245 (4th Cir. 2007).

[23] But opining that none would prevent Coryn's registration.

[24] The jury also heard that Coryn's application did not mention
restaurant and bar services--the services listed on SEACRETS's
registration.  Tr. 329:2-5.  That evidence does not support a
finding of intent to confuse or knowing disregard of O.C.'s
mark, because of the undisputed evidence that Coryn was not
aware of the SEACRETS mark until after filing its intent-to-use
application.  Tr. 327:18-25.
    Despite Coryn's lack of awareness, its failure to perform a
trademark search before filing its application permits an
inference that Coryn had the requisite intent.  *George & Co.*,
575 F.3d at 398 (failure to "conduct a trademark search or
contact counsel [before filing the application] shows
carelessness"); *Fisons Horticulture, Inc. v. Vigoro Indus.,
Inc.*, 30 F.3d 466, 480 (3rd Cir. 1994) (in reverse confusion
case, junior user had requisite intent because "while it may

### vii. Actual Confusion

Evidence of actual confusion "is often paramount in the likelihood of confusion analysis,"[25] but not necessary to a finding of likelihood of confusion.[26]  Actual confusion may be proved by anecdotal or survey evidence.  *Id*. at 398.  "Evidence of only a small number of instances of actual confusion may be dismissed as *de minimis*."  *Id*.

Evidence that a handful of people over several years believed the parties' services came from the same source is *de minimus* when the field of potential consumers is large.  *George & Co*. 575 F.3d at 399 (evidence of four confused customers was insufficient when the plaintiff sold 500,000 of the product per year).

The jury heard evidence that each year, at least two to three customers have asked Moore whether O.C. is affiliated with

---

have acted innocently, [it] was careless in not conducting a thorough name search" before adopting the mark).

On the other hand, that it conducted a trademark search and relied on its counsel's advice that the SECRETS mark would not conflict with other, similar marks weighs against a finding of the requisite intent.  *See Altira Grp. LLC v. Philip Morris Cos. Inc.*, 207 F. Supp. 2d 1193, 1200-01 (D. Colo. 2002).

Evidence that Coryn continued to use the SECRETS mark after O.C. objected to that mark is not probative of Coryn's intent. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 697 (E.D. Va. 2005).

[25] *George & Co.*, 575 F.3d at 393 (internal quotation marks and citations omitted).

[26] *CareFirst*, 434 F.3d at 269.

SECRETS.  Tr. 81:11-16.  It also heard that Reitter's study found that about 30% to 34% of his survey participants thought the services came from the same source.[27]  Tr. 511:16-25, 512:10-19.  The jury was entitled to reject Coryn's challenges to the weight of Reitter's survey and accept the results.  Accordingly, a reasonable jury could have concluded that the actual confusion factor favored O.C.

### viii. Quality of Coryn's Product

The eighth factor "applies in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods."  *George & Co.*, 575 F.3d at 399.  O.C. does not suggest that Coryn infringed its SEACRETS mark with "cheap copies or knockoffs."  *See id.*; Tr. 98:8-25, 107:6-25, 108:1-13, 113:25, 114:1-25 (acknowledging that SECRETS offers more luxurious services than SEACRETS).  This factor bears little to no weight here.  *George & Co.*, 575 F.3d at 399.

### ix.  Consumer Sophistication

The ninth factor, like the eighth, does not apply to all infringement suits.  *Sara Lee*, 81 F.3d at 467.  "Barring an unusual case, buyer sophistication will only be a key factor when the relevant market is not the public at-large."  *Id.*; *see also George & Co.*, 575 F.3d at 400.  It applies, instead, when a

---

[27] Survey evidence showing that 10% or more of the subjects are confused is sufficient to show actual confusion.  *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 n.15 (4th Cir. 1996).

typical consumer "is sophisticated in the use of--or possesses an expertise regarding--a particular product [or service]."[28] *Sara Lee*, 81 F.3d at 467.

Although the jury heard evidence that Coryn's clientele might be more limited than the public-at-large because of the expense of a resort stay,[29] the jury could have concluded that O.C.'s consumers--the population at risk of harmful confusion in a reverse confusion case[30]--are the general public. *See* Tr. 107:17-25.

Further, even if the jury concluded that the average consumer of hotel, restaurant, and bar services is sophisticated, they could have concluded that, despite that sophistication, confusion remained likely, because sophistication is only one of the factors and can be outweighed by the others. *See Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, 898 F.3d 147 (table), 1990 WL 27236, *4 (4th Cir. 1990).

---

[28] For example, when the "ordinary consumer [of the service at issue for both marks is] most likely a highly trained procurement professional whose sensitivity is heightened by the responsibility of sensibly spending millions of dollars." *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990).

[29] Tr. 401:13-23 (describing target clientele as having a household income "over $100,000").

[30] *MicroStrategy Inc.*, 245 F.3d at 347 (Niemeyer, J., dissenting).

As there was legally sufficient evidence for the jury to conclude that most, if not all, of the likelihood of confusion factors favored O.C., judgment as a matter of law on the infringement finding is not warranted. *See Reeves*, 530 U.S. at 149.

A new trial is also not warranted. Having considered and weighed the evidence, the Court concludes that the infringement verdict is not against the clear weight of the evidence or based on false evidence, and will not result in a miscarriage of justice. *See Atlas Food Sys. & Servs.*, 99 F.3d at 594.

### 3.   Compensatory Damages

Coryn next contends that it is entitled to judgment as a matter of law on the damages award because no reasonable jury could conclude that the evidence supported awarding damages. ECF No. 298 Attach. 1 at 25.

Under the Lanham Act, a successful plaintiff may, "subject to the principles of equity . . . recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. 1117(a). "The court shall assess such profits and damages or cause the same to be assessed under its direction" and ensure that any relief awarded "shall constitute compensation and not a penalty." *Id.*  Awarding

damages makes "violations of the Lanham Act unprofitable to the infringing party."[31]

The Fourth Circuit has identified six nonexclusive factors that should be considered when awarding damages or a defendant's profits:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006).

### i.   Coryn's Intent

In determining damages on a reverse confusion claim, the focus is on whether junior user has selected the infringing mark recklessly or despite knowledge of the senior user's mark--not whether the junior user intended to trade on the senior user's

---

[31] *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc.*, 994 F. Supp. 350, 380 (W.D.N.C. 1997) (*quoting Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1348 (7th Cir. 1994)).   An award may be appropriate if the infringement has unjustly enriched or damaged the plaintiff from a diversion of sales or loss of reputation or goodwill.   *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 178 (3d Cir. 2005).   An award may also be warranted if necessary to deter future infringement.   *See id.*   In any case, "the monetary relief granted . . . must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty."   *Id.* To this end, the Court has discretion to fashion an appropriate remedy, including by increasing or decreasing a jury's award. *See, e.g., id.* at 177; *Go Med. Indus. PTY, Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1274 n.4 (Fed. Cir. 2006).

goodwill and reputation.  *See* 4 McCarthy, § 23:10 (collecting cases).  Continued use after notice of the senior user's mark may be relevant, *Buzz Off*, 606 F. Supp. 2d at 588, or it may permit the inference that Coryn thought O.C.'s mark was too weak or otherwise did not conflict with Coryn's use, *see Renaissance Greeting Cards*, 227 F. App'x at 245.[32]  The jury was not required to accept that this was the case.  It could interpret the evidence as showing that Coryn's continued use of the mark was in bad faith.[33]

Also, the jury could have concluded that Coryn recklessly adopted the mark because it failed to perform a TTAB check, justifying some damages.  *See George & Co.*, 575 F.3d at 398; *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 480 (3rd Cir. 1994).

---

[32] A junior user may be "justified in continuing its use of the . . . mark if, as the district court concluded, [the junior user] believed [the senior user's] mark to be too weak to prevent [the junior user's] use of the mark."  *Renaissance Greeting Cards*, 227 F. App'x at 245 (*citing* McCarthy, § 23:120).

[33] As will be discussed in the punitive damages discussion, this factor applies to the punitive damages determination different-ly.  *Buzz Off*, 606 F. Supp. 2d at 588 ("[A]lthough this factor weighs in favor of SCJ in considering damages, the conduct by BOIS in this case is not so fraudulent, malicious, or deceptive, compared to other trademark infringement cases, to weigh heavily in favor of an enhancement to the damages awarded in the present case.").

ii.   Diverted Sales and Overwhelming the Market

The second *Synergistic* factor considers the junior user's effect on the senior user's market. *See Buzz Off*, 606 F.3d at 588. There was no evidence of diverted sales in this case. *See* Tr. 278:1-3, 278:9-14 (Moore testimony that he could not identify "any single sale that [he had] lost as a result of something [Coryn] did"). However, the jury could have concluded that O.C. lost some "market presence" because of Coryn's "expansive use" of the SECRETS mark. *See Buzz Off*, 606 F. Supp. 2d at 588. This would weigh slightly toward awarding some damages.

iii. Adequacy of Other Remedies

The third factor considers whether a remedy other than compensatory damages, including an injunction, "might more appropriately correct any injury the [senior user] suffered from the [junior user's] infringement." *Synergistic*, 470 F.3d at 176. If an injunction would be adequate, the third factor weighs against awarding damages. *Id.*

There was no evidence whether other remedies would adequately protect O.C. *See* ECF No. 305 at 34 (identifying no evidence about alternative remedies in discussion of third factor); ECF No. 298 Attach. 1 at 25 (same). Further, as discussed below, an injunction will adequately protect O.C.'s interest in controlling its goodwill and reputation. *See* Part

II.C.4, *infra*.  Accordingly, this factor weighs against a damages award.

### iv.   Unreasonable Delay

The jury could have accepted Moore's testimony that O.C. learned about the SECRETS mark in late 2003 and asserted its rights in the SEACRETS mark in January 2004.  Cancellation Pet. At A54; Tr. 80:19-21.  Accordingly, the jury could have concluded that this factor does not weigh against damages because O.C. did not unreasonably delay asserting its rights. *See Mazelmints, Inc. v. It's A Wrap, LLC*, No. 10-1117, 2011 WL 2960873, *5 (E.D. Va. Jul. 20, 2011) (finding fourth factor favored damages award because the plaintiff "sought relief immediately after becoming aware" of infringing behavior).

### v.   Public Interest

The fifth factor, the public interest in making the infringing misconduct unprofitable, weighs a plaintiff's right to be compensated for infringing activities against the defendant's right not to be assessed a penalty,[34] and in a reverse confusion case, the public interest in encouraging innovation and good faith investment in promoting marks that become more successful than the senior user's mark.[35]

---

[34] *Synergistic*, 470 F.3d at 176.

[35] *Buzz Off*, 606 F. Supp. 2d at 589.

The jury could have concluded that the public interest would be served by awarding nominal damages for Coryn's failure to check for similar marks and choose a mark not already in use for similar services. *See* Part II.A.2.vi.

### vi. Palming Off

It was undisputed that this was not a case of palming off. *See* Part II.A.2.viii.

Balancing the *Synergistic* factors, a reasonable jury could conclude that a nominal damages award was appropriate; thus, judgment as a matter of law is inappropriate. No new trial is necessary because that conclusion is not against the clear weight of the evidence, based on false evidence, or likely to cause a miscarriage of justice.

### 4. Punitive Damages

Coryn contends that the punitive damages award was inappropriate as a matter of law, and, if punitive damages were allowed, the amount violated Coryn's due process rights. ECF No. 298 Attach. 1 at 29, 31.

The Court may resolve an excessive verdict by conditioning the granting of a new trial on the plaintiff's rejection of a reduced verdict. *G.M. Garrett Realty, Inc. v. Century 21 Real Estate Corp.*, 17 F. App'x 169, 172 (4th Cir. 2001).[36]

---

[36] *See also Hebron Vol. Fire Dep't, Inc. v. Whitelock*, 890 A.2d 899, 904 (Md. Ct. Spec. App. 2006) (*citing Turner v. Wash.*

i.   Entitlement to Punitive Damages

In Maryland, punitive damages are appropriate when the plaintiff shows, by clear and convincing evidence that the defendant acted "maliciously, wantonly or fraudulently." *Seidelmann Yachts*, 14 U.S.P.Q.2d at 1511 (standard); *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 469, 601 A.2d 633, 657 (1992) (clear and convincing requirement).

O.C. does not contend that Coryn's behavior was malicious or fraudulent, arguing instead that the evidence supported a finding of wantonness.  ECF No. 305 at 40.  Wanton behavior is characterized by "extreme recklessness and utter disregard for" others' rights.  *Dennis v. Balt. Transit Co.*, 189 Md. 610, 617, 56 A.2d 813, 817 (1948).[37]

As noted above, the jury could have concluded that Coryn recklessly disregarded O.C.'s rights in the SEACRETS mark by failing to check the TTAB before filing its application.  This could justify an award of some punitive damages.

ii.  Due Process

To satisfy the Fourteenth Amendment Due Process guarantee, punitive damages imposed under state law must be reasonable.

---

*Suburban Sanitary Comm'n*, 221 Md. 494, 501-02, 158 A.2d 125 (1960)).

[37] *Quoted in Schaefer v. Miller*, 322 Md. 297, 319, 587 A.2d 491, 502 (1991).

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996)

(overturning $2 million punitive award in light, in part, of

$4,000 compensatory award).  To determine whether a punitive

damages award is reasonable, the Court considers: (1) the degree

of reprehensibility of the defendant's conduct; (2) the

difference between the actual or potential harm suffered

(compensatory damages) and the punitive award; and (3) the

difference between the punitive award and civil penalties in

comparable cases.  *Id.* at 575; *State Farm Mut. Auto. Ins. Co. v.*

*Campbell*, 538 U.S. 408, 418 (2003).

a.    Coryn's Conduct

The degree of reprehensibility of the defendant's conduct

is the "most important indicium of the reasonableness of a

punitive damages award." *State Farm*, 538 U.S. at 419 (*quoting*

*Gore*, 517 U.S. at 575).  The Court considers whether: (1) the

harm was physical or economic; (2) the defendant "evinced an

indifference to or a reckless disregard of the health or safety

of others;" (3) the plaintiff was financially vulnerable; (4)

the conduct was part of a pattern or an isolated incident; and

(5) the defendant acted with intentional malice, trickery, or

deceit, or accidentally.  *Id.*  That one factor favors the

plaintiff does not justify a substantial punitive award.[38]  *Id.*

---

[38] That most or all of the factors favor the defendant does not
necessarily make an award inappropriate; it militates for a less

There was no evidence that factors one, two, four, or five were present here: O.C. was not physically harmed; Coryn was not indifferent to and did not recklessly disregard the health or safety of others;[39] Coryn infringed no marks other than SEA-CRETS;[40] and there was no evidence that Coryn acted with intentional malice, trickery, or deceit.[41]

There was evidence that, by 2000--Coryn's first use of the SECRETS mark--O.C. had been profitable for 10 years and had the resources to continually expand the business, and between 1999 and 2008 O.C. had a total revenue of over $155 million.  Tr.

---

substantial penalty.  *Gore*, 517 U.S. at 576-80 (finding that "none of the aggravating factors . . . is present" but acknowledging that "a modest award of exemplary damages" might be permissible).

[39] O.C. argues that Coryn recklessly disregarded its rights, ECF No. 305 at 40, but no evidence showed that Coryn recklessly disregarded anyone's health or safety.  *See State Farm*, 538 U.S. at 419.

[40] As trademark infringement is an ongoing tort, Coryn's continued use of the same mark does not render it a "recidivist."  *See Gore*, 517 U.S. at 579; McCarthy § 31:33. Even if Coryn's behavior can be construed as "part of a pattern," all other factors favor Coryn; accordingly, the first prong would still disfavor a substantial punitive award.  *State Farm*, 538 U.S. at 419.

[41] O.C. has essentially conceded that Coryn did not act with intentional malice, trickery, or deceit.  *See* ECF No. 305 at 39-40 (focusing entire punitive damages intent argument--except brief, unsupported, assertion that jury was entitled to conclude that Coryn acted fraudulently or maliciously--on argument that Coryn's conduct "demonstrated wantonness or an extreme recklessness and utter disregard for O.C.'s rights").

53:12-13, 59:1-25, 60:1-17, 265:1-8.  There was no evidence that, between 2000 and the trial, Coryn was financially vulnerable.  Accordingly, this factor also favors Coryn.

As none of the aggravating factors is present in this case, the first *Gore* prong weighs against a substantial punitive award.

b.   Disparity in Damages Awards

This prong measures the disparity in the harm actually or potentially caused and the punitive award by comparing the compensatory and punitive awards.  *See, e.g., State Farm*, 538 U.S. at 425.  Ordinarily, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *Id.*  However, "when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter."  *Saunders v. BB&T Co. of Va.*, 526 F.3d 142, 154 (4th Cir. 2008).[42]

---

[42] *Citing Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364–65 (11th Cir. 2004) (affirming $250,000 punitive award accompanying $115.05 compensatory damages); *Abner v. Kan. City S. R.R.*, 513 F.3d 154, 165 (5th Cir. 2008) ($125,000 punitive award, nominal damages of $1); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 674–78 (7th Cir. 2003) ($186,000 punitive damages, $5,000 actual damages); *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) (rejecting ratio analysis because "the compensatory award

The potential harm of the conduct may also justify a higher ratio.  If the defendant's conduct is sufficiently reprehensible and could have caused a great deal of harm, but actually caused relatively little harm, then a very high ratio, such as 526:1, could comport with due process.  *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 451, 462 (1993).[43]

---

here was nominal, [so] any appreciable exemplary award would produce a ratio that would appear excessive by this measure"). *See also Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 646 (6th Cir. 2005); *JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 876 (8th Cir. 2008) (A $1 nominal award "does not on its own preclude a punitive damages award of [$1,087,500]," but punitive award would be reduced based on nominal compensatory award and lack of comparable punitive awards). *But see Sepulveda v. Burnside*, 432 F. App'x 860, 866-67 (11th Cir. 2011) (remanding punitive damages of $99,999 and compensatory or nominal damages of $1 when 99,999:1 "ratio far exceeds any that this court has upheld as reasonable").

[43] Potential harm should not be confused with expected future harm.  Potential harm refers to the harm that might have occurred--but did not--"in a similar situation."  For example:

> a man wildly fires a gun into a crowd.  By sheer chance, no one is injured and the only damage is to a $10 pair of glasses. A jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care. We would allow a jury to impose substantial punitive damages in order to discourage future bad acts.

*TXO*, 509 U.S. at 459-60 (internal quotation marks and citations omitted).  Thus, this inquiry considers whether there were any narrow misses of great harm.

O.C.'s possible future lost profits are not "potential harm."  The jury was instructed to consider the value and goodwill of the mark in its compensatory award.  *See* Jury Instruction No. 28.  Prospective lost profits are not like the narrow misses considered in the due process analysis; they are actual damages and thus part of the compensatory award.  *See id.*

Despite these exceptions to the general single-digit rule, a 265,035:1 ratio, without aggravating factors from the first *Gore* prong, weighs heavily against finding that the award satisfies due process.  Although the jury awarded nominal damages, most of the awards the Fourth Circuit has approved or cited, in concluding that the single digit ratio guideline might not apply when nominal damages are awarded, considered ratios of 125,000:1 or less.[44]

### c.   Similar Civil Penalties

The parties agree that this factor "should be deemed neutral in this case."  ECF No. 305 at 43; ECF No. 298 Attach. 1 at 34.

None of the factors supports the imposition of $265,035 in punitive damages: Coryn's conduct was not especially egregious, did not cause very much actual harm, and did not have the potential to cause great harm to others.

Accordingly, the Court will grant Coryn a new trial on punitive damages unless O.C. accepts a remittance to "a modest award of exemplary damages"[45]: 50,000:1.  A $50,000 award far

---

[44] *See Kemp*, 393 F.3d at 1364-65 (2,374:1) (*citing Abner*, 513 F.3d at 165 (125,000:1); *Mathias*, 347 F.3d at 674-78 (37:1); *Saunders*, 526 F.3d at 154 (20:1); *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 378 (4th Cir. 2008) (12.5:1).

[45] *Gore*, 517 U.S. 580.

exceeds the general 9:1 ratio limit and is 40% of the Fourth
Circuit's largest approved ratio.  Exceeding $50,000 is
inappropriate here because there were no aggravating factors
justifying a maximum award, unlike in the action involving a
larger ratio.[46]

   B.   O.C.'s Motion to Amend, Alter, or for a New Trial

   O.C. contends that it is entitled to disgorgement of
Coryn's profits in addition to the nominal damages the jury
awarded it.  ECF No. 296 Attach. 1 at 2.  Accordingly, it seeks
amendment of the jury award or, alternatively, a partial new
trial.  *Id.*

      1.   Standard of Review

   Usually, a motion to alter or amend a judgment is analyzed
under Rule 59(e).  *MLC Auto., LLC v. Town of Southern Pines*, 532
F.3d 269, 280 (4th Cir. 2008); *In re Burnley*, 988 F.2d 1, 2-3
(4th Cir. 1992).[47]

---

[46] *See Abner*, 513 F.3d at 156-57 (the defendants subjected the
plaintiffs to a hostile work environment by allowing repeated
instances of racially derogatory behavior including allowing
employees to hang a wire shaped into a noose, racist graffiti on
the walls, and racially derogatory comments and threats to the
plaintiffs).

[47] Rule 59(e) applies to partial judgments.  *See, e.g.*, *Indus.
Enters., Inc. v. Penn Am. Ins. Co.*, No. 07-2239-RDB, 2009 WL
3647372 (D. Md. Nov. 3, 2009) *overruled on other grounds*, 637
F.3d 481 (4th Cir. 2011).  Under Rule 59(e), a district court
has the discretion to alter or amend a judgment "only in very
narrow circumstances: (1) to accommodate an intervening change
in controlling law; (2) to account for new evidence not

Under the Lanham Act, which governs this review of the award against Coryn, if "the court shall find that the amount of recovery based on profits is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the court shall find to be just," but the award must "constitute compensation and not a penalty."  15 U.S.C. § 1117(a).

    2.   Disgorgement of Profits

O.C. recognizes that increasing the award amount is a matter of the Court's equitable discretion.  ECF No. 296 Attach. 1 at 2; 15 U.S.C. § 1117(a).  The Court considers the *Synergistic* factors to determine whether the award is excessive or inadequate.  *See Super Duper*, 382 F. App'x at 317 n.8; *Buzz Off*, 606 F. Supp. 2d at 588.  As O.C. is the moving party here, the Court considers the evidence in the light most favorable to Coryn.

        i.   Coryn's Intent

Though willful infringement can be sufficient to justify awarding some compensatory damages in a reverse confusion case, lack of fraud, bad faith, or intent to deceive or trade on the senior user's goodwill undermines the appropriateness of increasing the jury's compensatory damages award.  *Buzz Off*, 606

---

available at trial; or (3) to correct a clear error of law or prevent manifest injustice."  *Hill v. Braxton*, 277 F.3d 701, 708 (4th Cir. 2002) (internal quotation marks omitted).  "Moreover, Rule 59(e) motions may not be used to make arguments that could have been made before the judgment was entered."  *Id.*

F. Supp. 2d at 588 (denying defendant's motion to strike jury's compensatory award and plaintiff's motion to adjust it). Continued use of the mark after learning of the senior user is also insufficient. *Id.*

As in *Buzz Off*, accepting the jury's finding of willful infringement does not mandate enhancing the compensatory award. *Id.* Here, there was no evidence that Coryn intended to trade on O.C.'s goodwill, or that it acted in bad faith or fraudulently. *See supra.* Accordingly, the first factor supports an award of some damages, but does not strongly support increasing the jury's damage calculus.

ii.   Diversion of Sales

As discussed above, in a reverse confusion context, the Court considers diversion of sales and lost market presence under this factor. *See Buzz Off*, 606 F. Supp. 2d at 588.   There was evidence that O.C. lost no sales to Coryn, and continued to earn a substantial profit, despite the SECRETS mark.   Tr. 265:6-8, 278:1-3, 278:9-14.   Accordingly, this factor does not favor increasing the damages.

iii. Adequacy of Other Remedies

An injunction will adequately protect O.C.'s interest in retaining control over its market presence.   This factor weighs against more than nominal damages.

iv.   Unreasonable Delay

The evidence showed that O.C. learned about the SECRETS mark in late 2003 and asserted its rights in January 2004. Cancellation Pet. At A54; Tr. 80:19-21.  Accordingly, O.C. did not unreasonably delay asserting its rights.  *See Mazelmints, Inc.*, 2011 WL 2960873, *5 (finding fourth factor favored damages award because the plaintiff "sought relief immediately after becoming aware" of infringing behavior).

v.   Public Interest

The fifth factor, the public interest in making the infringing misconduct unprofitable, weighs a plaintiff's right to be compensated for infringing activities against the defendant's right not to be assessed a penalty, and the public's interest in encouraging innovation and good faith investment in promoting marks that become more successful than the senior user's mark.  *Buzz Off*, 606 F. Supp. 2d at 589.[48]

Though the public interest would be served by awarding some damages for Coryn's failure to check for similar marks and choose a mark not already in use for similar services, increasing the damages award might hinder innovation.  *See id.* This factor does not support awarding more damages.

---

[48] Because O.C. did not show that it lost any sales or significant market presence from Coryn's conduct, or that Coryn benefited from O.C.'s goodwill, disgorgement of Coryn's profits would be more of a punishment than compensation.  The Lanham Act does not authorize such an award.  15 U.S.C. § 1117(a).

vi.   Palming Off

This was not a case of palming off.  *See* Part II.A.2.viii.

Considering the evidence in the light most favorable to Coryn, the non-moving party, only the intent factor favors a damages award, and only slightly.  Accordingly, a nominal compensatory award is adequate.  No amendment of the judgment or new trial is appropriate.

C.   O.C.'s Motion for Permanent Nationwide Injunction

1.   Coryn's Motion for Leave to File a Surreply

Coryn has moved for leave to file a surreply to O.C.'s brief in support of permanent injunction.  ECF No. 311.  It argues that O.C. raised new legal arguments and "mischaracterizations of the evidence" in its reply brief.  *Id.* at 2.  O.C. counters that its reply brief "responded only to arguments first introduced in Coryn's . . . opposition brief."  ECF No. 312 at 2.

Unless otherwise ordered by the court, a party generally may not file a surreply.  Local Rule 105.2 (a) (D. Md. 2011). Leave to file a suprreply may be granted when the movant otherwise would be unable to contest matters presented for the first time in the opposing party's reply.  *Khoury v. Meserve,* 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd,* 85 F. App'x 960 (4th Cir. 2000).  Because O.C. raised new arguments, such as that an injunction is warranted because Coryn "continues to

44

develop its business under [the SECRETS] mark," ECF No. 301 at 3, Coryn's motion for leave to file a surreply will be granted.

### 2.   Standard of Review

O.C. seeks a permanent injunction "consistent with the jury's . . . finding of infringement." ECF No. 284 Attach. 1 at 2.  Under the Lanham Act, the Court may "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of [15 U.S.C. § 1125(a), (c), or (d)]." 15 U.S.C. § 1116.

To justify granting a permanent injunction, the movant must show that: (1) it has suffered an irreparable injury; (2) monetary damages are inadequate to compensate the injury; (3) the "balance of hardships between the plaintiff and defendant" warrants an equitable remedy; and (4) the public interest would not be disserved by an injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  If the movant makes a sufficient showing, "whether to grant the injunction still remains in the equitable discretion of the court." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007).

### 3.   Irreparable Injury

Injury is measured by damage to the senior user's reputation or goodwill. *See PBM Prods., LLC v. Mead Johnson &*

Co., 639 F.3d 111, 127 (4th Cir. 2011).[49]   A finding of infringement does not create a presumption of irreparable injury, but infringement often threatens irreparable injury to a senior user's goodwill.[50]

Here, O.C. presented some evidence that, by overwhelming the market with the SECRETS brand, Coryn may have usurped some control over O.C.'s goodwill.   Accordingly, the lack of control weighs slightly toward granting an injunction.   *See Buzz Off*, 606 F. Supp. 2d at 599 (finding first factor favored injunction in similar circumstances).

    4.   Adequacy of Money Damages

Monetary damages often do not accurately measure or compensate for damage to a senior user's reputation and goodwill.   *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 939 (4th Cir. 1995).[51]   The likelihood of

---

[49] Applying standard to false advertising claim.   *PBM*, 639 F.3d at 127; *see also Innovative Value Corp. v. Bluestone Fin., LLC*, No. 09-cv-0111-DKC, 2009 WL 3348231, *3 (D. Md. Oct. 15, 2009) (applying to trademark infringement claim).

[50] *See PBM Prods.*, 639 F.3d at 126-27 (noting that irreparable injury is the "most difficult element" in false advertising Lanham Act actions because "too many market variables enter into" the calculation and it is too difficult to "prove that so much of one's sales will be lost or that one's goodwill will be damaged").

[51] Also, when a defendant refuses to participate in litigation, further infringement is a continued threat and monetary damages will likely be inadequate.   *Innovative Value Corp. v. Bluestone Fin., LLC*, No. 09-cv-0111-DKC, 2009 WL 3348231, *3 (D. Md. Oct.

continued infringement renders monetary damages inadequate. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797, 800 (4th Cir. 2001) (trademark infringement is a continuing tort; injunction may be warranted if there is a reasonable expectation that infringement will continue); *Innovative Value Corp. v. Bluestone Fin., LLC*, No. 09-cv-0111-DKC, 2009 WL 3348231, *3 (D. Md. Oct. 15, 2009); 15 U.S.C. § 1116 (court may issue injunction to prevent further infringement). Further monetary damages cannot remedy future infringement, making an injunction more likely appropriate. *Buzz Off*, 606 F. Supp. 2d at 599.

O.C.'s lost control over the reputation of its mark and market presence suggest that it has suffered an injury that is not easily quantifiable. *See Lone Star*, 43 F.3d at 939. It has also shown a likelihood of future infringement, as Coryn has continued to develop its mark and advertise within the United States after the partial judgment of infringement. ECF No. 301 Attach. 1. Accordingly, this factor favors an injunction.

5. Balance of Hardships and Public Interest

The third and fourth factors consider the users' investment of time and resources into the marks, and the junior user's intent. *Buzz Off*, 606 F. Supp. at 599-600.

---

15, 2009). That is not the case here, as Coryn has actively participated in the action.

In a reverse confusion case, the Court considers whether the junior user invested "significant time and resources establishing its business, [without] engaging in fraud or other aggravated conduct." *Id.* at 599.  Injunctive relief should not have "an anti-competitive effect by unnecessarily impairing [the junior user's] business." *Id.* at 600.

As in *Buzz Off*, the junior user here, Coryn, invested significant resources establishing SECRETS Resorts, without engaging in fraud.[52]  Unlike the junior users in *Buzz Off*, however, Coryn has not voluntarily begun to change the SECRETS name, and it contends that making such a change would cost "millions of dollars."  ECF No. 306 Attach. 1 ¶5.  Further, enjoining Coryn "from advertising or promoting the SECRETS mark in the United States" might expose Coryn to termination of its contracts with SECRETS Resort owners.  *Id.* ¶6.  Accordingly, to the extent possible, an injunction "tailored to address the circumstances of this case" would serve the public interest in avoiding unnecessary anti-competitive burdens on innovative, good faith investment in marks without further harming O.C.  *See Buzz Off*, 606 F. Supp. 2d at 600.

---

[52] ECF No. 306 Attach. 1 (Zozaya Decl.) (stating that Coryn has spent "over $45 million" in advertising and marking SECRETS Resorts since 2002, and changing the name of the resorts would cost "millions of dollars").

Coryn notes that before the jury's verdict, it negotiated its rates with tour operators and travel agents, and paid for advertisements using the SECRETS mark, through the end of 2012. ECF No. 306 Attach. 1 ¶¶7-16.  Cancellation of those ads and contracts would be costly, anti-competitive, and in some cases impossible because the ads appear with many other sellers, and some advertisers might be unwilling to recall or reprint the materials.  *Id.* ¶18.  Thus, prohibiting advertising with the mark before 2013 would create an unnecessarily large burden on Coryn.  *See Buzz Off*, 606 F. Supp. 2d at 600.

Weighing the circumstances of the case and the large burden that Coryn would suffer if it were enjoined from using the SECRETS mark in the United States before the end of 2012 against O.C.'s right to a permanent injunction and interest in avoiding future harm, the Court will enjoin Coryn and its agents from:

- Entering or renewing any agreements to use the SECRETS mark in the United States;[53]

- Using or causing to be used the SECRETS mark in Commerce in the United States and its Territory after December 31, 2012, as a service mark or trade mark, by itself or with the words resort, hotel, spa, restaurant, or bar, in

---

[53] Limiting the geographic scope of the injunction is inappropriate here because O.C.'s registration gives it nationwide rights.  15 U.S.C. § 1115(a).

connection with resorts, hotels, spas, restaurants, or bars, or other services or goods within the hospitality field in a manner that is likely to cause confusion or mistake with respect to the SEACRETS mark;[54]

* Registering, hosting, or maintaining any website with a domain name that includes the term SECRETS, by itself or with the words resort, hotel, spa, restaurant, or bar, in connection with resorts, hotels, spas, restaurants, or bars, or other services or goods within the hospitality field in a manner that is likely to cause confusion or mistake with respect to the SEACRETS mark after December 31, 2012;[55]

O.C. also seeks the recall and destruction of infringing material. ECF No. 301 at 17. The Court finds that recall and

---

[54] This gives Coryn nine months for transition. Given the generous period, an extension will likely not be granted.

The extended transition period likely will not harm O.C. unnecessarily, as it has continued to grow for the past ten years, despite Coryn's use of the SECRETS mark; another nine months will likely not cause excessive harm.

[55] O.C. asks that Coryn be enjoined from using SECRETS in a domain name, anywhere in the world, if consumers in the United States will be able to access the website. ECF No. 301 at 17, 20. The injunction will bar Coryn from hosting, maintaining, or registering a domain name whose predominant mark is SECRETS in the United States, but O.C. has identified--and the Court has found--no authority for enjoining third parties, such as hotel owners, from registering or hosting a domain name outside the United States based on an infringement claim (rather than an anticybersquatting claim under 15 U.S.C. § 1125(d)). Accordingly, the Court will limit the injunction to the United States.

destruction of material with the SECRETS mark is unnecessary and wasteful in this case, as Coryn will not be barred from advertising outside the United States and may be able to use the materials internationally.

D.   O.C.'s Motion for Attorney's Fees

The Lanham Act mandates taxing costs for a prevailing senior user and permits awarding attorney's fees "in exceptional cases."  15 U.S.C. 1117(a).  A case is exceptional

> if the defendant's conduct was malicious, fraudulent, willful or deliberate in nature.  In other words, a prevailing plaintiff must show that the defendant acted in bad faith.

*People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001) (internal quotation marks and citations omitted).

A court may find that, despite acting willfully or in bad faith, attorney's fees are not appropriate.  *See id.*; *Buzz Off*, 606 F. Supp. 2d at 591 ("although the jury found that the infringement . . . was willful, the Court has nevertheless concluded that [it] should not be characterized as malicious, fraudulent, or in bad faith").

The Court finds that this case is not "exceptional." Although the jury found that Coryn infringed the SEACRETS mark willfully, it

> originally selected its mark without any intent to trade on [O.C.'s] goodwill, and without intent to

51

> commit fraud on the public. In addition, [Coryn] had
> multiple bases for challenging the . . . scope and
> enforceability of [O.C.'s] mark.

*Buzz Off*, 606 F. Supp. 2d at 591. Coryn's continued use of the

mark after O.C. filed its cancellation petition also does not

support awarding attorney's fees. *Id.*

O.C.'s motion for attorney's fees will be denied.

III. Conclusion

For the reasons stated above, Coryn's motion for leave to

file a surreply will be granted. Coryn's motion for judgment as

a matter of law or for a new trial will be granted in part and

denied in part. O.C.'s motion to amend the judgment or for a

partial new trial will be denied, and its motion for a permanent

injunction will be granted as modified.

_____
Date    4/11/12

_____
William D. Quarles, Jr.
United States District Judge